**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| DION PLUMP,<br><br>Plaintiff,<br><br>v.<br><br>GOVERNMENT EMPLOYEES INSURANCE COMPANY d/b/a GEICO,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 22-2498-EFM-ADM |

**PRETRIAL ORDER**

On October 3 and 17, 2023, U.S. Magistrate Judge Angel D. Mitchell conducted a pretrial conference in this case, by phone. Plaintiff Dion Plump ("Plump") appeared through counsel Mary Katherine Paulus. Defendant GEICO appeared through counsel Jenna Brofsky, Julianne Story, and Courtney Steelman.

This pretrial order supersedes all pleadings and controls the subsequent course of this case. It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice. *See* Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(a).

**1. PRELIMINARY MATTERS.**

**a. Subject-Matter Jurisdiction.** Subject-matter jurisdiction is invoked under 28 U.S.C. § 1331 and is not disputed.

**b. Personal Jurisdiction.** The court's personal jurisdiction over the parties is not disputed.

**c. Venue.** Venue in this court is not disputed.

**d. Governing Law.** Subject to the court's determination of the law that applies, the parties believe and agree that the following laws govern the substantive issues in this case:

i. Plump's Family Medical Leave Act ("FMLA") interference and discrimination claims (Counts I and II) are governed by 29 U.S.C. § 2615(a)(1).

ii. Plump's Americans with Disability Act, Amendments Act of 2008 ("ADAAA") retaliation claim (Count V) is governed by 42 U.S.C. § 12101.

iii. Plump's race discrimination claims (Counts VI and Count VIII) are governed by 42 U.S.C. § 2000e ("Title VII") and 42 U.S.C. § 1981.

**2. STIPULATIONS.**

**a.** The following facts are stipulated:

i. Plump is a Black male.

ii. Beginning June 8, 2020, GEICO employed Plump at its facility in Lenexa, Kansas as a MOAT[1] Sales Representative II. For that position, he sold insurance to customers by telephone and, as such, was required to obtain and maintain licenses issued by various states' insurance departments.

iii. New York is the second most frequent state MOAT Sales receives calls from, so GEICO considers it a required state license for the MOAT Sales Department.

iv. Plump was told that having a New York insurance license was important to his role, but he did not obtain a New York insurance license while he was employed by GEICO.

v. On February 5, 2021, the New York Department of Financial Services ("NYDFS") sent Plump a letter stating that his application was referred to their office, and that the NYDFS determined that he had been involved in a fine, denial, refusal, suspension, or revocation of license. The NYDFS requested that he submit specific information and documentation regarding that issue within 15 days.

vi. Plump was involved in a fine, denial, refusal, suspension, or revocation of his license from North Dakota that he did not report to New York.

vii. On July 21, 2021, the NYDFS sent Plump a letter stating that it did not receive a response to its February 5 letter and that Plump's application would be denied unless the NYDFS received the requested information by August 6, 2021.

viii. Plump did not respond to the NYDFS's February 5 or July 21 letters.

ix. On August 9, 2021, NYDFS sent Plump a letter stating his application was denied based on the examiner's recommendation; he demonstrated

[1] While "MOAT" is technically an acronym for a particular team at GEICO, the team is only referred to as "MOAT" and not spelled out further.

untrustworthiness within the meaning and intent of the New York insurance law; and he could appeal the decision by requesting a hearing via email.

x. After the time for Plump to appeal the denial had passed, he was prohibited from reapplying for a New York license for one year from the date of the denial.

xi. Around the end of October 2021, Plump began reporting to supervisor Allison Selg, who is White/Caucasian.

xii. In November 2021, members of GEICO management met with Plump to tell him that he was not eligible to remain in his sales position because he did not have a New York license and to explore the possibility of transferring him to a role in the Service Department, which would not require the New York license.

xiii. Plump also asked about transferring to a role in Buffalo, New York.

xiv. On November 17, 2021, at the request of Brian Blowe and the Service Department, Selg sent an email providing them with information and reporting about Plump's performance and attendance.

xv. Plump interviewed for a Service role, but ultimately was not approved to transfer to a position in that department.

