**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| DION PLUMP,<br><br>Plaintiff,<br><br>v.<br><br>GOVERNMENT EMPLOYEES INSURANCE COMPANY d/b/a GEICO,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) | Case No. 22-cv-02498 |

**DEFENDANT'S SUGGESTIONS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant Government Employees Insurance Company ("GEICO") provides the following Suggestions in Support of its Motion for Summary Judgment:

# TABLE OF CONTENTS


Page

INTRODUCTION ... 5

STATEMENT OF UNCONTROVERTED MATERIAL FACTS ... 7

I. The Parties. ... 7

II. Plump's Employment History ... 7

III. Plump Did Not Have the Required New York License for His Position ... 8

IV. Plump's Performance Did Not Meet GEICO's Expectations. ... 11

V. Plump's Concerns Were Addressed By GEICO. ... 12

VI. Plump Applied For, and Received, FMLA Leave. ... 13

VII. Plump Told Lies to GEICO About His Medical Treatment. ... 16

VIII. Additional Information. ... 16

ARGUMENT ... 19

I. Summary Judgment Standard. ... 19

II. Plump Cannot Establish Claims of Race Discrimination Under Title VII or § 1981; Therefore, the Court Should Grant Summary Judgment on Counts VI and VIII. ... 20

A. Plump Has No Direct Evidence of Race Discrimination. ... 21

B. Plump Has No Indirect Evidence of Race Discrimination. ... 21

1. Plump's Membership in a Protected Class is Insufficient to Establish a Prima Facie Case of Discrimination. ... 22

2. Plump Was Not Qualified Because He Did Not Have a Required License for His Position as a MOAT Sales Representative II. ... 22

3. Plump Cannot Demonstrate that the Circumstances Surrounding the Termination of His Employment Create an Inference of Discrimination. 24

4. GEICO Has a Legitimate, Non-Discriminatory Reason for the Termination of Plump's Employment. ... 24

5. Plump Cannot Establish Pretext ... 26

III. Plump Cannot Establish Claims for FMLA Discrimination or Interference; Therefore, the Court Should Grant Summary Judgment to Defendant on Counts I and II. ... 28

A. GEICO Did Not Discriminate Against Plump Under the FMLA. ... 28

B. GEICO Did Not Interfere with Plump's FMLA. ... 30

IV. Plump Cannot Establish that GEICO Retaliated Against Him Due to an Alleged Disability or Protected Activity; Therefore, the Court Should Grant Summary Judgment to Defendant on Count V. ... 33

CONCLUSION ... 35

# TABLE OF AUTHORITIES

Page(s)

Cases

*Adams v. Am. Guar. & Liab. Ins. Co.*,
233 F.3d 1242 (10th Cir. 2000) .......... 20
*Adler v. Wal-Mart Stores, Inc.*,
144 F.3d 664 (10th Cir. 1998) .......... 20
*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 19, 20
*Argo v. Blue Cross and Blue Shield of Kansas, Inc.*,
452 F.3d 1193 (10th Cir. 2006) .......... 20
*Branson v. Price River Coal Co.*,
853 F.2d 768 (10th Cir. 1988) .......... 26
*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......... 19, 20
*Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*,
685 F.3d 917 (10th Cir. 2012) .......... 21
*Conaway v. Smith*,
853 F.2d 789 (10th Cir. 1988) .......... 20
*Day v. Kraft Foods N. Am., Inc.*,
490 F. Supp. 2d 1148 (D. Kan. 2007) .......... 22
*Equal Emp't Opportunity Comm'n v. BCI Coca-Cola Bottling Co.*,
450 F.3d 476 (10th Cir. 2006) .......... 22
*Gray v. University of Ark.*,
883 F.2d 1394 (8th Cir. 1989) .......... 27
*Harris v. Allstate Ins. Co.*,
300 F.3d 1183 (10th Cir. 2002) .......... 19
*Hiatt v. Colo. Seminary, Corp.*,
858 F.3d 1307 (10th Cir. 2017) .......... 26, 27
*Johnson v. Norton Cnty. Hosp.*,
550 F. Supp. 3d 937 (D. Kan. 2021) .......... 28, 31
*Kendall v. Watkins*,
998 F.2d 848 (10th Cir. 1993) .......... 27
*Lincoln v. BNSF Ry. Co.*,
900 F.3d 1166 (10th Cir. 2018) .......... 33
*Matsushita Elec. Indus. Co. v. Zenith Radio*,
475 U.S. 574 (1986) .......... 19, 20
*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973) .......... 21, 22
*Metzler v. Fed. Home Loan Bank of Topeka*,
464 F.3d 1164 (10th Cir. 2006) .......... 31
*Miles v. Unified Sch. Dist. No. 500, Kansas City, Kansas*,
347 F. Supp. 3d 626 (D. Kan. 2018) .......... 28

*Mitchell v. City of Moore, Okla.,* 218 F.3d 1190 (10th Cir.2000) ........ 20, 24
*Monroe v. City of Lawrence, Kan.*, 124 F.Supp.3d 1097 (D. Kan. 2015) ........ 22
*Pippin v. Burlington Res. Oil Gas Co.*, 440 F.3d 1186 (10th Cir. 2006) ........ 26
*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) ........ 21
*Riggs v. Airtran*, 497 F.3d 1108 (10th Cir. 2007) ........ 21
*Shapolia v. Los Alamos Nat., Lab.*, 992 F.2d 1033 (10th Cir. 1993) ........ 22
*Spaulding v. United Transp. Union*, 279 F.3d 901 (10th Cir. 2002) ........ 19, 20
*Wallace v. Beech Aircraft Corp.*, 87 F.Supp.2d 1138 (D. Kan. 2000) ........ 27
*Webster v. Shulkin*, 707 Fed.Appx. 535 (10th Cir. 2017) ........ 27
*Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338 (2015) ........ 21

Statutes

29 U.S.C. § 105 ........ 28
42 U.S. Code § 1981 ........ 20, 21
42 U.S.C. § 12203(a) ........ 33

Rules

Fed. R. Civ. P. 56(c) ........ 19

Regulations

29 CFR 825.220 ........ 28

## INTRODUCTION

Federal anti-discrimination law does not offer a cloak of immunity to employees who fail to comply with the responsibilities of their position. In the instant matter, there is no dispute that as a MOAT Sales Representative II at GEICO, Dion Plump ("Plump") was required to obtain and maintain required licenses issued by the insurance departments of various states in order to perform his job of selling insurance. Additionally, there is no dispute that New York is considered the second most frequent state for calls to the MOAT Sales Department. Therefore, obtaining a New York license is required for associates in the MOAT Sales Department. Both parties agree: Plump was told that having a New York license was necessary for his role. However, during his employment with GEICO, Plump failed to obtain his New York license.

Not having this license impacted Plump's work performance. Plump did attempt to obtain his New York license in June of 2020. However, after two attempts to contact Plump regarding the need for additional documentation, and without any response from Plump, the New York Department of Financial Services ("NYDFS") denied Plump's application and determined that he demonstrated untrustworthiness within the meaning and intent of New York State insurance law.

