Dion S. Plump - June 01, 2023

Dion Plump vs Government Employees Insurance Company

YOUNG COURT REPORTING
Quality Services You Can Count On

(913) 735-5133
8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.youngcourtreporting.net
office@youngcourtreporting.net

EXHIBIT A

A. Yes.
**Q. And if you need a break, you just have to answer the question pending, and then we can certainly take a break. Okay?**
A. Yes.
**Q. Okay. I'm going to hand you what's being marked as Exhibit 1.**
(Plump Deposition Exhibit No. 1 was marked for identification.)
**Q. (By Ms. Brofsky) Is this the complaint that you filed against GEICO?**
A. I don't know, I assume so.
**Q. And if you look at the title of this document, what is it called?**
A. "Complaint for Damages."
**Q. Okay. And the parties listed on it are Dion Plump and Government Employees Insurance Company, d/b/a GEICO, correct?**
A. Correct.
**Q. Okay. You can take a second and look through it, generally, but I just want to make sure that this is the document that contains your claims in this lawsuit.**
A. Yeah.
**Q. Okay. Did you have the opportunity to**



**review this document before it was filed with the Court?**
A. Yes.
**Q. And on the top it says it was filed December 1st, 2022. Is that accurate?**
A. I don't know. I assume so.
**Q. Any reason to doubt that the file stamp on the top of this document is not accurate?**
A. I mean, I didn't do any filing, so that's the only reason why I wouldn't -- basically, I was just reviewing -- like, I was given it -- the complaint to review for accuracy, and that was pretty much it.
**Q. Okay. And I don't need to know what this -- what was discussed, but I assumed you were given the complaint by your attorneys?**
A. Yes.
**Q. And who are you represented by today?**
A. Katie Paulson with Cornerstone Legal.
**Q. And is that the same firm that represented you at the time you filed your complaint?**
A. Yes.
**Q. Okay. You can put that -- actually, let's -- let's turn to the third page of this**



**document. And do you see there's different paragraph numbers listed?**
A. Uh-huh.
**Q. Oh, and I forgot to add this to the rules, but if you could avoid saying uh-huh or --**
A. Yes.
**Q. Thank you. It's for the court reporter so we can have a clear transcript. Okay?**
A. Okay.
**Q. Okay. Paragraph 16 you state, during your employment you reported to human resources that you felt you were discriminated against because of your race. Do you see that?**
A. Yes.
**Q. Was that an accurate statement?**
MS. PAULUS: Yeah, we can't consult during the --
THE WITNESS: Okay.
A. So, on this one, I'll say -- I'll say no, just because in the communication I had with the HR rep I never directly alluded to it. But I was just -- I brought up certain circumstances that was kind of -- it was -- I was just, basically, like: Hey, I just find it funny that this happened, and this -- like, basically, what



happened to another person didn't happen to me. So I never directly brought up race, but I just brought up a circumstance that was kind of peculiar.
**Q. Who -- when you said communication with HR, who are you talking about?**
A. I believe it was -- so it was three Meaghans involved, so I always -- I get them confused, but I believe it was Meaghan Urban.
**Q. Okay.**
A. She was the -- there was a Meaghan Urban, there was Megen Snyder, and there was a Meghan Beaver. I just -- I always get them confused. But I think it was Meaghan Urban that was the HR person that I was talking to.
**Q. All right. And when do you recall having this conversation with Meaghan Urban?**
A. So we never actually had a conversation. It was all done through text -- I mean, email.
**Q. Okay. So when you're talking about alluding to something funny that happened, that was via email or text message?**
A. It was strictly email.
**Q. Do you still have a copy of that email?**
A. Somewhere.

Page 13

**Q. Do you think it was produced in this case?**
A. Yes.
**Q. So just to confirm, what's written in Paragraph 16 in the complaint is not accurate, correct?**
A. I want to say no just because I never actually alluded to race being involved. But I just wanted -- I wanted it to be open for interpretation. Like, I wanted -- I wanted some questions answered from the HR person.
**Q. Okay. Attached to your complaint in the same document there's an Exhibit 1. If you could turn to that, please, and let me know when you're there.**
A. All right.
**Q. Okay. Exhibit 1 appears to be the charge of discrimination that you filed with GEICO before filing the lawsuit. Do you see that?**
A. Yes.
**Q. Did you have the opportunity to review this charge before it was filed with the Kansas Human Rights Commission?**
A. Yes.
**Q. And on the bottom left, is that your**

Page 14

**signature?**
A. Yes.
**Q. And what's the date of your signature?**
A. March 21st, '22.
**Q. Okay. And by signing this document, you declared, under penalty of perjury, that the above is true and correct. Do you see that?**
A. Yes.
**Q. If you turn to the next page, the second paragraph, second sentence, you state, "During my employment with Respondent, I reported to human resources that I felt I was being discriminated against because of my race." Do you see that?**
A. Yes.
**Q. That statement is not correct. Am I -- am I correct?**
MS. PAULUS: Object to form.
You can answer.
**Q. (By Ms. Brofsky) I'll -- I'll rephrase the question.**
**Is the statement I just read -- and I'll read it again -- "During my employment with Respondent I reported to human resources that I felt I was being discriminated against because of**

Page 15

**my race" is not a correct statement. Is that true?**
A. So --
MS. PAULUS: Object to form.
A. -- so I'll say, the question you asked me earlier, if, when I reported to human resources if I felt like I was being discriminated against because of race, I was saying no to that.
As far as the EEOC filing, I did -- I did say that I think race had a -- had a factor involved.
**Q. To the EEOC you said that?**
A. Yes.
**Q. But you never said that to Meaghan Urban at GEICO, correct?**
A. Again, so the answer is no, but I -- I just wanted to make sense of certain circumstances.
**Q. If you'd turn back to page 1 of this document on -- under your name there's a street address listed. It's in Kansas City, Missouri. Do you see that?**
A. Yes.
**Q. Okay. Did you ever live at 5821 Northwest 72nd Street, Kansas City, Missouri?**
MS. PAULUS: That's our office address, just to have that on the record.

Page 16

A. Not that I -- not that I recall, no.
**Q. (By Ms. Brofsky) Do you know what address that is?**
A. Well, I'm assuming it's Cornerstone's.
**Q. Again, just for the record, you never lived in 72nd Street, Kansas City, Missouri?**
A. No.
**Q. Where were you residing on March 21st, 2022?**
A. March 21st, 2022, I was -- I was, effectively, homeless.
**Q. What state were you spending your time in?**
A. I was in -- I was in Buffalo, New York, at that time.
**Q. And when did you move to Buffalo, New York?**
A. February -- February 22nd of 2022.
**Q. Have you spent significant amounts of time in New York prior to February 22nd, 2022?**
A. Well, I mean, what would you consider significant?
**Q. That's a fair question. I'll ask you, did you consider time that was significant to be spent in New York prior to February 22nd, 2022?**

A. Nothing I would consider significant, no.
**Q. Why did you move to New York in -- in 2022?**
A. So it -- it actually came down to moving to either Dallas, Texas, or Buffalo, New York, to live with either some friends, or to live with my daughter and her -- and her mom. And I, ultimately, decided to stay with my daughter and her mom.
**Q. When you say your daughter's mom, is that Ms. Griffin?**
A. Yes, Maureen Griffin, yes.
Maureen Griffin.
**Q. Can you spell that for the court reporter, please.**
A. Mike, Alpha, Uniform, Romeo, Echo, Echo, November. Griffin, Golf, Romeo, India, Foxtrot, Foxtrot, India, November.
**Q. You mentioned Ms. Griffin, are you and Ms. Griffin married?**
A. No.
**Q. Were you and Ms. Griffin married?**
A. No.
**Q. At any point in time?**
A. No.



**Q. Were you and Ms. Griffin dating at any point in time?**
A. Yes.
**Q. Approximately, when were those periods in which you were dating?**
A. I don't know. It was some time in 2015 'till about 2018.
**Q. Did you date again around 2022?**
A. No.
**Q. If I were to look at documents -- and I'll show them to you -- where you're talking about a girlfriend in New York, is that Maureen or is that somebody else?**
A. That's my wife.
**Q. Okay. So you're currently married today?**
A. Yes.
**Q. When did you get married?**
A. November 11th of 2022.
**Q. November 11th is also my anniversary. It's a good date.**
**Okay. And what is -- what is her name or his name?**
A. Amanda. Same last name as me.
**Q. That would be Plump?**
A. Yes.