xvi. On December 10, 2021, Plump emailed Human Resources ("HR") to raise concerns about the handling of his New York license, his interview with the Service Department, his phone line receiving calls for flood insurance, and his working relationship with his supervisor. Later that day, HR invited Plump to a meeting to discuss his concerns. When Plump raised these concerns with HR, he did not refer to his race or make any reference to race discrimination.

xvii. HR investigated Plump's concerns, summarized the conclusions reached as a result of that investigation, and followed up with Plump regarding the findings of its investigation.

xviii. On December 15, 2021, Plump contacted GEICO's HR Department to ask about FMLA leave.

xix. GEICO gave Plump the paperwork to complete for FMLA leave and directed him how to return the completed forms.

xx. It was Plump's (or Plump's doctor's) responsibility to maintain and return the required leave documentation.

xxi. On December 16, 2021, Plump sent an internal message to his supervisor stating that he was going to check into a hospital, but he did not check into a hospital on that date.

xxii. At the time, a third-party company called The Hartford handled GEICO's FMLA and short-term disability ("STD") requests.

xxiii. At the end of 2021, GEICO began to transition away from using The Hartford as its third-party provider.

xxiv. On December 29, 2021, GEICO emailed Plump to inform him that effective January 1, 2022, The Hartford would no longer be administering FMLA and ADA accommodation requests for the company's employees.

xxv. As of January 1, 2022, The Hartford was still handling GEICO's pending STD requests whereas GEICO handled the intermittent FMLA requests.

xxvi. On January 7, 2022, GEICO Leave Specialist Megen Snyder emailed Plump to inform him he was eligible for FMLA leave and to provide him with his Eligibility and Notice of Rights and a certification form for his healthcare provider to complete and return by January 22, 2022. On January 21, 2022, Snyder emailed Plump to inform him that he had been approved for FMLA intermittent leave for the period of December 17, 2021, through September 21, 2022.

xxvii. On January 21, 2022, GEICO approved Plump for FMLA intermittent leave retroactively from December 17, 2021, to September 21, 2022. Plump's approved FMLA leave was limited to one-day episodes up to two times a month, with two doctor appointments a year.

xxviii. On February 3, 2022, MOAT Sales Manager Meghan Beaver requested approval from GEICO's HR personnel to terminate Plump's employment due to Plump not having his New York license.

xxix. On February 4, 2022, Plump told his supervisor he was "getting checked back into the hospital," but he did not check back into a hospital on that date.

xxx. On February 9, 2022, Plump asked his friend Maureen Griffin, who was listed as his emergency contact at GEICO, to let GEICO know that he was "in the hospital for an extended period of time," but Plump was not in the hospital on that date.

xxxi. Despite Plump's statements to the contrary, he was never admitted to a hospital at any time between December 16, 2021, and February 9, 2022.

xxxii. On February 10, 2022, GEICO sent Plump a letter informing him that his employment was terminated effective February 9, 2022.

**b.** The parties have stipulated to the admissibility of the following exhibits for purposes of summary judgment:

i. MOAT Sales Representative II Job Description (GEICO 000399)

ii. Plump's Workday Profile (GEICO 000312 – 000333)

iii. NYDFS Letter Dated February 5, 2021 (GEICO 000568)

iv. NYDFS Letter Dated July 21, 2021 (GEICO 000570)

v. NYDFS Letter Dated August 9, 2021 (GEICO 000352)

vi. Termination Letter Dated February 10, 2022 (GEICO 000229)

vii. "Overview of Dion Plump's Concerns" (GEICO 000418-000419)

viii. HR interview notes and related emails (GEICO 000235 –000238, GEICO 000241 – 000244, GEICO 000338 – 000341, GEICO 000360, GEICO 000371 – 000378, GEICO 000475 – 000477, GEICO 000519 – 000520, GEICO 000581 – 000603, GEICO 001082 – 001097, GEICO 001538 – 001542)

ix. Internal emails regarding Plump's FMLA/STD and "hospital stays" (GEICO 000001 – 000004, GEICO 000006, GEICO 000276 – 000288, GEICO 000311, GEICO 000361 – 000362, GEICO 000427, GEICO 001526, PLUMP 000012 – 000033, PLUMP 000285 – 000287, PLUMP 000012 – 000021, PLUMP 000050 – 000055, PLUMP 000069 – 000087, PLUMP 000098 – 000100)