In August of 2021, the NYDFS told Plump that he could appeal the denial by requesting a hearing via email. However, once time had passed to appeal the denial, and without response by Plump, Plump was prohibited from reapplying for a New York license by the NYDFS for one year from the date of the denial. GEICO learned about the denial of Plump's New York license in November 2021 and explored options for Plump to remain employed in a different role at GEICO. However, after interviewing for another position, Plump was ultimately not selected to transfer to another position due to his work performance, which included many instances of call avoidance.

In December of 2021, after realizing his employment was in jeopardy, Plump began seeing a therapist in the state of New York. When Plump asked GEICO for FMLA paperwork, he was

immediately provided the paperwork. Plump then applied for FMLA and was approved for intermittent FMLA. Numerous times over the next few weeks, Plump did not work and told GEICO that he was currently in or was being checked into a hospital. However, Plump was not truthful to GEICO. He was never in the hospital or any in-patient facility. Regardless, Plump was never prohibited from taking his approved FMLA leave.

GEICO terminated Plump's employment on February 9, 2022, because he did not obtain or maintain his New York license—a required license for his position. GEICO is unaware of any other GEICO associates who have been denied their New York license. However, GEICO has terminated the employment of two individuals, other than Plump, in the MOAT Department at the Lenexa, Kansas location (the same location where Plump was employed) because they did not have a required license. GEICO acted toward Plump as it had in other similar instances.

Nevertheless, Plump claims GEICO discriminated and/or retaliated against him because of his race, alleged disability, or protected activity in violation of Title VII, §1981, the ADA, and the FMLA. Plump's claims cannot survive summary judgment. First, Plump fails to establish a *prima facie* case on each of his claims for the reasons stated below. Second, Plump cannot identify any similarly situated employees outside his protected class treated more favorably than he was treated. Third, Plump cannot rebut GEICO's legitimate, non-discriminatory and non-retaliatory reason for the termination decision. In fact, he concedes he did not have the required New York license and he did not appropriately appeal the denial of that license.

Accordingly, GEICO is entitled to judgment as a matter of law on all of Plump's claims, and the Court should grant GEICO's motion for summary judgment.

**STATEMENT OF UNCONTROVERTED MATERIAL FACTS**

The following Statement of Uncontroverted Material Facts, which are referenced in the following Argument as "SUMF," show there is no genuine dispute to be tried and are offered in support of GEICO's Motion for Summary Judgment:

**I. The Parties.**

1. Defendant GEICO is an insurance provider that provides insurance to a wide range of customers—both government and private sector employees. (https://www.geico.com/about/corporate/at-a-glance/.)

2. Defendant maintains equal employment opportunity, anti-discrimination, anti-harassment and anti-retaliation policies within its Fair and Safe Workplace Policy. (Exhibit Stipulation xii, *see* Exhibit L, Fair and Safe Workplace Policy.)[1]

3. GEICO is committed to celebrating the diversity of all their associates. (https://www.geico.com/about/diversity-and-inclusion/.)

4. GEICO has comprehensive Diversity and Inclusion goals that include associate development, management development, management tools and resources, community building, and improving job seeker experience. (https://www.geico.com/about/diversity-and-inclusion/.)

5. Plump is a Black male. (Fact Stipulation i.)

**II. Plump's Employment History.**

6. Beginning June 8, 2020, Geico employed Plump at its facility in Lenexa, Kansas as a MOAT Sales Representative II. (Fact Stipulation ii.)

7. On February 10, 2022, GEICO sent Plump a letter informing him that his employment was terminated effective February 9, 2022. (Fact Stipulation xxxii.)

[1] For purposes of the Statement of Uncontroverted Facts, "Exhibit Stipulation" and "Fact Stipulation" refer to the stipulations in Section 2 of the Pretrial Order (Doc #48).

8. At the time of the termination of his employment, Plump's title was MOAT Sales Representative II. (Fact Stipulation xxxii.)

9. Plump was an at-will employee at GEICO. (*See* Exhibit A, Plump Dep. 97:16–98:18.)

10. Ms. Beaver, along with her boss, discussed the termination of Plump's employment with GEICO. (*See* Exhibit B, Beaver Dep. 13:10-15.)

11. Ms. Beaver choose to separate Plump's employment because he did not have the required licenses to maintain employment as a MOAT Sales agent. (*See* Exhibit B, Beaver Dep. 13:16-20.)

## III. Plump Did Not Have the Required New York License for His Position.

12. In his role as MOAT Sales Representative II, Plump sold insurance to customers by telephone and, as such, was required to obtain and maintain required licenses issued by the insurance departments in various states. (Fact Stipulation ii and Exhibit Stipulation i, *see* Exhibit E, MOAT Sales Representative II Job Description.)

13. New York is the second most frequent state from which MOAT Sales receives calls. (Fact Stipulation iii.)

14. GEICO considers New York a required state license for the MOAT Sales Department. (Fact Stipulation iii.)

15. Plump was told that having a New York license was important to his role. (Fact Stipulation iv.)

16. On Plump's resume, he self-identified his position with GEICO as a "licensed agent." (*See* Exhibit A, Plump Dep. 69:17–70:4.)

17. The goal of Plump's role at GEICO was to sell property insurance. (*See* Exhibit A, Plump Dep. 75:4-6.)

18. Plump did not obtain a New York insurance license while he was employed by GEICO. (Fact Stipulation iv.)

19. In June of 2020, Plump first attempted to complete his New York insurance license application. (*See* Exhibit C, Urban Dep. 51:15-24.)

20. On February 5, 2021, the New York Department of Financial Services ("NYDFS") sent Plump a letter stating that his application was referred to their office, and that the NYDFS determined that Plump had been involved in a fine, denial, refusal, suspension, or revocation of license. (Fact Stipulation v, Exhibit Stipulation iii, *see* Exhibit F, NYDFS Letter Dated February 5, 2021.)

21. In the February 5, 2021, NYDFS letter, the NYDFS requested that Plump submit specific information and documentation regarding the issue cited in the letter. (Fact Stipulation v., Exhibit Stipulation iii, *see* Exhibit F, NYDFS Letter Dated February 5, 2021.)

22. NYDFS gave Plump 15 days to respond. (Fact Stipulation v, Exhibit Stipulation iii, *see* Exhibit F, NYDFS Letter Dated February 5, 2021.)

23. Plump was involved in a fine, denial, refusal, suspension, or revocation of his license in the State of North Dakota that he did not report to the State of New York. (Fact Stipulation vi.)

24. On July 21, 2021, NYDFS sent Plump a letter stating it did not receive a response to its February 5, 2021, letter. (Fact Stipulation vii, Exhibit Stipulation iv, *see* Exhibit G, NYDFS Letter dated July 21, 2021.)

25. In that July 21, 2021 letter, NYDFS told Plump that they would deny his application unless they received the requested information by August 6, 2021. (Fact Stipulation vii.)

26. On August 9, 2021, NYDFS sent Plump a letter stating that Plump's application was denied based on the examiner's recommendation. (Fact Stipulation ix, Exhibit Stipulation v, *see* Exhibit H, NYDFS Letter Dated August 9, 2021.)