**Q. Okay. Sticking on this document that we're looking at here, the middle of the document, toward the right it says date discrimination took place. Do you see that in small font?**
A. Yes.
**Q. Okay. What did you list as the date the discrimination took place?**
A. June 18 -- June 8th of 2020 to the present.
**Q. Your employment with GEICO started on June 8th, 2020?**
A. Correct.
**Q. Are you claiming you were discriminated against from the first day you started at GEICO?**
A. So, basically, with this one there were some things that happened during that time that felt a little off, so I just couldn't pinpoint a specific, like, time that, okay, that was messed up, or this is messed up. So, yeah, it's -- it's a lot of stuff that could be misconstrued as some type of discrimination; so --
**Q. And those things happened in June 8th of 2020?**
A. Probably not that soon, but first couple of months were kind of rough.



**Q. How so?**
A. My first -- my first supervisor, Kyle Fuller (ph), was -- we had an interesting relationship. There was one particular time where he was trying to shadow me. And I told him I need to use the restroom. And so I used the restroom.
And when I came back he mentioned that -- even though he gave me permission to use the restroom, he told me that I shouldn't take break within the first 15 minutes of my shift.
**Q. Is that the policy, not to take a break during the first 15 minutes of one's shift?**
A. Yeah, that's the policy. But, I mean, before we started the call, like, he could have coached me on ways to handle what I needed to handle without -- without, basically, allowing me to do it and then coming back and telling me: Oh, you wasn't supposed to do that.
**Q. Would you have preferred he prevented you from going to the bathroom?**
A. I would prefer that he coach me on the right way to handle that without doing something that could be construed as outside policy.
**Q. He let you go to the bathroom, ultimately, correct?**

A. Yes.
**Q. And then he reminded you of the policy, correct?**
A. He reminded me -- so, keep in mind, I'm brand new, so I had no idea this was even a policy. But the way he delivered it, it wasn't like: Hey, by the way, you shouldn't do this.
It was like: You can't take -- you can't take breaks during the first 15 minutes of your shift; so --
**Q. So he remind- -- so just to be clear, he reminded you of the policy regarding when -- when one can take a break?**
A. Correct.
**Q. Okay. You said things -- things that happened in the first couple of months. Is there anything else, other than what we just talked about, you are referring to when you say things that happened in the first couple of months?**
A. I -- I don't remember. Just -- it was only that one thing and -- well, there was a situation with licensing that took place during that first couple months. But Kyle was only my manager for, maybe, a month and a half. I don't remember.



**Q. And are you claiming that he discriminated against you, or just claiming that he didn't appreciate the way that he acted in that situation?**
A. I'm claiming that I didn't appreciate the way he acted in that time.
**Q. Okay. So just to confirm, other than the situation with Kyle and the situation with licensing, which I'll ask you about in a second, that's what you were referring to when you said things that happened in the first couple months?**
A. Yeah.
**Q. Okay. Before we get into licensing, because it's critical that I get full and complete answers, are you taking any medications that might impair your ability to understand and answer my questions today?**
A. No.
**Q. Is there any reason why you can't give full, complete, and accurate testimony?**
A. No.
**Q. Is there any reason you can't recall events from several years ago?**
A. No.
**Q. Okay. So tell me about the, quote, situation with licensing. What do you mean by that?**



A. So during your first -- during your first, like, couple weeks on the floor, you're waiting to see which -- which states you get licensed for. And you have to -- the way it was explained to me, you have to have at least 12 states that you can service. And so there would be times where I would need to -- once I got onto the floor, there were times I would need to handle something for another state.
And, like, Kyle would -- Kyle would come to me and be like: Why are you off the phones?
And I would tell him: Like, hey, I'm trying to handle this thing for licensing.
And he would just, like, shut it down and say: Hey, you need to -- you need to let licensing handle that and just get back on the phones.
**Q. Okay. What was the issue with the way that --**
A. Well, when I tried to explain to him my -- my situation was kind of unique, he would just shut it down and just be like: No, you've got to get back on the phones.
**Q. Why was your situation unique?**



A. So I later found out that a previous -- a previous insurance company that I worked for because of the way they filed -- filed my licensing before, it put me in a situation where I had to do a lot more paperwork to get licensing approved with other states.
**Q. What -- what former employer are you talking about?**
A. Spring Venture Group.
**Q. Is it Spring?**
A. Yeah.
**Q. Like the season?**
A. Yeah.
**Q. Okay. And help me understand what you mean when you say that they put you in a situation where you had to do more paperwork. What did they, to the best of your knowledge, do or not do?**
A. So similar situation with GEICO, you're licensed throughout the entire US. The State of North Dakota, which is a state that we didn't really service that well, they -- they applied for a license for me in North Dakota. And the paperwork -- North Dakota was requesting certain paperwork to which North Dakota was sending the -- the memos to Spring, not to my -- my address. And

Page 25

Spring never -- they never saw to it. So, because of that whenever -- whenever you have to answer the question: Have you ever had your license suspended in a certain state, on that one, up until that point, to my knowledge, I hadn't had it, my license, suspended.

But then I found out that because North Dakota suspended my license, I should start answering that question yes. So once I have to do that, license bureaus, they want to know what happened in that situation, why was it suspended, and -- and then also, like, what steps I'm taking to -- to alleviate the situation.

**Q. And why -- why did North Dakota suspend your license?**

A. They -- I don't remember exactly. I know the lady sent me a letter. And she was just, like, hey, we sent you -- we sent you a letter and we sent you a follow-up letter. And you responded to neither one of them; so --

But I don't remember exactly what it was they were -- they were looking for, but it was something I would have responded to.

**Q. Did -- did you fail to report any child support payments to North Dakota?**

Page 26

A. I don't remember. That might have been the -- that might have been the situation because that definitely came up with a bunch of states, but I don't remember exactly what it was.

**Q. Are you currently licensed to sell insurance in North Dakota?**

A. No.

**Q. Did you ever become licensed to sell insurance in North Dakota?**

A. No.

**Q. So I think you mentioned that at GEICO you needed to be licensed at least 12 states --**

A. Uh-huh.

**Q. -- is that accurate?**

A. Yes -- well --

**Q. Okay.**

A. -- at least that's -- at least that's how it was communicated to me.

**Q. And who was -- who communicated that to you?**

A. Kyle Fuller.

**Q. And at any point in time, were you licensed in 12 states?**

A. Yes.

**Q. Okay. Did that ever include New York?**

Page 27

A. No.

**Q. Did you understand that you were required to be licensed in New York?**

A. That was never presented to me.

**Q. Are you sure?**

A. Positive.

**Q. Did you have any conversations with anyone at GEICO about being licensed in New York?**

A. No. I had a conversation with my manager at the time. He said that you need to have at least 12 -- so the way Kyle presented it to me, you need to have at least 12 licenses, but in key you need to have at least one of five states -- well, two of five states. He said, "You need to have California, Florida, New York, Virginia, and North Carolina."

**Q. Okay. So New York did come up as a state that was important for your position, correct?**

A. Yes.

**Q. Okay. I wrote down California, Florida, New York, Virginia. And I missed the last --**

A. North Carolina.

**Q. North Carolina, thank you.**

**Okay. We'll come back to that.**

**What did you to prepare for your**

Page 28

**deposition today?**

A. Nothing.

**Q. Did you meet with any attorney?**

A. I mean, me and my attorney spoke about what --

**Q. I don't need to know what you spoke with them about.**

A. Fair enough.

**Q. Did you review any documents?**

A. Some -- I had some documents sent over to me.

**Q. What documents did you review?**

A. I don't remember -- I don't recall. They're in an email.

**Q. What types of documents did you review?**

A. Just documents pertaining to -- to the case.

**Q. Did you review any emails?**

A. No.

**Q. Did you review any text messages?**

A. No.

**Q. Did you bring any documents with you today?**

A. No.

**Q. Did you review any documents that were**

Page 33

A. So you have certain metrics you have to hit. Certain -- certain aspects she could hit. Let -- let's just say if she had -- if you had four metrics, you had to hit she was really strong in one, and the other three, not so much.
**Q. What were the three she was not strong at?**
A. I don't remember.
**Q. And how did you know whether she was strong or not? Did you --**
A. Because every day they would -- our manager would supply us with -- it was, basically, a metric list. And it was showing who was doing what in the different metrics. So, like, you were graded on your ability. So you -- it was called productivity. That was the main one. So, basically, for every four phone conversations you had, you're expected to sell a product on one, so you're graded on that.
You're graded on -- I didn't -- I never understood what PPAH was, but I think that was some combination of the -- I guess the -- the dollar amount, plus your productivity. And, then, you were graded on being able to sell identity -- identity theft packages and jewelry packages.