x. Documents regarding Plump's Termination (GEICO 000260 – 000262, GEICO 000353, GEICO 000355, GEICO 000435 – 000436, GEICO 000523 – 000528, GEICO 000539 – 000540)

xi. GEICO 2022 Associate 1 Handbook's Corrective Action Policy (GEICO 000054 – 00057), Attendance and Leave Policies (GEICO 000066 – 000110)

xii. GEICO 2022 Associate 2 Handbook's Fair and Safe Workplace Policy (GEICO 000138 – 000145), Code of Conduct (GEICO 000148 – 000149), Be Honest (GEICO 000149 – 000150), Open Door Policy (GEICO 000153 – 000154), Obey All Codes and Policies and Adhere to Standards of Professional Conduct (GEICO 000159 – 000161), Reporting Problems, Consequences, Code of Conduct – Questions and Answers (GEICO 000162 – 000163), Workplace Safety (GEICO 000185 – 000186), Attendance and Requesting Time Off (GEICO 000188), Job Abandonment (GEICO 000189), At-Will Employment Agreement (GEICO 000192)

**c.** The parties will stipulate to the admissibility of additional exhibits for trial 5 days before trial.

**3. FACTUAL CONTENTIONS.**

**a. Plaintiff Plump's Factual Contentions.**

When GEICO hired Plump as a MOAT Sales Representative, GEICO told him that he would need to obtain and maintain licenses to sell insurance in certain states, but GEICO never told him he was required to obtain a New York license. As of December 2020, Plump was licensed to sell insurance in 28 states, but he had not yet received licenses for certain states, including New York.

When the NYDFS sent Plump a letter in February 2021 requesting additional information and documentation about the denial or suspension of his license in North Dakota, Plump's department was supported by GEICO's licensing team in Dallas. Plump believed the licensing team was handling the submission of any required documentation for his licensure. When previous licensing issues had come up, Plump's supervisor had directed him to let the licensing team handle it and keep his focus on taking customer calls. In August 2021, when NYDFS denied Plump's license to sell insurance in New York, a copy of the denial letter was sent both to Plump and to GEICO's licensing team in Dallas. Although the Dallas licensing team received the copy of Plump's denial letter, they failed to upload it to Plump's file. The denial letter from the NYDFS stated Plump could request a hearing to appeal the denial if the NYDFS received such a request within 15 days of the date of that letter. At the time, Plump asked his supervisor what he should do in response to the letter, and she told him he should contact the NYDFS. Plump sent an email to the NYDFS, but they informed Plump that he could no longer appeal because his request for a hearing was not received within 15 days of the date of the denial letter, and he would not be eligible to reapply for his state license until August of 2022.

At some point in 2021, GEICO determined that there were opportunities for improvement in communication between the Dallas licensing team and members of management in the Kansas City MOAT Sales department,[2] and that the Dallas team had not been properly following up with leadership and all necessary parties regarding license applications and issues. In approximately August of 2021, GEICO created a Kansas City MOAT Licensing Unit. In September of 2021, this new, local Licensing Unit took over for the Dallas licensing team in supporting licensing for MOAT Sales Representatives at the Lenexa location. After the Kansas City MOAT Licensing Unit began working on licensing issues, Plump's supervisor told them in late October of 2021 that Plump did not have a New York license. A Licensing Technician in the new Kansas City MOAT Licensing Unit researched the denial of Plump's New York state license and requested an extension of time from the NYDFS to appeal the denial. The NYDFS informed the Licensing Tech that Plump was unable to appeal the denial but that he could reapply for a license within one year of the date of the denial.

After Plump began reporting to Selg, although his overall performance rating year to date was a 3.6 (which GEICO defined as "Good" –*i.e.*, consistently meeting and occasionally exceeding the goals for his position), Plump found that most of his communications and interactions with her were negative, rather than positive. Plump began to believe Selg was treating him less favorably and subjecting him to more scrutiny and criticism than his non-minority peers. In late November, Selg conducted audits of Plump's calls because she believed he was demonstrating productivity issues. Selg also prepared a written corrective action dated December 2, 2021, for Plump's purported call-avoidance issues, but she never delivered it to him.