27. The August 9, 2021 letter stated that Plump demonstrated untrustworthiness within the meaning and intent of the New York State insurance law. (Fact Stipulation ix, Exhibit Stipulation v, *see* Exhibit H, NYDFS Letter Dated August 9, 2021.)

28. The August 9, 2021 letter further stated that Plump could appeal the decision by requesting a hearing via email. (Fact Stipulation ix, Exhibit Stipulation v, *see* Exhibit H, NYDFS Letter Dated August 9, 2021.)

29. Plump did not respond to the NYDSF's February 5, 2021, or July 21, 2021, letters. (Fact Stipulation viii.)

30. Plump does not recall how he replied to the August 9, 2021, letter. (*See* Exhibit A, Plump Dep. 136:19–138:14.)

31. After the time for Plump to appeal the denial had passed, Plump was prohibited from reapplying for a New York license for one year from the date of the denial. (Fact Stipulation x.)

32. State insurance license appeals and denials were sent to GEICO associates. (*See* Exhibit B, Beaver Dep. 49:3-6.)

33. Ms. Beaver became aware of issues with Plump's New York license in November of 2021. (*See* Exhibit B, Beaver Dep. 14: 5-10.)

34. At that time, the licensing supervisor and manager were already reviewing to see if GEICO could obtain a license or appeal the NYDFS's denial. Once they determined an appeal was

not possible, they explored another role for Plump outside of MOAT sales. (*See* Exhibit B, Beaver Dep. 14: 14-23.)

35. In November 2021, members of GEICO management met with Plump to tell him that he was not eligible to remain in his sales position because he did not have a New York license and to explore the possibility of transferring Plump to a role in the Service Department, which would not require the New York license. (Fact Stipulation xii.)

36. Plump interviewed for a Service role, but ultimately was not approved to transfer to a position in that department. (Fact Stipulation xv.)

37. Plump previously failed to respond to another state's insurance department after failing to respond to two different letters from that department. (*See* Exhibit A, Plump Dep. 25: 14-23.)

38. Plump's failure to respond to North Dakota's letters resulted in that state—North Dakota—suspending Plump's license. (*See* Exhibit A, Plump Dep. 25:7–26:10.)

39. Plump's North Dakota license was suspended when Plump was with a previous employer. (*See* Exhibit A, Plump Dep. 24:7-9.)

**IV. Plump's Performance Did Not Meet GEICO's Expectations.**

40. "Call avoidance" can refer to the process of passing a customer call to someone else when the answering employee has a license in the state where the caller is calling from. (*See* Exhibit A, Plump Dep. 34:13-23.)

41. Plump had, at least on one occasion, transferred a call where he was licensed in the state of the caller. Additionally, Plump believes there could be several more occasions. (*See* Exhibit A, Plump Dep. 35: 5-19).

42. QTC means quote to call and is the percentage of quotes that an associate generates in relation to the number of calls they receive. (*See* Exhibit B, Beaver Dep. 22:24-25:5.)

43. On November 18, 2021, Mr. Foskey, Ms. Beaver's boss, sent an email with the subject line "QTC" to Kansas City MOAT Managers and MOAT Sales Supervisors. The email stated "I need to understand why these associates are below 60 percent QTC. No associates should be below 60 percent." Plump's name was included in the list. (*See* Exhibit B, Beaver Dep. 22:1-25:11.)

44. In response to the November 18, 2021, email, Ms. Selg indicated that Plump was the only agent that had licensing problems as he was denied his New York license and his transfer percentage was currently above 50 percent month to date. (*See* Exhibit B, Beaver Dep. 26:4-7.)

45. On December 7, 2021, Ms. Beaver and her boss had a meeting. The meeting agenda reflected that Plump's QTC audit showed a 50 percent transfer due to license, 20 percent due to call avoidance, and 18 transfers to California in November where he held an active license. This transfer rate could have led to employment termination. (*See* Exhibit B, Beaver Dep. 44:3-46:11.)

**V. Plump's Concerns Were Addressed By GEICO.**

46. On December 10, 2021, Plump emailed GEICO's Human Resources to raise concerns about the handling of his New York license, his interview with the Service Department, his phone line receiving calls for flood insurance, and his working relationship with his supervisor. (Fact Stipulation xvi.)

47. Later that day, HR invited Plump to a meeting to discuss his concerns. When Plump raised these concerns with HR, he did not refer to his race or make any reference to racial discrimination. (Fact Stipulation xvi, Exhibit Stipulation viii, *see* Exhibit J, HR interview notes and related emails.)

48. Plump never alluded to race during his conversation with the GEICO "HR rep." (*See* Exhibit A, Plump Dep. 11: 10-21.)

49. Plump never brought up race. (*See* Exhibit A, Plump Dep. 11:18–12:4.)

50. Paragraph 16 of Plump's Complaint ("during your employment you reported to human resources that you felt you were discriminated against because of your race") is not accurate. (*See* Exhibit A, Plump Dep. 11:10-14 and 13:4-11.)

51. Plump believed that "a lot of stuff that could be misconstrued as some type of discrimination" took place since his first day of employment with GEICO. (*See* Exhibit A, Plump Dep. 19:13-21.)

52. No one in management ever made any negative comments about Plump's race. (*See* Exhibit A, Plump Dep. 238:25 – 239:2.)

53. Human Resources investigated Plump's concerns, and summarized the conclusions reached as a result of that investigation. (Fact Stipulation xvii, Exhibit Stipulation vii, *see* Exhibit I, Overview of Dion Plump's Concern's.)

54. Human Resources followed up with Plump regarding the findings of its investigation. (Fact Stipulation xvii, Exhibit Stipulation viii, *see* Exhibit J, HR Interview Notes and related emails.)

55. Part of that follow up included reviewing that licensing requirements sometimes change based on business needs and that Plump is required to have certain non-resident licenses. (*See* Exhibit C, Urban Dep 38:2-22.)

56. Additionally, Human Resources was unable to confirm any situations where an associate was transferred to another department without an interview. And in Plump's case, the management team determined after speaking with him, that they would not be selecting him to move into a service position. (*See* Exhibit C, Urban Dep. 56:7-18.)

**VI. Plump Applied For, and Received, FMLA Leave.**

57. Plump began seeing a new therapist in New York in December 2021. (*See* Exhibit A, Plump Dep. 106:10-12.)

58. On December 15, 2021, Plump contacted Human Resources to inquire about Family and Medical Leave Act ("FMLA") leave. (Fact Stipulation xviii.)

59. GEICO gave Plump the paperwork he needed to complete for FMLA leave. (Fact Stipulation xix, Exhibit Stipulation viii, *see* Exhibit K, Internal emails regarding Plump's FMLA.)

60. GEICO directed Plump on how to return the completed FMLA forms. (Fact Stipulation xix, Exhibit Stipulation viii, *see* Exhibit K, Internal emails regarding Plump's FMLA.)

61. It was Plump's (or Plump's doctor's) responsibility to maintain and return the required leave documentation. (Fact Stipulation xx.)