Page 34

**Q. So those were the four metrics you're talking about?**
A. Yeah.
**Q. Okay. And which one was she good at, to the best of your knowledge?**
A. Well, actually, it's a fifth one. Now that I think about it, it was a fifth one. And that's a -- I think it was like availability. Basically, how many -- how long you're in -- you're in what's called ready, ready status while you are on shift. She was really good at availability, if I can recall it correctly.
**Q. Have you heard the term "call avoidance"?**
A. Yeah. Yes, I've heard that term.
**Q. Okay. What does -- what does that mean in the context of GEICO employment?**
A. It just refers to if it's a call you can take, do you take it or do you pass it off to someone else.
**Q. And when you say if you can take it, that means you have the license in the state where the caller is calling from?**
A. Correct.
**Q. Is your testimony today that you never transferred a call from a state where you were licensed to sell insurance?**

Page 35

MS. PAULUS: Object to form.
You can answer.
A. No.
**Q. (By Ms. Brofsky) So there were times where you did, in fact, have a license to sell insurance to a caller but chose to transfer the call, correct?**
A. I can think of one for certain, but anything beyond that, I'm not aware.
**Q. So, again, just to confirm, do you believe there's only one time that you were licensed to sell insurance to a caller, and then transferred the call anyway?**
MS. PAULUS: I object to form.
A. There's only one that I remember.
**Q. (By Ms. Brofsky) It's possible there are more?**
A. Could be.
**Q. It's possible there could be several more?**
A. Could be. For one, I will say, so when Cici Haverdash (ph) was my supervisor, I was having issues with my -- with my -- MY equipment. So, like, I even mentioned to her that it was -- it was

Page 36

great if we could do -- because we would do, like, a group huddle. And so with a group huddle, it would activate my microphone, and, generally, my first phone call after a group huddle, I could take that call.
But then there were certain times where if we didn't have a group huddle, my first call, they couldn't hear me; I couldn't hear them. So I would have to pass them off. But outside of just directly talking to someone and not being able to take that call, there's only one instance that I can remember.
**Q. So when you say issue with equipment, you're specifically referring to the microphone?**
A. The microphone, yes.
**Q. Okay. And how many hours or days did that issue last?**
A. I mean, it -- it happened for at least two months that I can remember.
**Q. So every day for two months, your microphone --**
A. I'm not saying every day. Because, again, we would have group huddles. And any time we had the group huddle, my microphone would work on my next call. But, if we didn't have a group

Page 41

sent -- I've sent out.
**Q. (By Ms. Brofsky) And you said pretty much, so were there some that you haven't sent to your attorney?**
A. Okay. My apologies. Any communications I've had I've sent them out.
**Q. Sent them to your attorney?**
A. Yes.
**Q. Okay. I asked, have you been deposed before. And I know you said no. Have you been a party -- have you been a party to a lawsuit before?**
A. No.
**Q. Have you ever been named as a defendant in a lawsuit?**
A. No.
**Q. And I'm asking -- we'll start with Missouri. Have you ever had any cases brought against you by any financial institution or bank?**
A. Not that I can recall.
**Q. Okay. Did you ever have a lawsuit brought against you by America's Cash Advance? Does that sound familiar?**
A. I don't know.
**Q. Have you ever had a lawsuit brought against you by Axis International, Inc.?**

Page 42

A. I don't know.
**Q. Have you ever had a lawsuit brought against you by Capital One Bank?**
A. I don't know.
**Q. Have you ever had a lawsuit brought against you by Celtic Property Management?**
A. Yes.
**Q. Okay. Tell me about that.**
A. I was getting evicted.
**Q. Was that for failure to pay rent?**
A. Yes.
**Q. Okay. And what happened ultimately? Did you get evicted?**
A. I surrendered the property.
**Q. Meaning you left the property?**
A. Yes.
**Q. Okay. And so that was a lawsuit in which you were named as a party, correct?**
A. I assume so, yes.
**Q. Were you represented in that case?**
A. So on that one -- so I was -- I was -- had an eviction filed against me with Celtic twice. I was represented the first time, not the second time.
**Q. Was at least one of those during your**

Page 43

**employment at GEICO?**
A. Yes.
**Q. Okay. Were both of them during your employment at GEICO?**
A. Yes.
**Q. Where did you go when you were evicted the first time?**
A. I didn't go anywhere. I was allowed to maintain the residence.
**Q. Okay. The second time that you were evicted, where did you go?**
A. I went to Buffalo.
**Q. That would be New York?**
A. Yes.
**Q. Okay. And that was in 2021?**
A. It's 2022.
**Q. Okay. And so you were residing in Buffalo after you were evicted in 2022?**
A. Yes.
**Q. Okay. Would that have been January 2022?**
A. I don't remember the date.
**Q. But you would have still been employed at GEICO at the time, correct?**
A. Yes. But also around that time I was on leave, so I wasn't earning any income. So, on

Page 44

paper, I was employed with GEICO, but I probably worked, maybe, 40 hours total between December and when that was filed.
**Q. So GEICO allowed you to take a leave of absence, correct?**
A. I was approved for leave. I don't know if I was allowed.
**Q. GEICO approved your request for leave in the early 2022 time period, correct?**
A. Yes.
**Q. And what was the basis, or reason, for your request for leave?**
A. Anxiety, depression.
**Q. And GEICO approved intermittent FMLA; is that right?**
A. To this day I still don't know what I was approved for. When I would ask questions, I couldn't get an answer that -- that was satisfactory -- well, something that I could -- that I could really understand.
**Q. But you understood that you were approved for some sort of leave related to your anxiety and depression?**
A. Yes.
**Q. Okay, okay. And when you moved to --**

**So a case against Dion R.G. Plump in Wisconsin, criminal felony, that's not you?**
A. Yeah, I have no felonies.
**Q. Okay.**
A. I gotta love my cousin.
**Q. So the first lawsuit filed against you by Celtic, you said you -- you were evicted, but you got to stay?**
A. Yeah, so when I had the hearing, the United Way, they worked out a deal to where they would cover what I owed to, kind of, get me back on my feet.
**Q. That was awfully nice of them.**
**Did you have to pay that back?**
A. No.
**Q. And did you stay in that property, or did you move?**
A. I stayed.
**Q. How long did you stay there for?**
A. I don't remember.
**Q. Where did you move to after the property?**
A. Buffalo -- well, technically, I moved to Medina, New York.
**Q. And which part of New York?**
A. Medina, it's just outside of Buffalo.



**Q. Would you spell it, please.**
A. M-E-D-I-N-A.
**Q. Medina, okay.**
**And when -- when was the move to Medina?**
A. I want to say it was around -- February 22nd is the date that keeps jumping out to me. Yeah, February 22nd is when I moved to Medina.
**Q. What day of the week was that?**
A. I don't recall.
**Q. How did you get to Medina?**
A. I drove.
**Q. Did you bring all your stuff with you in your car?**
A. I brought what I could fit.
**Q. Did you have a moving truck?**
A. No.
**Q. And what type of car do you -- or did you drive at that time?**
A. RAV4 2007.
**Q. Do you still have that?**
A. Yes.
**Q. I think that's R-A-V, correct?**
A. Yes.
**Q. Do you also have some traffic tickets in your record?**



A. I don't know how that works. I usually paid a lawyer to take care of it.
**Q. Okay. But you recall getting pulled over for some traffic violations?**
A. Yes.
**Q. So where are you currently living?**
A. I live at 500 Seneca Street, Apartment 417, Buffalo, New York 14204.
**Q. And is that with your wife?**
A. Yes.
**Q. And how long have you lived on Seneca Street for?**
A. Since April of 2022.
**Q. Can you tell me everywhere you lived while you were employed at GEICO?**
A. I just lived -- so when I first started at GEICO, I was squatting on a friend's couch. I don't -- I don't remember the address.
And then probably two months into working for GEICO -- maybe, I don't know. Some time -- some time within the first, like, three or four months moving to GEICO -- working for GEICO, I moved into the Cleveland Avenue location.
**Q. Is that in KCMO?**
A. Yes.