[2] Defendant used the "Kansas City MOAT Sales department" synonymously with the Lenexa, Kansas facility.

On December 10, 2021, Plump reached out to HR to express concerns about his New York licensing issues, his interview for a service position, his call gating, and his working relationship with Selg. Plump also expressed that he felt he was being systemically phased out of his employment with GEICO, which did not make sense to him considering his consistent "proficient"-level performance ratings, the number of complimentary calls he received, and his consistent high ranking in sales of Personal Articles Floater ("PAF") policies, which was one of the cross-sales metrics on which he was measured. Meaghan Urban, a GEICO HR Compliance Specialist, interviewed Plump and other witnesses during her investigation into his concerns.

On December 16, 2021, the day after Plump requested information about applying for FMLA and STD benefits, Plump told Selg that he was going to admit himself to a hospital, would be out sick, and was in the process of filing for FMLA. Around this time, while Plump was visiting family in the Buffalo, New York area, he consulted with a local physician about his concerns of stress, depression, and anxiety. That physician referred Plump to a therapist for further treatment. Plump sought treatment from a therapist for these issues, and his physician also submitted a certification in support of his application for FMLA leave. Although Plump considered seeking inpatient care, his therapist told him it would be difficult to find a facility with an open bed and Plump also did not want to be away from his daughter for an extended period of time.

On January 24, 2022, Plump asked Snyder about his pending STD application with The Hartford, and also asked her for clarification as to whether his approved leave was for continuous or intermittent leave. Plump later asked Snyder when he was expected to return to work, but she responded that his return-to-work date would depend on The Hartford's decision regarding his request for STD. On that same date, Beaver reached out to HR to note that Plump now had access to his email account and phone, and to ask whether anything further was needed to move forward

with issuing Plump a call-avoidance warning or terminating his employment because of his licensing issue.

After Plump returned to work, and after a coaching session Selg had with Plump, Plump sent Selg a chat message on January 29, 2022, stating that the two had yet to have a truly positive interaction, that he was frustrated with her reprimands of him, and that part of the reason he had to take leave is because of the stress and anxiety he experienced under her leadership. On February 2, Beaver told Plump that his management team was reviewing his employment due to his failure to obtain a New York license and asked him to submit a written statement within six hours with any information he wanted them to consider. That same day, Urban met with Plump by phone to inform him of the results of her investigation into his concerns. In the written statement Plump provided to Beaver, he noted his proficient performance ratings and other achievements, explained that he had not been diligent in submitting requested paperwork to the NYFDS because his prior supervisor directed him to let the licensing department handle the matter (and he believed they would do so), and he explained the stress and anxiety he had been under during the past 45 days—including the leave of absence he had taken for same.

**b. Defendant GEICO's Factual Contentions.**

GEICO has clear and well-disseminated policies against discrimination, harassment, and retaliation, and a reasonable and available procedure for handling complaints, which provides for prompt and effective responsive action. At all times relevant to this matter, Plump was aware of these policies and GEICO's procedures. Plump had access to GEICO Handbooks and requested a copy be sent to him. The anti-discrimination policies are listed in the Handbook. Plump, as exhibited by his actions, knew how to contact GEICO's HR Department. However, he never made a complaint of discrimination based on race or his alleged disability.

GEICO required Plump to be licensed in New York based on the call volume from New York customers and because of business needs. Ultimately, Plump was responsible for obtaining and maintaining his state licenses. This is demonstrated by Plump applying for a New York license in June 2020, shortly after he gained employment at GEICO. However, he did not submit the required documentation to NYDFS in support of a license application, despite NYDFS's multiple follow-up letters. After NYDFS denied his application, Plump failed to timely appeal the denial. Because Plump was unable to provide the required services to customers seeking New York coverage, he transferred those customer calls to other GEICO employees. Plump's call-transfer rate quickly rose, and he did not meet GEICO's required metrics. In addition to the New York transfers, Plump was transferring other calls and telling customers he was not licensed in other states—when he was in fact licensed in those states. Because of Plump's performance issues and high call-transfer rates, GEICO audited Plump's calls (along with other individuals with high call-transfer rates). In November 2021, when GEICO approached Plump to discuss the status of his New York license, he did not take accountability for failing to submit the necessary documentation or appeal. GEICO nevertheless tried to work with him and allowed him to interview for a position in the Service Department. The issue with Plump's New York license was shared with him before December 2021 and before his request for FMLA, STD, or notice regarding any health condition.