62. When Plump originally applied for FMLA leave, it was handled by Hartford, a third-party company. (*See* Exhibit D, Snyder Dep. 8:16-22 and 9:18-23.)

63. At that time, Hartford handled GEICO's FMLA and Short-Term Disability ("STD") requests. (Fact Stipulation xxii.)

64. At the end of 2021, GEICO began to transition away from using Hartford as their their-party provider. (Fact Stipulation xxiii, Exhibit Stipulation ix, *see* Exhibit M, Internal emails regarding Plump's FMLA)

65. As of January 1, 2022, Hartford was still handling GEICO's pending STD requests. (Fact Stipulation xxv, Exhibit Stipulation ix, *see* Exhibit M, Internal Emails regarding Plump's FMLA.)

66. As of January 1, 2022, GEICO handled the intermittent FMLA requests. (Fact Stipulation xxv, Exhibit Stipulation ix, *see* Exhibit M, Internal Emails regarding Plump's FMLA.)

67. On December 29, 2021, GEICO sent an email to Plump that stated "Associates with a pending intermittent claim must provide their completed medical paperwork to the GEICO leave team for review. (Contact information provided below.)" (Fact Stipulation xxiv, Exhibit

Stipulation ix, *see* Exhibit M, Internal emails regarding Plump's FMLA and Exhibit D, Snyder Dep. 11:12–14:1.)

68. On January 7, 2022, Plump was told the due date for paperwork was "1/22/22." (Fact Stipulation xxxvi, Exhibit Stipulation ix, *see* Exhibit N, Internal emails regarding Plump's FMLA and Exhibit D, Snyder Dep. 23:1-10.)

69. On January 21, 2022, Plump emailed Ms. Snyder stating, "I've been receiving ongoing treatment, but today was the earliest appointment I could get with my PC doctor. We went over the paperwork, and she mentioned she is sending it today." (Exhibit Stipulation ix, *see* Exhibit N, Internal emails regarding Plump's FMLA and Exhibit D, Snyder Dep. 23:24-25:7.)

70. Ms. Snyder responded that she checked for the documents, and they had not yet been received. Ms. Snyder then followed up and gave Plump suggestions on calling his provider's office to fax it again and possibly email the documents." (Exhibit Stipulation ix, *see* Exhibit N, Internal emails regarding Plump's FMLA and Exhibit D, Snyder Dep. 24:18–25:4.)

71. On January 21, 2022, GEICO approved Plump for FMLA intermittent leave retroactively from December 17, 2021, to September 21, 2022. (Fact Stipulation xxvii, Exhibit Stipulation ix, *see* Exhibit O.)

72. Plump's approved FMLA was limited to one-day episode up to two times a month with two doctor appointments a year. (Fact Stipulation xxvii, Exhibit Stipulation ix, *see* Exhibit O, Internal Emails regarding Plump's FMLA.)

73. Plump understood he was approved for leave for anxiety and depression in early 2022. (*See* Exhibit A, Plump Dep. 44:4-24.)

## VII. Plump Told Lies to GEICO About His Medical Treatment.

74. On December 16, 2021, Plump sent an internal message to his supervisor stating that he was going to check into a hospital. (Fact Stipulation xxi, Exhibit Stipulation ix, *see* Exhibit P, Internal Emails regarding Plump's FMLA)

75. Plump did not check into a hospital on that date. (Fact Stipulation xxi.)

76. On December 16, 2021, and for the following 42 days, Plump did not report to work. (*See* Exhibit 1 attached to Exhibit R, Fusco Declaration.)

77. On February 4, 2022, Plump told his supervisor he was "getting checked back into the hospital." (Fact Stipulation xxix.)

78. Plump did not check back into a hospital on February 4, 2022. (Fact Stipulation xxix.)

79. On February 9, 2022, Plump asked his friend and emergency contact, Maureen Griffin, to let GEICO know that he was "in the hospital for an extended period of time." (Fact Stipulation xxx, Exhibit Stipulation ix, *see* Exhibit Q, Internal emails regarding Plump's FMLA.)

80. Maureen Griffin was Plump's listed emergency contact at GEICO. (Fact Stipulation xxx.)

81. Maureen Griffin is Plump's daughter's mom. (*See* Exhibit A, Plump Dep. 17:10-13.)

82. Plump was not in the hospital on February 9, 2022. (Fact Stipulation xxx.)

83. Despite his statements to the contrary, Plump was never admitted into a hospital at any time between December 16, 2021, and February 9, 2022. (Fact Stipulation xxxi.)

## VIII. Additional Information.

84. Ms. Selg was a MOAT Sales Supervisor at GEICO. (Selg Dep. 6:16-18.)

85. Ms. Urban is a Senior Associate Relations Specialist with GEICO. (*See* Exhibit C, Urban Dep. 5: 12-17.)

86. Ms. Snyder is a HR Leave Specialist for GEICO. (*See* Exhibit D, Snyder Dep. 6:13-14.)

87. Ms. Beaver is a MOAT Sales Manager for GEICO. (*See* Exhibit B, Beaver Dep. 4:14-19.)

88. Ms. Beaver has direct reports of supervisors, trainers, and members within the development programs and associates in the MOAT Sales Department. (*See* Exhibit B, Beaver Dep. 7:15-24.)

89. Ms. Beaver supervised Ms. Selg. (*See* Exhibit B, Beaver Dep. 8:4-8.)

90. Ms. Selg supervised five individuals other than Plump. Two of those other individuals are Black. (*See* Exhibit S, Selg Dep. 83:23 – 84:20.)

91. The authority to make the decision to separate employment is Ms. Beaver's. (*See* Exhibit B, Beaver Dep. 12:24-13:5.)

92. Plump only assumes his race had a factor in GEICO's decisions. (*See* Exhibit A, Plump Dep. 239:3–340:6.)

93. Ms. Beaver is unaware of any other GEICO associates who have been denied their New York license. (*See* Exhibit B, Beaver Dep. 18:10-21.)

94. Ms. Beaver recalls terminating the employment of two other individuals who did not have required licenses in the MOAT Department at the Lenexa, Kansas location besides Plump. (*See* Exhibit B, Beaver Dep. 19:3-20:21.)

95. According to Plump, he might have worked a shift or two for GEICO from New York. (*See* Exhibit A, Plump Dep.87:4-8.)

96. On April 5, 2021, Plump posted to a social media account, "I'm 'working' from home . . . " in Lime Lake, New York (which is approximately 45 minutes from Buffalo, New York). Plump's social media post also said, "They didn't specify whose home." Plump testified that the "they" might have referred to an employee of GEICO. (*See* Exhibit A, Plump Dep. 87:20–93:20.)

97. While employed by GEICO, Plump inquired about transferring to a role in Buffalo, New York. (Fact Stipulation xiii.)

98. Plump was evicted from his property twice while working for GEICO by Celtic Property Management. In the first eviction, he was able to maintain the residence. For the second eviction, he surrendered the property and went to Buffalo, New York. (*See* Exhibit A, Plump Dep. 42:5-43:14.)