**Q. How long did you stay there for?**
A. Let's see, I think I -- I think I moved in, like, September. I moved in in, like, September and -- I don't remember.
**Q. Which year would that have been?**
A. Actually, I didn't move -- okay. So I guess I was squatting longer than I thought. So I want to say -- I want to say I moved into that place 2021. And then I had just renewed the lease around the time I got evicted the second time.
**Q. So the whole time you were working at GEICO, you were either squatting or you were out at the Cleveland Avenue location?**
A. Correct.
**Q. Okay. And you mentioned you got married eight months ago, something like that?**
A. It was about six months, seven months ago.
**Q. Okay. Seven months ago.**
**What does your spouse do for a living?**
A. She's a nurse.
**Q. Do you and she enjoy spending time together?**
A. Yes.
**Q. What do you like to do together?**

to a good stopping point, can we take a break?
MS. BROFSKY: Yeah, absolutely, just a few more minutes.
MS. PAULUS: Sure.
**Q. (By Ms. Brofsky) Okay. With GEICO you said you were licensed in 37 states; is that accurate?**
A. I assume so. When I did a -- I did a count. And I think I came up with 37.
**Q. When did you do that counting?**
A. It was around the time -- like, Michelle had asked me to, like, jot down all the states that I was licensed for. And I think I -- I think when I looked at it, I was licensed for, like, 37 states.
**Q. And you list your job title as licensed agent?**
A. Uh-huh.
**Q. What does that -- is that a yes?**
A. Yes.
**Q. What does that mean?**
A. So a lot of times what I do on my résumé, I'll just put a description that best -- that best describes it without going into a whole lot of


detail. My official title was a MOAT sales licensed agent, but I just put licensed agent because it's easier to explain that than say: Hey, I was a MOAT sales agent.
**Q. And, as a MOAT sales agent, what were you responsible for selling?**
A. Property insurance.
**Q. Just property insurance?**
A. Yes.
**Q. So you're not responsible for selling auto insurance?**
A. No, that's a different department.
**Q. Were you responsible for selling flood insurance?**
A. So that was something that they were rolling out towards the end, but I never actually -- like, I went through a training for it, but I never actually sold flood insurance.
**Q. Okay. In the third bullet point you said, led the floor -- or lead the floor in JM sales. What does JM stand for?**
A. Jewelers Mutual.
**Q. So you're also -- that's for selling jewelry?**
A. Well, that's considered property


insurance.
**Q. Okay. So it's both physical real estate and other property?**
A. I mean, the way it was described to me, it was property. If you can possess it, property; so --
**Q. So jewelry falls within property?**
A. Yeah.
**Q. Okay. And then you said, lead the floor in jewelry sales two months in a row out of 250 agents. How did you come to believe that to be true?**
A. Because they -- they like -- I mean, it's sales. So a lot of teams you have, like, leader boards.
**Q. Okay.**
A. And they sent out an email, and my name was at the top.
**Q. So it was a -- the leader board was contained within the email?**
A. Yeah.
**Q. And you said sales MVP for three weeks. Do you know when those three weeks were?**
A. Some time in September.
**Q. Would that have been in 2020 or 2021?**


A. 2021.
MS. BROFSKY: Okay. All right. Let's take a break now per your attorney's request.
THE WITNESS: All right.
(Brief recess taken.)
**Q. (By Ms. Brofsky) Mr. Plump, welcome back. Do you understand you're still under oath?**
A. Yes.
**Q. Did you talk to anyone else, other than your attorney, during the break?**
A. No.
**Q. Okay. Before the break we were looking at your résumé and talking about your employment at GEICO; is that right?**
A. Yes.
**Q. And you said you were a MOAT sales representative?**
A. Yeah.
**Q. At the end of your employment, were you a MOAT sales representative 2?**
A. So, I don't know how the -- the promotions work.
**Q. So we can put the number to the side, but you were a MOAT sales representative, correct?**

A. Yeah.
(Plump Deposition Exhibit No. 4 was marked for identification.)
**Q. (By Ms. Brofsky) And is what I just handed you the job description for the position that you had with GEICO at the time your employment ended?**
A. Let me see. You asked if this is the job description?
**Q. Correct.**
A. I wouldn't know. I mean, I never actually saw this. This is the first time I've ever seen this. But I would say the majority of what I've seen seems pretty in line with what we had to do, but I don't know -- I didn't read everything.
(Stenographer asks for clarification.)
It seems pretty much in line to what we were asked to do. But I don't remember the -- the levels. It says something about a level 60. I just know that I think I -- I think I received three promotions while I was at GEICO.
**Q. Okay. What -- tell me what your job duties were.**
A. Basically, so you have your laptop.



**Q. Uh-huh.**
A. You're supposed to -- you're supposed to sign in at the time your shift starts. And the expectation is for you begin ready, which is -- ready is like a status. And the expectation is to be in ready within the first five minutes of your shift and to maintain -- I don't remember what the -- what the availability metric was, but I just -- I just stayed in ready to receive phone calls.
**Q. And how would know when a phone call came to you?**
A. Because it would just pop up. Your screen would just, kind of, light up.
**Q. And the goal was to sell property insurance?**
A. So the goal was -- as a rule of thumb if you get four phone calls, you're supposed to sell at least one product out of those four phone calls.
**Q. So people were calling expressing interest or wanting to know more about the products at GEICO?**
A. I wouldn't call it that. A lot of times people were forwarded over to me thinking that they were talking to the discount team. And, basically,



what would happen was we would set them -- we would -- we would, basically, sell property insurance for them to qualify for the discount.
**Q. Okay. So, again, the goal was to sell property insurance, broadly speaking?**
A. Yeah.
**Q. Okay. Paragraph 11 of the job description has certain requirements that most sales representatives are required to meet. Do you see that?**
A. Yes.
**Q. Okay. Can you read me the third bullet point from the top, please.**
A. "Must be able to obtain and maintain required licenses issued by insurance departments of various states."
**Q. Do you see that?**
A. Yes.
**Q. Did you meet that requirement?**
A. I mean, the licenses that I obtained I maintained, yeah.
**Q. But you didn't maintain all of the licenses required for your position, correct?**
A. I don't remember losing any.
**Q. You didn't, in fact, obtain licenses that**



**were needed for your position?**
A. So it was never -- so it was never communicated to me that I needed to have New York or Florida. I had -- I had, at least, four supervisors prior to Allison. And -- which each four of those -- like, the -- the thing -- basically, the way it was communicated to me, as long as I had enough licenses to be serviceable, that's all that mattered.
**Q. And who gets to decide if you're serviceable?**
A. Well, so the way that was communicated to me was being able to maintain at least a 3 rating on your performance reviews.
**Q. It was within GEICO's discretion to determine if you were serviceable or not, correct?**
MS. PAULUS: Object to form.
You can answer.
A. Yes, I wouldn't know that. But I just know that like I said when I first started, I was told that I needed to have at least twelve with two of the five key states. And I, basically, was rocking and rolling with the states I had for the almost two years I worked there.
**Q. (By Ms. Brofsky) At some point, though,**

Page 85

**Q. And so were you unable to use that company discount after you left E-Solutions?**
A. I mean, the plan -- I don't -- the plan that was set up is still the plan I -- is the plan I have now.
**Q. So why did the number change?**
A. I just didn't have access to that number. I -- I don't know what you call it, but -- so that's the number that I -- the 205 number, that's my number I've had since I was, like, 13. And I ported over the number to a family account with an ex-girlfriend. And when that relationship went south, she made it difficult for me to get that number back.
**Q. Okay. I presume that's not Maureen Griffin?**
A. No.
**Q. So you don't have access to anything on that old phone any more --**
A. No.
**Q. -- or on that old number?**
**And did you have any phone numbers between the 205 number and the 816 number?**
A. No.
**Q. Okay. I believe, from some of your**