On December 15, 2021, Plump had a new patient appointment with a doctor in Buffalo, New York. During this appointment, he said that he was currently staying in Buffalo but worked in Kansas City. Plump also indicated that he was hoping he would be able to take a break from work to focus on himself and his mental health. He also mentioned that he worked from home, so he was able to be in Buffalo long-term.

On the same day, Plump met with Urban to follow up on his December 10, 2021 email. Not once did Plump complain about race discrimination. At the time GEICO terminated Plump's employment, he reported to Selg. Selg's team had five other employees, two of which were also African American and/or Black (so three out of five employees reporting to Selg). Over the following weeks, HR investigated Plump's purported concerns. The investigation included witness interviews with various members of GEICO's licensing and supervision teams, and other of Plump's peers. In the end, the investigation showed that Plump was being held to the same standard as all MOAT Sales Representatives. Between December 2021 and February 2022, GEICO's HR Department tried to meet with Plump multiple times to discuss the outcome of the investigation. However, because of the holidays, Plump's absence from work, and Plump rescheduling the meetings, it was January 28, 2022, when GEICO HR followed up with Plump to discuss the concerns he raised the prior month. After three attempts to connect, HR met with Plump on February 2, 2022.

On December 16, 2021, Plump sent an internal message to his supervisor stating that he was going to admit himself to the hospital that same day and that he would file for FMLA. Plump never admitted himself to a hospital nor did he tell GEICO that he never admitted himself to a hospital.

Plump worked with The Hartford to process his STD claim and with GEICO to process his FMLA claim. Initially, neither were approved because, despite multiple requests asking Plump for the required documentation, Plump did not submit or provide the documentation required to fully process his requests. Snyder from GEICO's Leave Team continuously urged Plump to complete the required paperwork so that his leave would be protected.

On January 21, 2022, Snyder again reminded Plump that he needed to submit the required FMLA documentation. That same day, Plump attended a telemedicine appointment with a doctor in Buffalo, New York. The next day, GEICO approved Plump for intermittent FMLA leave, applied retroactively back to December 17, 2021. Snyder continued to encourage Plump to get his paperwork to The Hartford so they could determine his STD request.

During the February 2 HR meeting, Urban went over Plump's New York licensing timeline, reviewed information regarding a transfer to the Service Department, and reviewed Plump's concerns with the support he was receiving as it related to flood calls. Urban also explained that she provided feedback to his team to help establish an effective coaching plan to make sure Plump received the support he requested. During that meeting, Plump asked again how FMLA worked. Urban told Plump to reach out to the Leave Team. Plump stated he did not have any additional questions.

Later that day, continuing the issues related to Plump's New York license, Plump's supervisory chain requested permission to move forward with terminating his employment for failing to obtain his New York license, which resulted in continual call-avoidance issues. Before GEICO decided to terminate Plump's employment, it reviewed his FMLA and STD status, and discovered that his continuous FMLA and STD claims were denied on January 12, 2022, for failure to provide proper documentation. However, GEICO had approved intermittent FMLA for episodic flare ups (two times a month for one day each). After consulting with management and given that Plump's intermittent FMLA was not related to his prior failure to obtain his required New York license, Plump's managers moved forward with separating Plump's employment.

On February 9, GEICO tried to contact Plump about his employment termination as he had not reported to work. Plump's emergency contact, Maureen Griffin, responded: "I am a friend of

Dion Plump. He is currently receiving treatment at a mental health facility and is unavailable to talk." Griffin sent this email because Plump asked her to "do [her] thing and let [GEICO] know [Plump was] in the hospital for an extended period of time per [his] FML." Plump did not have continuous FMLA. Further, Plump was not in the hospital, nor did he tell GEICO that he was not in the hospital.