99. Celtic Property Management is a company in Kansas City, MO. (https://www.celticproperties.net/contact.)

100. Plump resided in Buffalo, New York after he was evicted in 2022. (*See* Exhibit A, Plump Dep. 43:17-19.)

101. At the time of his eviction in 2022, Plump was still employed at GEICO. (*See* Exhibit A, Plump Dep. 43:22-44:3.)

102. From approximately mid-December 2021through the beginning of January 2022 and late January or early February 2022, Plump was in New York. (*See* Exhibit A, Plump Dep. 104:8-17.)

103. On the date GEICO terminated Plump's employment, Plump was in Buffalo, New York. (*See* Exhibit A, Plump Dep. 104:1-3.)

104. Plump later testified he did not move to New York until after he was terminated from GEICO. (*See* Exhibit A, Plump Dep. 204:10-15.)

105. By February 22, 2022, Plump was living in Buffalo, New York. (*See* Exhibit A, Plump Dep. 16:16-18.)

106. At least for part of the time, Plump lived in Medina, New York outside of Buffalo. (*See* Exhibit A, Plump Dep. 49:21-25.)

## ARGUMENT

### I. Summary Judgment Standard.

Summary judgment is appropriate when the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In responding to a motion for summary judgment, a plaintiff must do more than simply show that there is some metaphysical doubt as to the material facts. The plaintiff must set forth specific facts showing there is sufficient evidence to allow a jury to return a verdict in the plaintiff's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986); *Harris v. Allstate Ins. Co.*, 300 F.3d 1183, 1186 (10th Cir. 2002).

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986)). In attempting to meet this standard, a movant that does not bear the ultimate burden at trial (here, the Defendant) need not negate the other party's claim in full; rather, the movant need only point out to the court a lack of evidence on an essential element of the other party's claim. *Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). The nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore, Okla.,* 218 F.3d 1190, 1197-98 (10th Cir.2000) (quoting, *Adler,* 144 F.3d at 671). The non-moving party cannot avoid summary judgment by offering conclusory opinions, allegations unsupported by specific facts, or speculation. *Id.*; *Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006).

Summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327 (quoting Fed. R. Civ. P. 1). In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

## II. Plump Cannot Establish Claims of Race Discrimination Under Title VII or § 1981; Therefore, the Court Should Grant Summary Judgment on Counts VI and VIII.

To succeed on his claims of race discrimination under Title VII and 42 U.S. Code § 1981 ("§ 1981"), Plump must show that his race was a motivating factor in (Title VII) or the but-for cause (§ 1981) for the termination of his employment with GEICO. Plump must either provide direct evidence of discrimination or demonstrate a *prima facie* case through circumstantial evidence under the *McDonnell Douglas* burden shifting test, and then rebut GEICO's nondiscriminatory reason for the employment decision by a preponderance of the evidence that the asserted reason was pretextual. *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1345

(2015); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 154 (2000); *Riggs v. Airtran*, 497 F.3d 1108, 1114 (10th Cir. 2007).

**A. Plump Has No Direct Evidence of Race Discrimination.**

For Plump to prove race discrimination with "direct evidence," Plump must point to evidence of discrimination that, if believed by the trier of fact, proves discriminatory conduct by the employer without resorting to inference or presumption. *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1354 (2015); *Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917, 919-20 (10th Cir. 2012).

In this instance, Plump has no such evidence. Plump has not provided any evidence that the reason for the termination of his employment was due to his race. In fact, the only evidence Plump has brought forward is that he happens to be Black and is thus within a protected category. Such status, alone, is not enough. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 792-93 (1973). Furthermore, Plump testified that no one in management at GEICO ever made any comments about his race. (SUMF 52.) Nor did Plump ever make any complaints regarding race discrimination. (SUMFs 47, 48, 49, and 50.) Because Plump cannot satisfy his burden of proof via the direct method, his only avenue is to proceed via the indirect burden-shifting framework.

**B. Plump Has No Indirect Evidence of Race Discrimination.**

To establish a *prima facie* race discrimination claim, Plump must point to evidence in the record showing that: (1) he is a member of a protected class; (2) he was qualified for his position; (3) he was subjected to an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *McDonnell Douglas Corp.* at 792-93; *Equal Emp't Opportunity Comm'n v. BCI Coca-Cola Bottling Co.,* 450 F.3d 476, 483-84 (10th Cir. 2006). Plump cannot make even this basic showing.

**1. Plump's Membership in a Protected Class is Insufficient to Establish a Prima Facie Case of Discrimination.**

It is not contested that Plump is a Black male. (SUMF 5.) However, Plump's membership in a protected class, without more, is not sufficient to establish a *prima facie* case of discrimination. *McDonnell Douglas Corp.* at 792-93. Rather, Plump must demonstrate that the termination of his employment occurred "under circumstances which give rise to an inference of unlawful discrimination." *Monroe v. City of Lawrence, Kan.*, 124 F.Supp.3d 1097, 1111 (D. Kan. 2015). Plump cannot meet his burden. Plump lacked a mandatory license for his job at the time his employment was terminated. Additionally, Plump has presented no evidence illustrating the termination of his employment arose under circumstances giving rise to an inference of discriminatory intent.

**2. Plump Was Not Qualified Because He Did Not Have a Required License for His Position as a MOAT Sales Representative II.**

Plump did not meet the requirements for a MOAT Sales Representative II. In determining whether a plaintiff is qualified for a position, the Court considers whether the plaintiff was qualified for and satisfactorily performing the job. *Day v. Kraft Foods N. Am., Inc.*, 490 F. Supp. 2d 1148, 1154 (D. Kan. 2007). Additionally, a plaintiff's own opinion or their co-workers' opinions about the plaintiff's qualifications do not create a genuine dispute of material fact. *Shapolia v. Los Alamos Nat. Lab.*, 992 F.2d 1033, 1039 (10th Cir. 1993).

GEICO is an insurance provider that provides insurance to a wide range of customers—both government and private sector employees. (SUMF 1.) To help achieve this goal, individuals, like Plump, in roles such as MOAT Sales Representatives, sell property insurance to customers. (SUMF 17.) In this role, Plump was required to obtain and maintain required licenses issued by the insurance departments in various states. (SUMF 12.) GEICO considers New York a required state for purposes of licenses in the MOAT Sales Department. (SUMF 14.) Plump was told that

having a New York license was important to his role. (SUMF 15.) However, Plump did not have a New York license during his employment with GEICO. (SUMF 18.)

In June of 2020, Plump attempted to apply for a New York license through the NYDFS. (SUMF 19.) However, on February 5, 2021, the NYDFS sent Plump a letter stating that his application was referred to their office, and it was determined that Plump had been involved in a fine, denial, refusal, suspension, or revocation of a license. (SUMF 20.) In the February 5, 2021, letter, the NYDFS asked Plump to submit specific information and documentation regarding the issue cited in the letter. (SUMF 21.) The NYDFS gave Plump 15 days to respond. (SUMF 22.) Plump admits that he was involved in a fine, denial, refusal, suspension, or revocation of his license in the State of North Dakota that he did not report to the State of New York. (SUMF 23.) However, Plump did not respond to this letter from the NYDFS. (SUMF 29.)