Page 86

**responses, that, before DexMedia, you worked at Hertz. Is that accurate?**
A. I worked at Hertz in tandem with -- with DexMedia for a little bit.
**Q. And help me understand what that means.**
A. I had two jobs.
**Q. At the same time?**
A. Yeah.
**Q. Okay. Did they -- did the two jobs know about each other?**
A. No.
**Q. And was that a violation of the policy of the other job?**
A. No, because there was no noncompete with either of those companies.
(Stenographer asks for clarification.)
A. There was no noncompete with either of those companies.
**Q. (By Ms. Brofsky) And were those both full-time jobs?**
A. So the Hertz was -- the Hertz started out as a part-time capacity. And then after -- after I got let go from DexMedia, I, basically, did it full time.
**Q. Okay. I believe you mentioned while at**

Page 87

**GEICO, that you were working only from Kansas City. Did I get that right?**
A. Yeah.
**Q. You never worked remotely?**
A. We worked remotely.
**Q. You never worked from New York?**
A. I might have did like a shift or two in New York when Maureen first moved to New York.
**Q. When would that have been?**
A. I don't -- I don't recall.
**Q. Would that have been before 2020?**
A. No, because they -- they were still living in Florida in 2020.
**Q. Okay. So when did they move to New York?**
A. I don't remember.
**Q. I'm going to show you what's being marked as Exhibit 6.**
(Plump Deposition Exhibit No. 6 was marked for identification.)
**Q. (By Ms. Brofsky) Can you confirm that these are posts from your Instagram?**
A. Yeah.
**Q. Okay. And what is your Instagram handle?**
A. That's my Instagram, that, underscore, dude, underscore, 63.

Page 88

**Q. Okay. And why the No. 63?**
A. My height.
**Q. Are you 6-foot-3?**
A. Yeah.
**Q. Okay. And who is -- who's A-U-P-O-O-C-H-7?**
A. That's a dude I went to Auburn with.
**Q. Is he a friend of yours?**
A. Yes.
**Q. Okay. It looks like these posts are made on -- excuse me, April 5th, 2021. Do you see that?**
A. Uh-huh.
**Q. Is that a yes?**
A. Yes.
**Q. Okay. And what do you tell the other individual on April 5th, 2021, about your work?**
A. "I'm 'working' from home, sir...." They didn't specify whose home.
**Q. Okay. And you have working in quotation marks; is that correct?**
A. Yeah.
**Q. Were you actually working?**
A. So this was -- I can't -- I can't recall what was happening around that time, but I could see how the context of this could be misconstrued

to something else.
**Q. My impression is when you -- why did you put the word "working" in quotation marks if, in fact, you were working?**
A. I don't know. It's social media. I just trying to have fun with it.
**Q. Are you dishonest on social media?**
MS. PAULUS: Object to form.
You can answer.
A. I wouldn't say dishonest. I'm just having fun with it.
**Q. (By Ms. Brofsky) You said they didn't specify whose home. What do you mean by they? What did you mean by they?**
A. I have no idea. Like I said, this is just -- yeah, I don't know. I can't speak to it intelligently.
**Q. You did write this post, correct?**
A. I did, yeah.
**Q. And your location was Lime Lake, New York; is that right?**
A. So this is me just posting video from Lime Lake -- I don't know for certain. I mean, like, for instance, this -- this other post with chips, I posted that, but that happened, like, two



months -- that happened, like, two months prior to when I actually posted it.
So, again, like, I don't -- I don't -- I take this with a grain of salt because I -- I don't always post immediately what's happening in the moment.
**Q. On April 5th, 2021, you did post that you were "working" from home, correct?**
A. Again, that post is there, yes, but -- yeah, I don't think -- I don't think this -- like, this photo has anything to do with like an actual shift. One of the things you can look at is, as far as my availability, I was always in the high 90s. And the reception is not great at that location, so I definitely wouldn't have tried to work from that location.
**Q. On April 5th, 2021, who was your employer?**
A. I'm assuming GEICO.
**Q. Is Lime Lake close to Buffalo, New York?**
A. No.
**Q. Where is Lime Lake?**
A. So it's, kind of, in the middle of nowhere, about 45 minutes southwest of Buffalo. Southwest? Southeast? I don't know.



**Q. Is that your picture next to that dude underscore 63?**
A. Yeah, that's -- I mean, that's my -- that's my profile, that's my info. But, like I said, I definitely wouldn't have tried to -- like the time -- the times that I worked in Buffalo, it was at Maureen's house. That location, it's a beautiful location, but the reception down there is awful. I -- I wouldn't have tried to do it there, for sure. And, like I said, the -- this post with the picture with the poker chips, I mean, sometimes I don't post things, like, right as they happen.
**Q. Then why did you state that you were working from home?**
A. So, again, that's something that's possibly taken out of context because me and Brandon, who is aupooch, we just -- we have playful banter.
**Q. We think that the they didn't -- strike that.**
**Do you believe that the word "they" in your post was referring to GEICO, your employer?**
A. Again, this is just -- I think -- I think the context on this is missing.



No, I don't --
**Q. Who -- who else could you be referring to as "they," on April 5th, 2021, when you stated you that were working from home?**
MS. PAULUS: Object to form.
You can answer.
A. So, I mean, it's just -- yeah, it's -- like I said, it's just -- it's more so banter more than anything. If I showed you, like, you know, what me and Brandon talk about it, it's just a lot of silliness from all over the place.
So --
**Q. (By Ms. Brofsky) Like --**
A. -- there's a reason why I didn't use any -- any particular name because I wasn't talking about anybody, in particular.
I, honestly, don't know how to -- how to answer the question you're asking because, again, it's more so banter than anything. And Lime Lake is not an area that I would even try to -- try to work a shift from.
Like I said, I worked -- when I did work a shift in Buffalo, a couple shifts in Buffalo, I did it at Maureen's house.
**Q. And setting -- and I appreciate the**

Page 93

**context. Setting aside all that, my specific question is, when you say they didn't specify who is home, am I correct that the "they" refers to the employer you were working for at that time, which was GEICO?**
MS. PAULUS: I object to form.
A. No.
**Q. (By Ms. Brofsky) Who were you referring to when you said they didn't specify whose home on April 5th, 2021?**
A. They could be a -- I don't know. It's -- it's definitely not -- like, if I would say something about GEICO, I would say GEICO. Again, this is more so banter than anything else. I don't know how to directly answer your question.
**Q. Is it possible you were referring to GEICO?**
A. I mean, it might have been -- if anything, it might have been, like, an employee of GEICO but not GEICO particularly.
**Q. You can put that to the side for now.**
**All right. Mr. Plump, I think we've established that you began your employment at GEICO on June 8th, 2020. Do I have that right?**
A. Yeah.