Plump has not suffered any damages and/or has not been damaged to the extent alleged because he was already contemplating moving to Buffalo, New York, and he was employed by a company there within two weeks after GEICO terminated his employment. Specifically, on February 11, the day after Plump received GEICO's termination memo, he confirmed an interview time for later that same week with an employer in Buffalo, and he was offered employment for that position on February 27. Additionally, at or near the same time, Plump was facing his second eviction from his property in Missouri.

Plump's damages were caused by him and/or third parties, including his emergency contact, Maureen Griffin, over whom GEICO had no control and were not caused by GEICO. Further, both Plump and Griffin lied to GEICO about the status of Plump's condition when they stated, on multiple occasions, that Plump was in the hospital when that simply was not true. Also, Plump did not show up for work for over 40 days. His damages were further caused by his own failure to respond to NYDFS.

**4. LEGAL CLAIMS AND DEFENSES.**

**a. Plaintiff Plump's Claims.**[3]

Plump asserts that he is entitled to recover upon the following theory(ies):

[3] Plump is abandoning his claims for disability discrimination and failure to accommodate under the ADAAA, 42 U.S.C. § 12101 (Counts III and IV); retaliation under 42 U.S.C. § 2000e (Count VII); and retaliation under 42 U.S.C. § 1981 (Count IX).

i. Interference with entitlement to FMLA benefits (Count I) – GEICO violated the FMLA by discouraging Plump from using FMLA leave and terminating his employment, which interfered with his right to take the FMLA leave to which he was entitled.

ii. FMLA Discrimination (Count II) – GEICO discriminated against Plump in violation of the FMLA by terminating his employment after he engaged in activities protected under the FMLA, including notifying GEICO of his need to take leave for a qualified medical reason and applying for, and then utilizing FMLA leave.

iii. Retaliation in Violation of the ADAAA (Count V) – GEICO retaliated against Plump by terminating his employment after he engaged in the protected activity of requesting a reasonable accommodation of a medical leave of absence for his depression and anxiety.

iv. Race Discrimination in Violation of Title VII (Count VI) and/or § 1981 (Count VIII) – GEICO discriminated against Plump because of his race by terminating his employment under circumstances which give rise to an inference of racial discrimination.

**b. Defendant GEICO's Defenses.**

GEICO asserts the following defenses:

**GENERAL DEFENSES (Applicable to all Counts):**

i. Plump claims are barred to the extent that he unreasonably failed to take advantage of preventive or corrective opportunities provided by GEICO, or to avoid harm otherwise.

ii. Plump's claims are barred to the extent that he relies on conduct of non-supervisory employees that GEICO was not aware of and should not have been aware of—specifically, members of GEICO's licensing team, leave team, and Plump's peers.

iii. GEICO is entitled to a set-off or credit to the extent that Plump failed to mitigate his claimed damages by not obtaining and maintaining a New York license, and by voluntarily leaving his subsequent employment.

iv. GEICO's actions were based on legitimate reasons and carried out in the good faith exercise of reasonable business judgment; were not based on Plump's race or any alleged disability, and/or his alleged protected activity; and were carried out, or would have been carried out, regardless of any protected status and/or activity.

v. Punitive damages would be unconstitutional because the standard is vague and arbitrary and the procedure for assessment violates GEICO's right to due

process of law, equal protection, the right to be free from unlawful takings, the right to be free from excessive fines and all other substantial and procedural protections of the Constitution applicable to punitive damages.

vi. Plump is not entitled to punitive damages because neither GEICO, nor any of its employees sufficiently high in its corporate hierarchy, acted with malice or reckless indifference to Plump's rights or approved, authorized, ratified, or had actual knowledge of any such acts.

vii. Plump's alleged injuries were not proximately caused by GEICO in that any individual's actions towards him were not foreseeable because GEICO did not know, and had no reason to know, that any individuals posed a risk of discrimination, harassment, retaliation, or any other misconduct.

viii. GEICO is not vicariously liable for the conduct of any third-parties, such as Griffin or Plump's physician.

ix. Plump's damages are barred or reduced by the after-acquired evidence doctrine because Plump told GEICO false information about his alleged medical condition and whereabouts, which GEICO did not know about until after Plump's employment ended.