On July 21, 2021, the NYDFS sent Plump a letter stating they did not receive a response to their February 5, 2021, letter. (SUMF 24.) In that letter, the NYDFS told Plump that they would deny his application unless they received the requested information by August 6, 2021. (SUMF 25.) Plump did not respond to this second letter from the NYDFS. (SUMF 29.)

On August 9, 2021, the NYDFS sent Plump a third letter stating that Plump's application for New York was denied based on the recommendation of the examiner. (SUMF 26.) In that letter, the NYDFS stated that Plump demonstrated untrustworthiness within the meaning and intent of the New York State insurance law. (SUMF 27.) The NYDFS stated that Plump could appeal the decision by requesting a hearing via email. (SUMF 28.) Once the time had passed to appeal the denial, Plump was prohibited by the NYDFS from reapplying for a New York license for one year from the date of the denial—a license required for Plump's employment. (SUMF 31.)

### 3. Plump Cannot Demonstrate that the Circumstances Surrounding the Termination of His Employment Create an Inference of Discrimination.

Plump presents no evidence to support his race discrimination claims. Plump lacks any evidence of race-based comments or comparators who were treated differently. In fact, the only evidence provided regarding Plump's peer was from Ms. Allison Selg, Plump's supervisor at the time of the termination of his employment. (At the time of the termination of Plump's employment, Ms. Selg supervised five other individuals—two others who were Black[2]. (SUMF 90.) In other words, half of employees who were supervised by Ms. Selg (3/6) were Black. There is no indication of a race-based motive at or near the time of the termination of his employment, Plump only assumes his race had a factor in GEICO's decisions. (SUMF 92.) As Plump's only "evidence" is his own speculation, which is insufficient, unsupportable, and inconsistent with uncontroverted record evidence, he fails to establish the fourth prong of his *prima facie* case. *Mitchell* at 1197-98.

### 4. GEICO Has a Legitimate, Non-Discriminatory Reason for the Termination of Plump's Employment.

Plump's failure to obtain and maintain a New York license in violation of GEICO's requirements is a legitimate, non-discriminatory reason which justifies the termination of his employment. (SUMFs 11, 12, 13, 14, 15, and 18.) This deficiency caused serious concerns when it came to Plump's work performance. Because he did not have a license for a high-call state, when a potential GEICO customer called his phone line requesting insurance in New York, Plump would have to transfer the call to another Representative. Additionally, Plump admits he has occasionally transferred a call where he was licensed in the state of the caller. (SUMF 41.) This is called "call avoidance": the process of passing a customer call off to another Representative when the original

---

[2] In the deposition testimony, the term "African American" was used. However, for purposes of this matter and the instant briefing, African American and Black are synonymous.

answering employee has a license of the state of the caller. (SUMF 40.) High transfer rates (which include call avoidance) can lead to employment termination. (SUMFs 40 – 45.)

On November 18, 2021, an Assistant Vice-President, Mr. Lee Foskey, sent an email to a manager, Ms. Meghan Beaver, Plump's chain of command with the subject line "QTC." (SUMF 43.) QTC means "quote to call" and is the percentage of quotes that an employee generates in relation to the number of calls they receive. (SUMF 42.) Call avoidance contributes to QTC. (SUMF 45.) The email stated, "I need to understand why these associates are below 60 percent QTC. No associates should be below 60 percent." (SUMF 43.) Plump's name was included in the list. (SUMF 43.) Plump was the only Representative that had licensing problems due to the denial of his New York license. (SUMF 44.) Because of this, his transfer percentage was above 50 percent month to date. (SUMF 44.)

On December 7, 2021, Ms. Beaver met with Mr. Foskey to discuss Plump's QTC audits, which showed a 50 percent transfer rate due to license issues, a 20 percent transfer rate due to call avoidance, and 18 transfers to California (a state in which Plump held an active license.) (SUMF 45.) This transfer rate, alone, could have led to the termination of Plump's employment. (SUMF 45.) However, GEICO first attempted to see if Plump would be eligible for a transfer to another department that did not require a New York license. (SUMF 35.) Ultimately, GEICO determined a transfer was not possible and that they would terminate his employment. (SUMFs 36 and 11.) The legitimacy of GEICO's decision to termination Plump's employment is supported by various reasons: (1) the fact that multiple individuals contributed to the decision that affected Plump's employment – not just Plump's supervisor; (2) the fact that he was the only individual unable to appeal his New York license; and (3) and the fact that other employees' employment has also been terminated because they, too, did not hold required licenses. (SUMF 94.)

The undisputed evidence shows that Plump violated GEICO's practice and policy when he failed to obtain and maintain a New York license. The undisputed evidence further shows Plump knew this license was important for him in his role. As such, GEICO has met its burden to set forth a legitimate, nondiscriminatory reason justifying the termination of Plump's employment and is entitled to judgment as a matter of law on Plump's claims.

**5. Plump Cannot Establish Pretext.**

Plump cannot demonstrate that GEICO's reason for terminating his employment was pretext for illegal discrimination. Therefore, Plump cannot satisfy his ultimate burden and GEICO's motion for summary judgment should be granted with regard to his race discrimination claims.

A plaintiff's mere second-guessing of the defendant's reasoning for an adverse employment action or evidence suggesting that the defendant made an erroneous business decision fails to show pretext because a Court should not sit as a super-personnel department that reviews an employer's business decisions. *Hiatt v. Colo. Seminary, Corp.*, 858 F.3d 1307, 1316 (10th Cir. 2017) ("Evidence that the employer should not have made the [adverse employment] decision—for example, that the employer was mistaken or used poor business judgment—is not sufficient to show that the employer's explanation is unworthy of credibility."); *Pippin v. Burlington Res. Oil Gas Co.*, 440 F.3d 1186, 1197 (10th Cir. 2006) (in the Court's review of an employer's decision to conduct a RIF, "we will not disturb the exercise of defendant's business judgment."); *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988) ("As courts are not free to second-guess an employer's business judgment, this assertion is insufficient to support a finding of pretext."). Pretext does not exist merely because the adverse employment action was unwise, unfair, or incorrect. *Hiatt* at 1316 (10th Cir. 2017). Furthermore, a plaintiff cannot rely on speculation or conjecture to establish pretext. *See Webster v. Shulkin*, 707 Fed.Appx. 535, 542

(10th Cir. 2017) (Plaintiff's claims didn't "rise above the level of speculation, which is insufficient to demonstrate pretext."); *Wallace v. Beech Aircraft Corp*., 87 F.Supp.2d 1138, 1149 (D. Kan. 2000) ("Mere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment.")

In this instance, Plump has proffered no evidence of any type of discriminatory animus. As discussed in more detail above, Plump's entire discrimination claims hinges on his incorrect speculation that his employment was terminated due to his race—despite acknowledging that he did not have a required New York license.