Page 94

**Q. How did you learn about that position?**
A. Facebook.
**Q. Was it a specific post that you saw?**
A. It was just a Facebook post saying they were hiring. And I -- I responded. It was a pretty quick process.
**Q. What was the process like?**
A. Ooh. So I had a phone interview, which led to an in-person interview. And the first part was, kind of, a skills assessment. Then I sat down and I had to work on, like a -- a role play with a -- it was like a -- I think he was a sales manager. But I had a role play.
And then I met with a young woman and she asked some questions. And I want to say I was -- I want to say they made an offer on the spot.
**Q. You want to say that they did make the offer on the spot?**
A. I think so.
**Q. Why did you want to work for GEICO?**
A. It was -- I liked what they were doing at the -- at the Kansas office. I mean, it's a name. And, at that time, I was -- I was leaving, kind of, my second startup. And so I just wanted the -- I want to align myself with something that was a

Page 95

proven entity at the time.
**Q. With whom did you interview?**
A. I interviewed with, like, three different people. I don't -- I mean, it's been almost three years -- three, four years. I don't recall the names off the top. I just remember the process.
**Q. Okay. If you remember them today, will you let me know?**
A. I wouldn't -- I -- it would be hard for me to remember them --
**Q. Okay.**
A. -- because that was the only time I had communications. Like, the guy, I never saw him again. And the lady who I talked with, I never saw her again.
**Q. Do you know who made the decision to hire you?**
A. I do not.
**Q. As part of your onboarding, did you have an orientation?**
A. Yes.
**Q. Okay. And was -- were you given the opportunity to review or receive a copy of an employee handbook?**

Page 96

A. I don't remember how that process went.
**Q. Did you hear about or learn about an Equal Employment Opportunity policy at GEICO?**
A. No, not that I remember.
**Q. Are you aware that GEICO has an Equal Employment Opportunity policy?**
A. Not that I'm aware of. I don't know.
**Q. Do you recall -- strike that.**
**As part your onboarding, did you learn about the anti-discrimination policy that GEICO has?**
A. I don't remember.
**Q. As part of the onboarding, did you learn about the complaint procedure that GEICO has?**
A. No, I don't remember that. That's the reason why I went a different way when I had to file my complaint. Well, that's why I didn't know where to go when I tried to file my complaint initially.
**Q. Did you receive yearly training on GEICO policies?**
A. No.
**Q. Did you receive notice of GEICO policies at any point after you started working there?**
A. What was that question again?

**Q. Did you receive notice of updates to GEICO policies at any point after you had started working there?**

A. So that was -- that was kind of the funny part about it. My managers, before my last two, we would have a meeting, and anything that was coming down the pike, they would let us know, hey, going forward, you can't do this, or you can't do that.

**Q. Uh-huh.**

A. And my last two supervisors, everything I learned, like any updates, I was -- it was kind of reactionary, as opposed to setting the -- setting the tone that something's changing; so --

(Plump Deposition Exhibit No. 7 was marked for identification.)

**Q. (By Ms. Brofsky) I'm going to hand you what's being marked as Exhibit 7, it's a copy of the GEICO handbook. And it is so voluminous that we have used a rubber band to hold it together.**

**You don't need to read every single page. You certainly can. I am not going to ask you about every single page. But I want to ask you, first, on the first page it says your handbook. And it says the company is an at-will employer. Do you see that?**



A. Yes.

**Q. Are you familiar with the term "at will employment"?**

A. I've got an idea of what it means, but it's -- I -- I couldn't explain it intelligently.

**Q. What's your understanding or idea of what that term means?**

A. Yeah, I couldn't explain it intelligently.

**Q. Did you understand that both you and GEICO were free to end your employment relationship at any time with or without reason?**

A. For my interpretation of it, at-will, I understand that that could be a thing.

**Q. And do you understand that at-will employment applied to your particular employment at GEICO?**

A. I assume so, yes.

**Q. And I know this is a big document, but is looking at this reminding you that, at some point in time, you received access to this document?**

A. So we received everything digitally. I could have received this one. I haven't had a chance to go through everything, but I did have online access to certain documents.



**Q. Right. And what did that -- in what form did you have access to those documents? By that, I mean, was there an intranet?**

A. So that's the -- that's the part that was kind of frustrating. It wasn't readily available. Around the time I was going through my ordeal, and I complained to HR, I was trying to get a copy of this to verify my situation. And with me being off, I didn't have access to the intranet to actually pull this up.

**Q. So let's break that down a little bit. When you were on leave, because you were on leave, you weren't supposed to be accessing any company documents or work, correct?**

A. I don't -- I don't know that to be true or not. I just know that I couldn't get access to -- I was trying to get a copy of the handbook, and there was no way for me to get it without actually being able to log back into the system.

**Q. So when -- when you were on leave, you were unable to log into the system?**

A. Yes.

**Q. Okay. And when you were on leave, you weren't allowed to do any work, correct?**

A. So -- so that's the tricky part because I



don't really know. Like, during the time that I thought I was on leave, I was told I had to come back to work. And when I was trying to get direct answers about if I was on leave or not, I couldn't -- I couldn't make heads or tails of any it, so I don't know how to -- I don't know how to really address that question.

**Q. All right. When did you file a request for leave?**

A. So I think I filed sick time around, like, December. And I got approved for it in January, but it was retroactive to December.

**Q. Okay. So prior to December, you had access to the intranet, correct?**

A. Yes.

**Q. And you would have been able to access GEICO's policies should you needed -- should you have needed to, correct?**

A. That's the tricky part. So that's why I had to reach out to the HR specialist, Meaghan Urban, to try to -- try to show me how to get to it. And I just -- it -- it was about as clear as mud.

**Q. Did you ever try and access GEICO's policies before December of 2021?**

A. I didn't have a need to, so no.
**Q. But you --**
A. Wait, you said before December?
**Q. Yes.**
A. Not -- well, so November it would be a yes.
**Q. Okay.**
A. Because I did try to -- I did try to access it in November. But, prior to November, no. So, yes to -- yes to before December.
**Q. Okay. Can you turn to -- in -- in this same document, Exhibit 7, turn to what's marked as GEICO 40. On the bottom right there's what's called a Bates stamp. And it starts at GEICO 8. If you could turn to GEICO 40, let me know when you get there.**
**And you can certainly take out -- yeah. Are you at page 40?**
A. Yeah.
**Q. Okay. Is this GEICO's relocation policy?**
A. Yeah.
**Q. Is this GEICO's relocation policy?**
A. Again, I'm not entirely familiar with this handbook, so I wouldn't be able to speak to it intelligently. But I'd assume so if it's in this



packet.
**Q. Did you, at any point, let GEICO know that you were relocating to New York?**
A. I wasn't relocating.
(Stenographer asks for clarification.)
A. I wasn't relocating.
**Q. (By Ms. Brofsky) So the answer is, you never let GEICO know that you were relocating to New York?**
MS. PAULUS: Object to form.
A. There was no need to let them know I was relocating because I wasn't -- because I wasn't -- I wasn't relocating. Like, I was planning on staying at the Cleveland -- Cleveland Avenue location as long as I was employed with GEICO.
**Q. (By Ms. Brofsky) Did you request a relocation?**
A. No. I mean, so that's a tricky one. So around the time that it was positioning me to apply for the service role, I inquired about, potentially, taking the service role in Buffalo, but beyond that, no.
**Q. Did you want to be in New York to be closer to your family there?**
A. So at that point I was kind of torn with



the possibility. Like I said, around the time -- around the time I got fired, I was either going to move to Dallas and stay with some friends, or I was going to move to Buffalo. So I was just trying to figure out -- I was trying to toy with some ideas to figure out which -- which situation I wanted to go through with.
**Q. So you were planning to move to one of those two cities in early 2022, correct?**
MS. PAULUS: Object to form.
You can answer.
A. No, because it was -- it was basically like a spur of the moment, like, okay, I've got to make a decision right now.
**Q. (By Ms. Brofsky) Why did you have to make a -- why did you have to make a decision?**
A. Well, I mean, I was in Kansas City by myself. And I had just lost my job. And so there was no real reason for me to stay in --
**Q. So --**
A. -- Buffalo -- I mean, in Kansas City.
**Q. I'm sorry to cut you off.**
**Is your testimony that you were in Kansas City on the date that your employment with GEICO ended?**



A. No, I was not in Kansas -- I was not in Kansas City when my employment ended. I was in Buffalo.
**Q. Okay. What were you doing in Buffalo?**
A. A lot. Trying to console Maureen, trying to be there for my daughter. And also trying to -- just trying to get better.
**Q. How long were you in New York for?**
A. So I was in New York from, roughly, mid-December through the beginning of January. And Amanda paid for a flight for me to come back to -- to come back to Buffalo. So I don't remember exactly, but I was -- I was there from, like, mid-December to, like, the first part of January. And then I came back to Kansas City. And then I went back some time around, like, late -- might have been late January, early February.
**Q. So between December and February you were only in Kansas City for about a week?**
A. Yeah, maybe two.
**Q. You said you were trying to get better. What did that look like?**
A. Well, for one, it was -- it was very good to -- to be around my daughter. She brings me a lot of happiness. And so just, kind of, being in

Kansas City by myself, I was, like, left to my own thoughts. And being in Buffalo, allowed me to not think about my situation so much.