**SPECIFIC DEFENSES (Applicable to Specific Counts):**

x. As to Counts I and II, Plump cannot establish a prima facie case of FMLA discrimination such as (1) by showing that any protected status and/or activity was a motivating factor for any adverse employment decision by GEICO, and (2) because GEICO did not deny Plump FMLA benefits. Further, there was no connection between Plump's FMLA application or use and any adverse employment decision. The individual who made the decision to terminate his employment was not his supervisor and GEICO had legitimate, non-discriminatory reasons to terminate his employment.

xi. As to Count V, Plump has no standing or right to relief because he did not have a disability (or GEICO did not have notice of any alleged disability) within the meaning of 42 U.S.C. § 12102(2), nor did GEICO perceive him as having a disability in November of 2021 when Plump learned that GEICO was evaluating his employment status due to his lack of a New York license.

xii. As to Count V, Plump is barred from seeking compensatory and punitive damages because GEICO made good-faith efforts, in consultation with Plump, to identify and make a reasonable accommodation that would provide him with an equally effective opportunity.

xiii. As to Count V, to the extent GEICO denied Plump's request for accommodation (which GEICO denies), such accommodation was unreasonable and/or would have imposed an undue hardship on GEICO's operations and because Plump never made a request for an accommodation.

xiv. As to Count V, Plump cannot establish a prima facie case of ADAAA retaliation based on any protected status and/or activity, such as by showing that any protected status and/or activity was a but-for cause for any adverse employment decision by GEICO because there is no causal connection between Plump's alleged disability and/or request for accommodation and any alleged adverse employment action; being a member of a protected class, alone, is not sufficient to prove retaliation; GEICO's reason for terminating Plump's employment was not pretextual; and he did not request an accommodation.

xv. As to Count VI, Plump cannot establish a prima facie case of race discrimination, such as by showing his race was a motivating factor in any adverse employment decision by GEICO because there is no causal connection between Plump's race and any alleged adverse employment action; being a member of a protected class, alone, is not sufficient to prove discrimination; and GEICO's reason for terminating his employment was not pretextual.

xvi. As to Count VI, Plump cannot recover emotional distress damages because he has no proof that any such damages were caused by GEICO. *See* 42 U.S.C. § 1981(a).

xvii. As to Count VIII, Plump cannot establish a prima facie case of discrimination under § 1981 based on any protected status and/or activity, such as by showing his protected status and/or activity was a but-for cause of any adverse employment decision by GEICO because there is no causal connection between Plump's race and any alleged adverse employment action; being a member of a protected class, alone, is not sufficient to prove discrimination; GEICO's reason for terminating his employment was not pretextual; and that GEICO interfered with any contractual relationship.

xviii. As to Count VIII, Plump has not identified any actions taken regarding a valid employment contract (or contractual rights) with GEICO.

**5. DAMAGES AND NON-MONETARY RELIEF REQUESTED.**

Plaintiff Plump seeks the following:

**a.** <u>FMLA interference and/or discrimination (Counts I & II):</u>

i. Lost wages at the rate of approximately $926.80 per week and the value of his lost employment benefits of approximately $123.55 per week for the time period between Plump's termination on February 9, 2022, through the last date of trial;

ii. interest on the amount of lost wages and employment benefits calculated at the prevailing rates;

iii. liquidated damages equal to the amount of lost wages. employment benefits, and interest; and

iv. Plump's reasonable attorneys' fees at the rate of $600 per hour for M. Katherine Paulus, and $300 per hour for former counsel Lauren Beck, as well as his recoverable litigation costs. To date, Plump has incurred approximately $53,000.00 in attorneys' fees and litigation costs. *See* 29 U.S.C. § 2617(a)(3).

**b.** ADA retaliation (Count V):

i. #ack pay at the rate of approximately $926.80 per week and the value of his lost employment benefits of approximately $123.55 per week for the time period between Plump's termination on February 9, 2022, through the last date of trial;

ii. front pay for 10 years, or approximately $481,936, which is calculated as 10 times $48,193.60—*i.e.*, Plaintiff's last annualized rate of pay from GEICO; and

iii. an award of Plump's reasonable attorneys' fees consistent with the rates specified in Section 5(a)(iv) above. *See* 42 U.S.C. § 12205.