A mere belief by Plump that the termination of his employment was unfair cannot be used to establish pretext. *Kendall v. Watkins*, 998 F.2d 848, 851 (10th Cir. 1993), *citing Gray v. University of Ark.*, 883 F.2d 1394 (8th Cir. 1989) ("Merely showing that the reason articulated by the employer is wrong or unreasonable will not suffice… 'An employer's articulated reason for [failing to hire] a member of a protected class need not be a sound business reason, or even a fair one.'").

In sum, Plump cannot meet his burden to show discrimination as to his claims of race discrimination. Even if the Court were to find that Plump was able to make a *prima facie* case, which GEICO denies, GEICO has come forth with a legitimate, nondiscriminatory reason for the termination of Plump's employment which remains unrebutted: Plump did not have the required New York license. Accordingly, GEICO is entitled to judgment as a matter of law on Plump's claims of race discrimination in Counts VI and VIII.

## III. Plump Cannot Establish Claims for FMLA Discrimination or Interference; Therefore, the Court Should Grant Summary Judgment to Defendant on Counts I and II.

### A. GEICO Did Not Discriminate Against Plump Under the FMLA.

Section 105 of the FMLA and section 825.220 of the FMLA regulations prohibit employers from discriminating or retaliating against an employee for having exercised or attempted to exercise any FMLA right. 29 U.S.C. § 105 and 29 CFR 825.220. For Plump to successfully support a FMLA discrimination (or retaliation) claim, the record evidence must show: (1) that he engaged in a protected activity; (2) that GEICO took an action that a reasonable employee would have found materially adverse; and (3) that a causal connection exists between the protected activity and the adverse action. *Johnson v. Norton Cnty. Hosp.*, 550 F. Supp. 3d 937, 966 (D. Kan. 2021). Unlike an FMLA interference claim, as noted below, a claim of FMLA discrimination is subject to the burden-shifting analysis of *McDonnell Douglas* as explained above. *Id*.

Plump and GEICO agree that Plump requested, was approved, and used intermittent FMLA leave. (SUMF 71.) That conduct qualifies as a "protected activity." *Miles v. Unified Sch. Dist. No. 500, Kansas City, Kansas*, 347 F. Supp. 3d 626, 633 (D. Kan. 2018). Importantly, however, only the leave Plump took in accordance with his <u>approved intermittent</u> FMLA leave (two, one-day episodes a month) is protected. (SUMF 72.) Absences beyond the approved leave do not qualify as protected activity. (*See* Section III(A) below for more details on Plump's approved leave and sequence of events.)

Additionally, the parties agree that Plump was terminated from his employment at GEICO (the "adverse employment action.") (SUMF 7.) However, Plump has not and cannot show that there was a causal connection between his FMLA request/leave and the termination of his employment. As fully described above, *supra* 2(B)(4), GEICO has shown a legitimate, non-

retaliatory reason for the termination of his employment—and the timeline supports GEICO's position.

Because Plump knew the importance of having a New York license, he attempted to complete his New York license application in June of 2020, shortly after starting employment at GEICO. (SUMFs 15 and 19.) Between February and August of 2021, Plump disregarded numerous communications sent to him directly from the NYDFS requesting additional information. (SUMFs 20 – 32.) When GEICO became aware of this in November 2021, they approached Plump about his licensing issue. (SUMFs 33 and 35.) At that time, the licensing supervisor and manager were reviewing to see if GEICO could obtain a license or appeal the denial—since Plump failed to do. (SUMF 34.) Once they determined an appeal was not possible, they explored an option for Plump to remain employed in a role outside of MOAT sales. (SUMF 34.)

In **November of 2021**, members of GEICO management met with Plump to explore the possibility of transferring him to a role in the Service Department**,** which would not require a New York license. (SUMF 34.) Plump interviewed for the Service Department, but ultimately, he was not approved to transfer to a position in that Department. (SUMF 36.) Concurrent to this process, GEICO had conducted an audit of the Kansas City MOAT Department's calls. (SUMFs 43 and 45.) Plump's transfer percentage was high, and his QTC was low. (SUMFs 43, 44, and 45.) Indeed, Plump was the only Representative that had licensing problems as he was denied his New York license. (SUMF 44.)

On **December 7, 2021**, after review of the audit of Plump's calls, GEICO determined his transfer rate could lead to the termination of his employment. (SUMF 45.) Plump, after learning his job was in jeopardy, emailed GEICO's Human Resources Department to express, for the first time ever, concerns about his license, his interview for Service, his call gating, and his working

relationship with his supervisor. (SUMF 46.) Additionally, at or around the same time, on **December 15, 2021**, Plump, for the first time ever, began asking Human Resources about FMLA leave. (SUMF 58.) Human Resources investigated Plump's expressed concerns, and summarized the conclusions reached as a result of that investigation. (SUMF 53.) Human Resources followed up with Plump regarding the findings of their investigation. (SUMF 54.) Part of that follow up included reviewing the licensing requirements of his position and reminding Plump that sometimes they change based on business needs. (SUMF 55.)

Only after being questioned about his licensing failures did Plump start discussing FMLA (or any medical condition or alleged disability) with GEICO. Regardless, GEICO provided the requested FMLA paperwork for Plump to complete. Over a month later, on **January 21, 2022**, Plump returned the required documentation. (SUMFs 69, 70, and 71.) GEICO permitted Plump to take intermittent FMLA as recommended by his doctor. (SUMF 71.) Yet, Plump was absent from work for more time than approved—over 40 days in a row – much more than "two one-day episodes a month". (SUMF 76.) All during this period, Plump still did not (and could not) obtain or maintain a New York license. (SUMF 18.) Therefore, almost two months later, on **February 9, 2022**, GEICO terminated Plump's employment. (SUMF 7.) Plump's attempt to obtain a New York license in June of 2020 without providing all required paperwork, which ultimately led to the termination of his employment, is wholly unconnected to his request for FMLA in **December of 2021**. GEICO did not discriminate against Plump for receiving or using FMLA, and GEICO is entitled to summary judgment on Count I.

**B. GEICO Did Not Interfere with Plump's FMLA.**

To prevail on an FMLA interference claim, Plump must demonstrate: (1) that he was entitled to FMLA leave, (2) that some adverse action by GEICO interfered with his right to take FMLA leave, and (3) that GECIO's action was related to the exercise or attempted exercise of his

FMLA rights. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1180 (10th Cir. 2006); *see also Johnson v. Norton Cnty. Hosp.* at 964. If Plump could demonstrate the first two elements, then GEICO would bear the burden of demonstrating that the termination of Plump's employment "was not related to the exercise or attempted exercise" of Plump's FMLA rights. *Johnson* at 964. However, Plump cannot make the required showing.

Plump and GEICO agree that Plump was eligible for and in fact was approved to take intermittent FMLA leave. On December 15, 2021, Plump contacted GEICO's Human Resources to inquire about FMLA. (SUMF 58.) GEICO gave Plump the paperwork he needed to complete for FMLA leave. (SUMF 59.) GEICO directed Plump on how to return the completed forms. (SUMF 60.) Plump knew that it was his (or his doctor's) responsibility to maintain and return the required leave documentation. (SUMF 61.)