And, also, I had a pretty good therapist that helped me get through some -- basically, shed light on some situations that I didn't know I had going on.

**Q. And what is the therapist's name?**

A. So his name is Tim. I don't remember his last name.

**Q. And are you -- are you still seeing Tim?**

A. No. That was part of the reason I was looking for jobs that had benefits, so I could get back to seeing -- seeing a therapist.

**Q. Where does Tim practice therapy?**

A. It's called Best Self Behavioral.

**Q. And are they based in New York?**

A. As far as I know. I don't know, they're everywhere.

**Q. Did you see Tim in person?**

A. Yes. Well, I saw him -- I saw him in person twice. And then we had a video -- a video session.

**Q. And when you saw him in person, where did you go to meet with him?**



A. I went to the Orchard Park location.

**Q. Orchard Park?**

A. Yeah.

**Q. And Orchard Park is near Buffalo --**

A. New York. Yeah.

**Q. -- in New York?**

A. Yeah.

**Q. So you were seeing -- or you -- strike that.**

**You began care with a new therapist in New York around December 2021?**

A. Yes.

**Q. Why didn't you seek therapy in Kansas City?**

A. Because I didn't know I needed it at the time. I had -- like I said, I initially went to Buffalo to get away and just to spend time with my daughter. And while I was there, I was talking to a friend about -- I had this, like, twitching underneath my eye. And I was talking to a friend about it. And they were like, you might be depressed.

And so I went to go see a physician. And that's why I booked -- like, while I was in town, I was, like, let me just see who I can see about



this. And so I talked to Dr. Lailah Omar (ph). And just talking to her, she prescribed me therapy. So I didn't -- I didn't know I needed it. It's a long story short.

**Q. And just as context to make sure you understand, I'm asking these questions because of the allegations that you've made in your petition regarding disability discrimination. Okay?**

A. Okay.

**Q. They're relevant to the allegations that you've made. I want you to understand that that's why we're talking about them today.**

A. I understand.

**Q. Okay. Were you ever in an outpatient facility -- strike that.**

**Were you ever in an inpatient facility?**

A. No.

**Q. So all the therapy was, you'd go for a visit, and then you'd go back home, or wherever you were staying?**

A. Yeah. So you have the -- like, Tim -- Tim told me that I could seek it, but he was telling me also that, like, getting a bed would be kind of rough. And on top of that, I just didn't want to -- I didn't want to be away from my



daughter that much.

**Q. Okay. Let's talk a little bit more about your time at GEICO and your employment there. And who was the supervisor -- your most recent supervisor, or last in time supervisor at GEICO?**

A. It would have been Allison Selg.

**Q. Okay. And who were you supervised by before that?**

A. Cici Haverdash.

**Q. Okay. And when -- who were you supervised by before that?**

A. Michelle Brunelli.

**Q. Okay. What about before that?**

A. So that -- that gets a little tricky because, so, Michelle was my supervisor twice.

**Q. Okay.**

A. But in between Michelle --

**Q. Uh-huh.**

A. -- the supervisor that I had, she was pregnant. And like not even -- not even like two weeks I got assigned to her team, she had to induce labor. So, then, I went to Jason. I can't remember Jason's last name. And then I went back to Michelle.

**Q. Okay. Any other supervisors I missed?**

A. Yes.
**Q. Okay. And did you receive this letter?**
A. I don't remember receiving this particular letter. But, again, this is all stuff that, basically, our licensing department would -- would, basically, field.
**Q. But this was sent to, both, at the address where you were squatting and to your email address, correct?**
A. I mean, yeah, but the North Dakota letter was addressed to the Spring Venture Group and not my residence. So a lot of times the address and where it's sent is not actually the same one.
**Q. And I'm not asking about a Spring Venture letter. I'm just confirming that Exhibit 11 --**
A. Uh-huh.
**Q. -- the July 21st, 2021, letter was sent to you, Dion Plump, at the address where you were staying and to you via your GEICO email, correct?**
A. It was addressed to me. I don't know if it was actually sent to me.
**Q. Okay. And it's addressed to both -- is that the correct email address for you when you worked at GEICO?**
A. Yes.



**Q. And you worked at GEICO on July 21st, 2021, correct?**
A. Yes.
**Q. Have you ever had any issues not receiving emails at your GEICO email address?**
A. No.
**Q. Okay. And this letter, July 21st, 2021, states that: Please be advised the Department will deny your application unless we receive the information by fax or email by August 6th, 2021. Do you see that?**
A. Yes.
**Q. Did you respond to this email?**
A. I don't believe so. I don't recall.
**Q. Sorry, I asked that poorly. Did you respond to this letter?**
A. I don't recall.
**Q. Okay. You can put that to the side.**
(Plump Deposition Exhibit No. 12 was marked for identification.)
**Q. (By Ms. Brofsky) I'm going to hand you what's being marked as Exhibit 12. This is yet another letter from the Department of Financial Services. There's a copy there for your attorney as well.**



**Okay. And is this a letter from the Department of Financial Services in New York to you dated August 9th, 2021?**
A. No.
**Q. Okay. What is incorrect about that?**
A. It's February 5th, 2021.
**Q. Okay. So let me hand you -- let's take that back.**
A. Actually, there is two different ones, this one is July 21st, and this one is February 5th.
**Q. Okay. Let's start again. I'm going to hand you what's being marked as Exhibit 12. Let's change the sticker on there.**
(Off-the-record discussion.)
**Q. (By Ms. Brofsky) Okay. Is Exhibit 12 a letter from the New York Department of Financial Services dated August 9th, 2021?**
A. It appears to be so, yes.
**Q. Okay. And this is a letter stating that your application for a license in New York has been denied based on the recommendation of the examiner; is that what -- is that correct?**
A. Yes.
**Q. Okay. And it was denied on the grounds**



**that you demonstrated untrustworthiness within the meaning and intent of the New York State insurance law. Do you see that?**
A. Yes.
**Q. The letter, Exhibit 12, also states that you may appeal by requesting a hearing via email to the email address listed. Do you see that?**
A. Yes.
**Q. Did you request a hearing to that email address?**
A. I did.
**Q. When did you do that?**
A. So I don't know if -- I think Cici might have been my supervisor at the time. But I sent -- I sent this -- this is what I actually responded to because I sent it to my supervisor at the time. I can't remember who it was. And they told me to reach out to them.
And I reached out to them. And they let me know that I wouldn't be able to reapply for New York licensing until August 9th of 2022.
**Q. So, just to confirm, you didn't respond to the February or the July letters, correct?**
A. Not that I remember, no.
**Q. And then to the August letter, you didn't**

Page 137

**actually send an email to the disciplinarymemos@dfs.ny.gov email, correct?**
A. I don't remember who I communicated with. I just know I responded to this letter once I got this one.
**Q. And you responded by sending it to somebody internally at GEICO, or you responded to somebody at the state?**
A. I ran it -- I ran it by my supervisor to see what next steps should be taken. And then -- and then I reached out to whoever with New York State.
**Q. And how did you reach out to the State?**
A. I believe it was email.
**Q. Do you have a copy of that email?**
A. No, I don't have any access to any emails I sent, except the ones that I -- that I kept copies of myself. But I didn't have this copy.
**Q. You believe you would have sent it from which email address of yours?**
A. It probably would have been from my GEICO email.
**Q. Is it possible you sent it from a different email address?**
A. Could be. I don't remember. I don't

Page 138

recall. I just remember the context of what happened in my communication that I knew I -- I had -- I couldn't reapply for New York for 365 days.
**Q. Now, did you reach out to New York within the 15-day deadline required here, or did you reach out to New York after the 15-day deadline?**
A. So that's around the time I was told that I just needed to focus on being on the phones as opposed to -- let licensing handle that type of stuff.
**Q. So you didn't respond within the 15-day deadline, correct?**
A. No.
**Q. So when you say that you reached out to the State, it was not in accordance with the instructions in the August 9th, 2021, letter, correct?**
MS. PAULUS: Object to form.
You can answer.
A. I -- are there instructions on here?
**Q. (By Ms. Brofsky) This letter states, "This request must be received by the licensing bureau within fifteen days from the date of this letter."**