**c.** Title VII and/or 42 U.S.C. § 1981 race discrimination (Counts VI & VIII):

i. Back pay at the rate of approximately $926.80 per week and the value of his lost employment benefits of approximately $123.55 per week for the time period between Plump's termination on February 9, 2022, through the last date of trial;

ii. front pay for 10 years, or approximately $481,936.00, which is calculated as 10 times $48,193.60—*i.e.*, Plaintiff's last annualized rate of pay from GEICO;

iii. compensatory damages for garden variety emotional distress in an amount to be determined by the jury;

iv. punitive damages in an amount to be determined by the jury; and

v. an award of Plump's reasonable attorneys' fees and litigation costs consistent with the rates specified in Section 5(a)(iv) above. *See* 42 U.S.C. § 2000e-5(k).

GEICO disputes that Plump's calculations as to back pay and lost benefits are correct and that 10 years is reasonable for front pay. Plump's hourly rate at the time GEICO terminated his employment was $22.78; his total salary and allowances was $45,901.70 per year. If GEICO prevails, it will seek reasonable attorneys' fees, at the rate of $475 for Ms. Brofsky and $350 for Ms. Steelman, and costs under applicable statutes. 42 U.S.C. § 2000e-5 (Title VII); 42 U.S.C. § 12205 (ADA); 42 U.S.C. § 1988 (§ 1981).

**6. AMENDMENTS TO PLEADINGS.**

None.

**7. DISCOVERY.**

Under the scheduling order and any amendments, all discovery was to have been completed by **September 8, 2023**. Discovery is complete.

Unopposed discovery may continue after the deadline to complete discovery so long as it does not delay briefing or ruling on dispositive motions or other pretrial preparations. Although discovery may be conducted beyond the deadline to complete discovery if all parties agree to do so, under these circumstances the court will not be available to resolve any disputes that arise during the course of such extended discovery.

**8. MOTIONS.**

**a. Pending Motions.**

None.

**b. Additional Pretrial Motions.**

After the pretrial conference, the parties intend to file the following motions:

i. Plump expects to file motions *in limine*.

ii. GEICO anticipates filing a motion for summary judgment and motions *in limine* along with other proper pretrial motions if the case survives summary judgment.

The dispositive-motion deadline, as established in the scheduling order and any amendments, is **November 10, 2023**. The parties must follow the summary-judgment guidelines on the court's website:

*http://ksd.uscourts.gov/wp-content/uploads/2015/10/Summary-Judgment-Guidelines.pdf*

Principal briefs in support of, or in response to, summary judgment motions must not exceed 40 pages and replies must not exceed 15 pages. *See* D. KAN. RULE 7.1(d)(2). Any motion

to exceed these page limits or for an extension of briefing deadlines must be filed at least three days before the brief's filing deadline. *See* D. KAN. RULE 6.1(a), 7.1(d)(4).

**c. Motions Regarding Expert Testimony.** Not applicable, i.e., the parties have stipulated that no expert testimony will be used in this case.

**9. TRIAL.**

This case is set for trial on **August 20, 2024, at 9:00 a.m.** in **Kansas City, Kansas**. This case will be tried by jury. Trial is expected to take approximately 5 days. The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial. If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge may enter an order or convene another pretrial conference to set deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials..

**10. ALTERNATIVE DISPUTE RESOLUTION (ADR).**

The parties participated in pre-litigation mediation, which was unsuccessful. Throughout the discovery process, the parties have continued to have informal settlement discussions. The parties currently believe the prospects for settlement of this case are fair and they do not believe that further court-ordered ADR would be helpful.

The parties are reminded that, under D. Kan. Rule 40.3, they must immediately notify the court if they reach an agreement that resolves the litigation as to any or all parties. Jury costs may be assessed under this rule if the parties do not provide notice of settlement to the court's jury coordinator at least one full business day before the scheduled trial date.

IT IS SO ORDERED.

Dated October 17, 2023, at Kansas City, Kansas.

s/ Angel D. Mitchell
Angel D. Mitchell
U. S. Magistrate Judge