On December 29, 2021, GEIO sent an email to Plump that stated, "Associates with a pending intermittent claim must provide their completed medical paperwork to the GEICO leave team for review. (Contact information provided below.)" (SUMF 67.) As of January 1, 2022, GEICO handled its intermittent FMLA requests after a transition away from a third-party provider, The Hartford. (SUMFs 64 and 66.) On January 7, 2022, Plump was told that the due date for paperwork was "1/22/22." (SUMF 68.) On January 21, 2022, Plump emailed Ms. Megen Snyder, a member of GEICO's leave team, stating, "I've been receiving ongoing treatment, but today was the earliest appointment I could get with my PC doctor. We went over the paperwork and she mentioned she is sending it today." (SUMF 69.) Ms. Snyder responded that she checked for the documents, and they had not yet been received. (SUMF 70.) Ms. Snyder then followed up and gave Plump suggestions on calling his provider's office and asking to fax it again and possibly email the documents. (SUMF 70.) Later that same day, Plump was approved for intermittent

FMLA leave retroactively applied from December 17, 2021, to September 21, 2022. (SUMF 71.) Plump's approved FMLA was limited to one-day episodes, up to two times a month with two doctor's appointments a year, per the medical note he provided. (SUMF 72.). Both Plump and GEICO agree: Plump applied for FMLA leave and was provided intermittent FMLA leave per his doctor's recommendation.

Furthermore, Plump cannot show that GEICO interfered with his right to take FMLA leave. There is no evidence to support these allegations. To the contrary, the only evidence presented shows that GEICO provided Plump with the necessary information on how to apply for FMLA leave; Plump understood it was his responsibility to maintain and return required leave documentation; Plump was approved for intermittent FMLA leave; and, by February 2022, Plump had well exceeded his approved FMLA. (*See below*, even though Plump was only approved for one-day episodes, up to two times a month, he was absent from work for **42 consecutive days**.) The termination of his employment with GEICO did not interfere with his right to take FMLA leave. Plump took his leave and surpassed it. Not only that, but he never indicated that he was attempting to, nor wanted to, expand his FMLA.

Lastly, because Plump cannot demonstrate the two first elements, GEICO does not bear the burden of demonstrating that the termination of his employment was not related to the exercise or attempted exercise of Plump's FMLA rights. Nonetheless, the termination of his employment was not related to his FMLA. GEICO encouraged Plump to obtain FMLA documentation and followed up with Plump when it was not received. Even if Plump were to demonstrate those first two elements, GEICO can show that the decision to terminate Plump's employment was wholly unrelated to his FMLA. (*See* Section 2(B)(4).)

Plump cannot make the required showing to support a claim for FMLA interference; therefore, GEICO is entitled to summary judgment on Count II.

## IV. Plump Cannot Establish that GEICO Retaliated Against Him Due to an Alleged Disability or Protected Activity; Therefore, the Court Should Grant Summary Judgment to Defendant on Count V.

The ADA prohibits employers from retaliating against employees for engaging in certain protected activities, including requesting a reasonable accommodation. 42 U.S.C. § 12203(a); *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1209 (10th Cir. 2018). To make a *prima facie* case for ADA retaliation, Plump must demonstrate that he engaged in protected activity, that a reasonable employee would have found GEICO's subsequent action to be materially adverse, and that a causal connection exists between the protected activity and GEICO's action. *Johnson* at 960. Overall, Plump's allegations in his Complaint, to support this claim, are unclear. Plump alleges that he engaged in a protected activity by reporting disabilities to GEICO and requesting a reasonable accommodation of taking time off while he was being treated for disabilities. (Pl's Complaint P. 116.) Furthermore, Plump alleges that he was "untimely terminated" as a result of his "protected activities." (Pl's Complaint P. 117.) The evidence does not support Plump's allegations.

First, while Plump never formally requested a reasonable accommodation, GEICO still worked with Plump after his multiple misrepresentations about the status of his medical treatment (i.e., his lies about being admitted to a hospital). On December 16, 2021, Plump sent an internal message to his supervisor stating that he was going to check into a hospital. (SUMF 74.) For that day and the following 42 days, Plump did not report to work. (SUMF 76.) GEICO understood that Plump was applying for FMLA during this time and did not penalize him for it. Later, of course, GEICO learned that Plump was not in fact checking into a hospital at this time. (SUMF 75.) On February 4, 2022, Plump told his supervisor that he was "getting checked back into the hospital." (SUMF 77.) At this time, Plump knew he was never initially checked into the hospital. (SUMF

83.) During this time, Plump was approved for intermittent FMLA leave, not continuous leave. (SUMF 71.) His approved leave was for two, one-day episodes a month. (SUMF 72.) GEICO accommodated Plump and allowed him to be on leave—in excess of his approved FMLA – for approximately 30 additional days. (SUMF 76.) By the time Plump's emergency contact emailed GEICO stating that Plump was "in the hospital for an extended period of time," GEICO had finalized the decision to terminate Plump's employment because he did not hold the required license for his position. (SUMF 79.) And GEICO later learned Plump was never "in the hospital." (SUMFs 82 and 83.)

Second, as more fully described above, *supra* II(B)(4), there is no causal connection between Plump's protected activity and the termination of his employment. The record evidence is clear: Plump was required to have a New York license. Plump did not have a New York license while employed by GEICO and could not obtain one in the near future. Plump was told that he needed a New York license. (SUMFs 14 and 15.) Plump failed to respond to the NYDFS to obtain his New York license. (SUMFs 26 and 29.) Plump lost his ability to appeal his license denial with the NYDFS for one year. (SUMF 31.) Despite the failure to obtain his New York license, GEICO attempted to see if he could be transferred to another department. (SUMFs 35 and 36.) For ADA retaliation claims, the burden shifts back to Plump to demonstrate that GEICO's reason was merely a pretext for retaliating against him for seeking an accommodation for his disability. *Johnson* at 960. Again, Plump cannot demonstrate that GEICO's reason was a pretext for retaliation, and the record evidence supports GEICO's position. (*See* Section II.)

Simply put, Plump cannot establish a claim that GEICO retaliated against him due to any protected activity under the ADA. Accordingly, GEICO is entitled to summary judgment on Plump's Count V.

## **CONCLUSION**

GEICO respectfully requests this Court enter judgment as a matter of law in favor of GEICO on all of Plump's claims under Title VII, § 1981, the FMLA, and the ADA, and for any other relief the Court deems just and proper.

Respectfully Submitted,

/s/ Courtney Steelman

Jenna P. Brofsky KS Bar No. 27989
Julianne P. Story KS Bar No. 15227
Courtney Steelman KS Bar No. 79001
Husch Blackwell LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone: (816) 983-8000
Facsimile: (816) 983-8080
Jenna.Brofsky@huschblackwell.com
Julianne.Story@huschblackwell.com
Courtney.Steelman@huschblackwell.com

**ATTORNEYS FOR DEFENDANT**

**CERTIFICATE OF SERVICE**

This is to certify that on the 10th day of November 2023 the above and foregoing was filed via the Court's electronic (ECF) filing/notification system which will cause a copy to be served on all parties of record.

/s/ Courtney Steelman

**Attorney for Defendant**