Page 139

A. Oh, you said August 9th. That's what's throwing me off.
**Q. Ah, August 9th is the date of this letter, correct?**
A. But this letter doesn't have any instructions on it, the August 9th letter doesn't have any instructions on it.
**Q. The last sentence of the August 9th letter reads, "This request must be received by the licensing bureau within fifteen days from the date of this letter." Do you see that?**
A. Yeah.
**Q. Okay. My understanding is that is an instruction to you that if you want to request a hearing, you have to do so within 15 days. Do you understand that in the same way I do?**
A. I understand it the way you just described it. At the time I didn't understand it that way.
**Q. Okay. And, regardless, you did not respond to this date within 15 days from August 9th, 2021, correct?**
A. I don't remember when I responded.
**Q. You can put that to the side.**
**In November of 2021, GEICO management**

Page 140

**spoke to you about your New York license, correct?**
A. Correct.
**Q. Okay. And you said that was Brian Blowe, I believe?**
A. It was a meeting with Brian Blowe, Allison Selg, and I just remember his name was Nick. He was, like, the guy in charge of licensing. That's all I remember.
**Q. Okay. And did you understand -- what did you understand from that meeting was required of you as to New York?**
A. Nothing. The conversation was -- the conversation was, hey, we notice you don't have New York. And so this is what we're going to do going forward.
**Q. In your meeting with Meaghan Urban, did that take place before your meeting or after your meeting with Brian, Allison, and Nick?**
A. It took place afterwards.
**Q. In your meeting with Meaghan, according to her notes you said that you were brought into a meeting where they were trying to say that because they don't have my New York license, I wasn't eligible to work sales any more. Is that what you said in your meeting with Meaghan Urban?**

**Q. So Allison's style is very different than Michelle's?**
A. Yeah, that's putting it mildly.
I actually felt like Michelle was trying to get me better; whereas, I just -- I just felt like Allison was just trying to get me.
**Q. Why did you feel that way?**
A. Just because every -- I mean, for instance, like, so the one call that always stands out to me when I asked about secondary insured, Michelle would have fought for me on that because it was a -- it was a call that was -- that was graded poorly. If Michelle had fielded that call, she would have -- she would have been like, hey, that's ticky-tacky because he did ask for this.
Whereas, Allison, like, it was just -- it was just a -- a ticky-tacky file. And even when I asked her, like, when did they put that into place?
She's like: It's been in place.
And then, when we did some research, it had only been in place for, like, three months.
And, see, another thing with Michelle, like, if they were making any kind of changes in the grading, Michelle would have had a meeting with us two weeks before to let us know it's coming.



The week -- the next week she would have said: Hey, make sure you -- you are working this into your calls because this is something they are going to be looking for. And then, the week of, she'd be like: Hey, it's -- it's the week of. Make sure you're doing this on every call.
**Q. Was Michelle a more experienced manager than Allison?**
A. I wouldn't say so because they both came from nonsales background, as far as to my recollection.
**Q. Do you know how many years of experience Michelle had versus Allison?**
A. No.
**Q. And these messages are from January 29th, 2022. Where were you physically located on that date?**
A. I don't recall. I might have been back in Kansas City around that time. I don't know. I was, basically, in Buffalo for much of the holidays. Then, after the holidays I came back.
**Q. (By Ms. Brofsky) All right. I'm going to hand you what's being marked as Exhibit 25.**
(Plump Deposition Exhibit No. 25 was marked for identification.)



**Q. (By Ms. Brofsky) And I'll tell you this was produced to us in a cutoff format.**
MS. BROFSKY: I think, Katherine, you're going to -- you're going to get us a better copy of this one.
A. I mean, I reached out to Dr. Omar about this. And she said, I mean, they don't have, like, a copy around.
**Q. (By Ms. Brofsky) Okay. Let's back up a second. Let's just establish what Exhibit 25 is.**
**It's a note from Dr. Omar about you, as the, patient Dion Plump; is that right?**
A. Yeah.
**Q. And what is Dr. Omar's address?**
A. It's 3900 North Buffalo Road, Orchard Park.
**Q. And -- and, for you, there's an address listed as 2467 Shadyridge Drive, Hamburg, New York; is that right?**
A. Yes.
**Q. Okay. Is that where you were living?**
A. No. So in order to -- I just had to give them an address. And so I gave them what I thought Maureen's address was. That's not even -- her



actual address is 4467. So that was me just giving them an address based on just free thought.
**Q. Did you need a New York address to see a New York physician?**
A. I don't know. I wasn't -- I wasn't thinking about it. I just gave them what was in front of me at the time.
**Q. And this note is dated what?**
A. 12/15 of '21.
**Q. So 12/15/2021, you told the doctor that you were located at -- or in Hamburg, New York?**
A. Again, that's the address I used for the sake of the appointment. I didn't officially relinquish my Kansas City address until February of 2022.
**Q. How -- how did you officially relinquish it?**
A. Well, I was already undergoing an eviction procedure, so I just told them that I was leaving.
**Q. And who was -- who was leading the eviction?**
MS. PAULUS: Object to form.
A. Who was leading it?
**Q. (By Ms. Brofsky) Who was evicting you?**

**easier. Do you see that -- do you -- actually -- do you see that your FMLA was approved for episodic flare-ups?**
A. Yes.
**Q. Okay. And do you see that your leave was approved for intermittent leave?**
A. Yes.
**Q. Okay. Do you know what intermittent means?**
A. That's the million dollar question. I kept trying to get answers on how everything was supposed to work. And that's when Megen -- I could never get a straight answer from Megen Snyder.
**Q. Does intermittent mean continuous, in your mind?**
A. I don't -- I mean, I don't know. Like, my -- that's not my -- that's why I was reaching out to Megen to try to get clarity on what it was supposed to entail.
**Q. You can put that to the side. Actually, give that one back to me. Thank you.**
**How did you reach out to Megen to, quote, get clarity?**
A. It was combination of -- I know it was email. I think we might have text. I don't



remember. But I know we had one phone conversation, and that's when I just -- the phone conversation was, like, the last time I communicated with her.
**Q. I -- do you still have those text messages with Megen?**
A. I have to look. I don't think so.
**Q. Okay. We'll take a look. Add it to the list for our next break.**
**In this complaint you -- excuse me.**
**In the complaint, you have two counts of race discrimination. What facts support your claim that you have been discriminated against on the basis your race?**
A. Well, so the communication between Kyle, Allison, and then the fact that I talked to people that were asked to report to a new role; whereas, I had to go through an interview process. And it wasn't even an official interview process. Like, I never physically filled out the online form saying that I was applying for a certain job. I just had a calendar invite to talk to someone. And, in that meeting, I found out what job I was supposedly applying for.
**Q. Anyone in management ever make negative**



**comments about your race?**
A. Not that I can recall.
**Q. Are you assuming that your race was involved in the decisions that you mentioned earlier?**
A. I'm assuming it might have had a factor.
**Q. And why are you assuming that?**
A. Because I was treated differently than some of my coworkers.
**Q. And the specific alleged difference is the three individuals, one of whom is Liz Rose, the other two whose names you can't recall, that you believe were moved over to service, correct?**
MS. PAULUS: Objection. Misstates prior testimony. You can answer.
A. I just know that --
(Stenographer asks for clarification.)
MS. PAULUS: I said, objection, misstates prior testimony. And then I said you can answer.
A. I just know that they were asked to report to a different department.
**Q. (By Ms. Brofsky) But you don't know if they were asked to report to a different**



**department; you just know what they told you, correct?**
A. Correct.
**Q. Do you know what licensures those three individuals had or didn't have?**
A. No.
**Q. Did you know -- or do you know the call avoidance or call transfer rates of those individuals and how that compared for you?**
A. No, I wouldn't know.
**Q. That would be confidential employee information, correct?**
MS. PAULUS: Object to form.
You can answer.
A. I don't know if it would be confidential. I just know I wouldn't have access to it. But what I did have access to was performance. And I know I was outperforming Liz, for sure.
**Q. But, again, no knowledge of their call avoidance or call transfer percentages, correct?**
A. No, I think that's -- only management has access to that type of information.
**Q. You don't know whether they were licensed in New York, correct?**
A. Only management would know -- only agent