# *DION PLUMP vs.*

# *GOVERNMENT EMPLOYEE INSURANCE CO.*

---

## *DEPOSITION OF MEGHAN S. BEAVER*

*August 03, 2023*

---

METROPOLITAN COURT REPORTERS

COURT REPORTING + LEGAL VIDEO

mcr@metropolitanreporters.com
www.metropolitanreporters.com
913.317.8800 800.748.7511

OUT-OF-TOWN DEPOSITIONS?
WE'VE GOT YOU COVERED!

DEPOSPAN™ NETWORK OF LOCALLY-OWNED REPORTING AGENCIES

WWW.DEPOSPAN.COM

EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DION PLUMP,
Plaintiff,
vs. Case No.
GOVERNMENT EMPLOYEE INSURANCE 2:22-cv-02498
COMPANY,
Defendant.

REMOTE DEPOSITION OF MEGHAN S. BEAVER, a Witness, taken on behalf of the Plaintiff before Linda M. Wilson, CSR No. 1391, CCR No. 988, pursuant to Notice on the 3rd day of August, 2023, with all parties, including the witness, appearing via mobile videoconference.



APPEARANCES

APPEARING FOR THE PLAINTIFF VIA MOBILE VIDEOCONFERENCE:

Ms. M. Katherine Paulus
CORNERSTONE LAW FIRM
5821 NW 72nd Street
Kansas City, Missouri 64151
816.581.4040
m.paulus@cornerstonefirm.com

APPEARING FOR THE DEFENDANT VIA MOBILE VIDEOCONFERENCE:

Ms. Courtney Steelman
HUSCH BLACKWELL, LLP
4801 Main Street
Suite 1000
Kansas City, Missouri 64112
816.983.8000
jenna.brofsky@huschblackwell.com

ALSO PRESENT VIA MOBILE VIDEOCONFERENCE:

Ms. Mehrgol Khan
GEICO Representative



INDEX


| WITNESS: | PAGE: |
|---|---|
| MEGHAN S. BEAVER | |
| Examination by Ms. Paulus | 4 |
| Examination by Ms. Brofsky | 48 |


EXHIBITS


| EXHIBIT NUMBER | DESCRIPTION | PAGE IDENTIFIED |
|---|---|---|
| 21 | E-Mail Thread with Lee Foskey 11/18/21 RE: QTC, GEICO 1320 | 22 |
| 22 | Dion Plump Performance Appraisal GEICO 1182-1183 | 36 |
| 23 | Dion Plump Three-Month Rating GEICO 421 | 39 |
| 24 | Webex Messages Selg/Beaver GEICO 1335-1342 | 43 |


NOTE: Deposition Exhibits 21 through 24 were attached to the original transcript.



(Deposition commenced at 1:35 p.m.)
MEGHAN S. BEAVER,
being first duly sworn, testified under oath as follows:
EXAMINATION
BY MS. PAULUS:
Q. Please state your full name.
A. Meghan Beaver.
Q. Do you have a middle name, Ms. Beaver?
A. Shannon, Meghan Shannon Beaver.
Q. Ms. Beaver, have you ever been known by any other names?
A. No.
Q. Ms. Beaver, where are you currently employed?
A. GEICO.
Q. What is your current job title with GEICO?
A. MOAT sales manager.
Q. How long have you held that position with GEICO?
A. Since November of 2021.
Q. Generally how long have you worked for GEICO?
A. About seven years.

Q. If we could go back kind of in reverse chronological order, what job title did you hold prior to November of 2021?
A. I was a MOAT sales manager within GFR.
Q. What does GFR stand for?
A. GEICO field representative.
Q. Do you currently office out of the Lenexa, Kansas location?
A. Yes.
Q. Has that been true throughout your employment with GEICO?
A. No. I started in the Virginia Beach office.
Q. I apologize, I couldn't hear. Where did you start?
A. Virginia Beach.
Q. Got it, thank you. How long were you at the Virginia Beach office?
A. From May of 2016 to November of 2021.
Q. Did you hold any job titles between the beginning of your employment with GEICO and when you became a -- strike that.
Let me just ask, were there any other job titles you held other than MOAT sales manager, GFR, and MOAT sales manager in the Lenexa, Kansas



location?
A. Yes.
Q. What were those job titles?
A. I had a number of different roles throughout the five years I was in the Virginia Beach office.
Q. What roles were those?
A. I started in MOAT service in the management development program and then I was -- I moved to MOAT sales also in the management development program. I was a MOAT sales supervisor, a MOAT service PMT supervisor and a MOAT service pilot supervisor and then a GFR performance coach.
Q. Was the move from the MOAT sales manager GFR position to your current position, was that a lateral move?
A. Yes.
Q. Why did you transfer to the Lenexa, Kansas location?
A. I wanted to return back to an in-office position.
Q. Was the MOAT sales manager GFR position, was that remote rather than an in-office position?
A. Yes. It was a combination of remote



and travel.
Q. So as the MOAT sales manager, who do you report to?
A. I report to a director, a MOAT sales director.
Q. Who is currently the MOAT sales director that you report to?
A. Sarah Harding.
Q. Who held the MOAT sales director position prior to Ms. Harding?
A. Matt Powell.
Q. How long has Sarah Harding been in the MOAT sales director position?
A. Since May of this year.
Q. Can you give me just a high level summary of what your job responsibilities are as a MOAT sales manager?
A. Yes. I have supervisors who report to me and I also have trainers who report to me and members within our development programs and associates, so phone associates report to the supervisors, so I am over the Kansas City MOAT sales department. So all of the associates and all of the leadership fall within my job responsibility.
Q. Thank you. How many MOAT sales



supervisors do you currently supervise or how many directly report to you?
A. Ten to 11, I think.
Q. At one time did you supervise -- or manage I should say for clarity sake since we are going to use the word supervisors. Did you manage a MOAT sales supervisor named Allison Selg?
A. I did manage Allison Selg, yes.
Q. Ms. Selg had testified that she had gone through the management development program at the Lenexa, Kansas location. At that time that she went through that management development program, was she reporting to you or were you supervising her while she was in that program?
MS. STEELMAN: Objection, misstates prior testimony. You can answer if you understand the question.
A. Allison reported to me.
BY MS. PAULUS:
Q. While she was in the management development program?
A. Yes.
Q. How would you describe Ms. Selg's performance as a supervisor when you were managing her as a supervisor?

A. She met expectations.
Q. When you say she met expectations, are you referring to the company's expectations or yours as her direct manager?
A. The company's.
Q. Why did Ms. Selg leave her employment with GEICO?
A. She left voluntarily.
Q. About how many MOAT sales agents report to each supervisor?
A. Currently the lowest I have reporting to a supervisor is five and the most I have is nine or ten.
Q. Do the MOAT sales supervisors need to have your approval as a MOAT sales manager for any corrective action that is issued to the representatives or agents on their team?
A. Yes.
Q. What does that approval process specifically look like?
A. Any time there is corrective action, it is submitted to our HR team and I am included on the submission, whether it be via e-mail or any other means. Our HR team reviews it and approves it and then we issue it and generally I am involved in the



issuance of it.
Q. When you say generally you are involved in the issuance of it, do you typically deliver it directly to the sales agents or are you present when it's issued by the supervisor? What do you mean by that?
A. Depending on the supervisor's experience with issuing using corrective action, I will be present while they administer it or I will administer it and have them present.
Q. What are some of the criteria that MOAT sales supervisors are measured on?
A. Currently for performance, they are measured on points for their associates. Survey percent excellent and I am blanking on the third thing that they're measured on right now.
Q. Okay. So when you say they are measured on points for their associates, what points are you referring to? What does that mean?
A. There is a point value associated with every policy form, so when an associate sells a policy, they receive a certain number of points based on that sale and the average number of points per associate falls on the supervisor's performance criteria.



Q. What was your employment background prior to working for GEICO? Where did you work immediately before you began working for GEICO?
A. I was a student.
Q. When you say you were a student, were you a student at a college university?
A. Yes.
Q. What university did you attend?
A. Old Dominion.
Q. What year did you graduate?
A. 2016.
Q. What was your major?
A. Applied mathematics.
Q. What made you apply to work at GEICO?
A. They came to a career fair at Old Dominion.
Q. How long was the management development program that you participated in at GEICO? How long were you involved in that?
A. From May of 2016 to October or November of 2017.
Q. So I understand a little bit of the organizational structure, is there a MOAT service manager who would be your counterpart for the Kansas City MOAT service department or how is that



structured?
A. Yes, there are service managers.
Q. Is there more than one MOAT service manager with responsibility for the Kansas City area?
A. Currently there are two.
Q. So you qualified that as currently. Previously was there a different number of service managers, MOAT service managers that would be considered kind of your counterpart for that department?
A. Yes.
Q. And what was that? Was there fewer, more?
A. More. It fluctuates based on the staff size.
Q. For MOAT sales agents, are the supervisors that they directly report to, are they -- well, let me ask it this way. Do they have the authority to recommend a termination of those that they supervise or is that something that you have to do as the sales manager?
A. I'm not sure I understand your question.
Q. Sure. So my question is basically do the supervisors who report to you, do they have the

authority to recommend termination of those that they supervise, the MOAT sales agents? Or does that authority rest with you as the MOAT sales manager?
A. The authority to make the decision to separate employment would be mine.
Q. And so the plaintiff in this lawsuit, Dion Plump, were you the individual who made the decision to terminate his employment?
A. Yes.
Q. Did anyone else within GEICO have any input into that decision?
A. I had guidance from my boss on how we had handled in the past and I had guidance from HR to understand how we had handled in the past, but I was the one who chose to separate employment.
Q. Why did you choose to separate Mr. Plump's employment?
A. Because he did not have the required licenses to maintain employment as a MOAT sales agent.
MS. STEELMAN: Ms. Paulus, I'm sorry to interrupt, we have got a lot of loud noise outside our door. Can we take a quick break so I can ask them quiet down a little bit?
MS. PAULUS: Yeah, that's fine. Let's



go off the record for a couple of minutes.
(Off-the-record discussion.)
MS. PAULUS: Let's go back on.
BY MS. PAULUS:
Q. Ms. Beaver, do you recall when approximately you first became aware of a licensing issue with Mr. Plump?
A. Yes.
Q. When was that?
A. In November of 2021.
Q. How did you become aware of that issue?
A. I don't recall.
Q. Once you became aware of it, however that may have been, what steps did you take kind of in response to that issue with Mr. Plump?
A. So there were already steps being taken at the time I became aware of it. The licensing supervisor and manager were already reviewing to see if we were able to obtain the license or appeal the denial, and upon learning that we could not appeal the denial, they were reviewing options for a move outside of MOAT sales.
Q. When you say options, are you referring to potentially transfer to a different



department that would not be requiring that New York license?
A. Yes.
Q. Was that, with respect to Mr. Plump, do you recall which department that was contemplated for a potential transfer for him?
A. Yes.
Q. What was that?
A. MOAT service.
Q. Was Mr. Plump interviewed for a position in the MOAT service department?
MS. STEELMAN: Objection, form. Answer if you know.
A. I don't know.
BY MS. PAULUS:
Q. Do you recall at this time, so November of 2021, do you recall who the MOAT service managers were?
A. Yes.
Q. Who were those individuals?
A. Alicia Sullivan, Erin Mundy (ph) and Bailey Kratts (ph).
Q. Prior to learning about the issue with Mr. Plump's state license, had you had any interaction with Mr. Plump?



A. I don't recall.
Q. Did Cece Haberdash report to you as the MOAT sales manager?
A. No.
Q. Did she predate you being in that position at the Lenexa, Kansas office?
A. Yes.
Q. Who held the MOAT sales manager position prior to you?
A. Brian Bowle and Sam Waddell and Allison Smith.
Q. Just so I understand, Mr. Bowle, Mr. Waddell and Ms. Smith, did they all hold the MOAT sales manager position at the same time? Were there three that were responsible for the Kansas City MOAT sales department?
A. I don't know if they all held the position at the same time. I don't recall who held what position before I started there.
Q. At the time that you transitioned into the MOAT sales manager position, the one in the Kansas office, who held the MOAT sales director position or who did you report to directly when you first took that position?
A. Lee Foskey.

Q. Did Brian Bowle hold a different position during the time that you were the MOAT sales manager? I'm sorry, let me rephrase that question, it was a bad question.
You had referenced that he had previously held a MOAT sales manager position, correct?
A. Yes.
Q. And was he still working for GEICO in a different position at the time that you assumed that role?
A. He was also working as a MOAT sales manager in Kansas City when I started, so we worked together.
Q. Thank you for that clarification. I have an understanding that at some point, I believe in August of 2021, that there was a Kansas City licensing department that was started. Does that match your understanding of kind of that timing?
MS. STEELMAN: Objection, form. You can answer if you understand or know.
A. I don't know.
BY MS. PAULUS:
Q. Was there a MOAT sales licensing department in Kansas City at the time that you moved



into that sales manager position?
A. There was a licensing department in Kansas City. I don't know if it was specific only to MOAT sales.
Q. At the time that you became aware of the issue with Mr. Plump's state license, and just to clarify, we're talking about a New York state license, correct?
A. Yes.
Q. At the time that you became aware of that, were you aware of any other sales representatives in the MOAT sales department who did not have any of the state licenses that GEICO considered to be required for that position?
A. The Kansas City office was frequently hiring and it does take a length of time for associates to get all of their licenses, so on an ongoing basis, there would have been associates who were waiting to have licenses issued by various states. But I was not aware of any other associates who had been denied their New York license.
Q. Were you aware of any associates who had been denied licenses from other states who were in the MOAT sales department in Kansas City?
A. I can't recall if I knew at that time



of associates who were denied licenses at that point in time for other states.
Q. Since the time that you held the MOAT sales manager position in Kansas City or at that Lenexa, Kansas location, have you terminated any other sales agents within that department for not having required licenses for any states?
A. Yes.
Q. How many?
MS. STEELMAN: Objection, form. Katherine, if I could just ask, are you asking for her personal knowledge since she held that role in November 2021?
MS. PAULUS: I am going to ask you not to make speaking objections. It's inappropriate under the District of Kansas guidelines, but I am happy to rephrase my question.
BY MS. PAULUS:
Q. I'm asking how many do you recall terminating for not having a required state license within that department since the time you held that role which would have been November 2021 through the present?
A. At the moment, I can recall two.
Q. Is that two other than the plaintiff



in this lawsuit, Mr. Dion Plump, or does that include him?
A. Outside of Dion.
Q. So do you recall the names of either of those individuals?
A. Yes.
Q. What were their names?
A. Eric Roberts and I don't recall the second name.
Q. Do you recall which state license Mr. Roberts did not have?
A. Kansas.
Q. The other individual, do you recall which state license that individual did not have?
A. They did not pass the licensing exam.
Q. Do you recall with Mr. Roberts, whether his Kansas license was denied, do you recall?
A. Yes.
Q. How soon after his license was denied, approximately, was he terminated?
A. Three months.
Q. For the other individual that did not have their licensing exam, when in the process after a sales agent is hired by GEICO, where in the training process do they take their licensing exam,

how soon does that occur after they are hired?
A. They start on a Monday and they take their licensing exam the following Thursday.
Q. What kind of training do they receive for that exam?
MS. STEELMAN: Objection, form. You can answer if you know.
A. They receive group training by a licensing instructor starting Tuesday, the day after they begin through the day before their exam.
BY MS. PAULUS:
Q. And that licensing exam they take, is that a universal exam that is required for every state license?
A. There is a different exam depending on which state they live in.
Q. So it's dependent on where they live or what state they work in for that licensing exam?
A. Where they live.
Q. So even if they work at the Kansas location, if they live across the state line in Missouri, they have to take the Missouri state licensing exam initially?
A. Yes.
Q. Ms. Beaver, I am going to show you --



I am going to share my screen and show you where I left off and I believe this is going to be plaintiff's Exhibit 21. That was produced today. The Bates stamp is GEICO 1320. Let me scroll over here. Since this is an e-mail thread, I will start with the oldest e-mail here. I am going to ask you to review that, Ms. Beaver, and let me know when you need me to scroll up.
A. You can scroll. Scroll up.
Q. Ms. Beaver, have you had a chance to review this document?
A. Yes.
Q. Do you recognize this document?
A. Yes.
Q. What is it?
A. This is an e-mail.
Q. The original e-mail is from Lee Foskey?
A. Yes.
Q. Sent Thursday, November 18, 2021 to distribution of Kansas City MOAT managers and Kansas City MOAT sales supervisors, is that correct?
A. Yes.
Q. The subject line is QTC. What does that stand for?



A. Quote to call.
Q. What does that mean?
A. Quote to call is the number of or the percentage of quotes that an associate generates in relation to the number of calls they receive?
Q. Here in Mr. Foskey's e-mail he refers to -- he called it the art of the possible. What does that refer to?
MS. STEELMAN: Objection, form. You can answer if you know.
A. Art of the possible is, in this example, 100 percent minus the percentage in the decline column minus the percentage in the transfer column.
BY MS. PAULUS:
Q. What does decline refer to in this context?
MS. STEELMAN: Objection, form. You can answer if you know.
A. The customer was declined for a quote.
BY MS. PAULUS:
Q. What is the reason that a customer might be declined for a quote?
A. Their house having unfavorable eligibility for insurance.



Q. And here it says in this chart here, the percentage of productivity. What does that refer to, to your knowledge? How is productivity measured in this context?
A. The formula for productivity is number of sales divided by number of calls.
Q. And for transfers, is that referring to calls that are transferred to other departments or individuals within the department?
A. Yes.
Q. In Mr. Foskey's e-mail, he states:
Team, I need to understand why these associates are below 60 percent QTC. No associates should be below 60 percent.
Did I read that correctly?
A. Yes.
Q. So here in this chart we see that plaintiff's name, Dion Plump, and the other associates' names who are identified on this chart have been redacted out. Was it your understanding that Mr. Foskey had just identified those associates who were below QTC in this chart?
A. Can you rephrase your question?
Q. Sure. I am trying to understand. This chart doesn't reflect every associate within the

MOAT sales department in Kansas City, is that correct?
A. Yes.
Q. So this chart, the redacted names and Mr. Plump's name, these are just the associates who were below 60 percent quote to call at the time that Mr. Foskey sent this e-mail. Was that your understanding?
MS. STEELMAN: Objection, form. You can answer if you know.
A. That would by my understanding.
BY MS. PAULUS:
Q. So the next chronological e-mail on this thread is Allison Selg responding to Mr. Foskey saying: Currently the agents on my team that are below 60 percent QTC are redacted name, Dion Plump and redacted name. When I ask my team why their QTC is so low, they admitted they are not logging every quote that they are quoting, such as JM/ID and other ancillary products. Did I read those sentences correctly?
A. Yes.
Q. What is JM/ID?
A. Jeweler's mutual and identity theft.
Q. Ms. Selg also states: My team says



they are going to start immediately working on logging every quote and that I will do my part as their supervisor by holding them accountable making sure they are doing so. Dion is the only agent that has licensing problems as he was denied his New York license and his transfer percentage is currently above 50 percent month to date.
Did I read that correctly other than stating the whole thing instead of the abbreviations?
A. Yes.
Q. Then Ms. Selg, she had forwarded her response to Mr. Foskey to you, is that correct?
A. Yes.
Q. I will stop sharing my screen here. When you transferred into the MOAT sales manager role in Kansas City -- or the Kansas City department, were you working in the office, physically in the office every day when you moved into that role?
A. No.
Q. Were you working remotely for some portion of the week, a hybrid schedule?
A. Sometimes.
MS. PAULUS: Let's go ahead and take a break.
(A short recess was taken.)



BY MS. PAULUS:
Q. Ms. Beaver, I am going to share my screen and I am going to show you what I have previously marked as plaintiff's Exhibit 6. Since this is another e-mail thread, I am going to ask you to review it. It's GEICO 450 and 449. Let me know when you need me to scroll up.
A. I'm ready. I am ready.
Q. That's all there is on this document, so now that you have had a chance to review this document, Ms. Beaver, I am going to ask, the first e-mail on this thread appears to be from you to the Kansas City HR compliance box sent on December 23rd, 2021 with the subject line Dion Plump transfers, is that correct?
A. That's correct.
Q. Do you recall why you were sending this information to the HR compliance box regarding Mr. Plump?
A. It was requested that I send it.
Q. Then about a month later, the next e-mail on this e-mail thread is from you to the Kansas City HR compliance box stating: Good afternoon, Dion now has access to his e-mail/phone. We previously were unable to move forward with the



call avoidance warning/termination due to licenses since we couldn't get his statement. Is there anything needed from me to begin to move that forward again.
Did I read that correctly?
A. Yes.
Q. Do you recall why you were sending this e-mail to the Kansas City HR compliance box on January 24, 2022?
A. No.
Q. Next e-mail on this thread, this time three days later, January 27, 2022, Kansas City HR compliance box, this time copying Allison Selg. You say: Good morning, following up on this. Can we please escalate, the associate is trying to return to work from leave currently.
Did I read that correctly?
A. Yes.
Q. And do you recall why you were asking to escalate in this e-mail to the Kansas City HR compliance box on that date?
A. I don't recall on this day the specific reason; however, looking at the timestamp of the initial e-mail and the second e-mail, our HR turnaround time is two days, so they were outside of

Page 41

that feeds into the cross sell metric.
Q. I'll stop sharing my screen here. When you informed Mr. Plump or when you advised him that the company was considering terminating his employment because of his New York license issue, I just want to clarify and make sure I understand. Was that in reference to the conversation that you had shortly before he was terminated?
MS. STEELMAN: Objection, misstates prior testimony. You can answer.
A. Can you re-ask the question?
BY MS. PAULUS:
Q. I just wanted to clarify that earlier you stated you recall having a conversation with Mr. Plump regarding the company considering terminating his employment because of his New York license issue. Is that correct?
MS. STEELMAN: Same objection.
A. I met with him to advise that we were separating or we were reviewing him for separation based on failure to obtain a New York insurance license.
BY MS. PAULUS:
Q. Thank you, I think you answered my question there. I was just asking if that was within

Page 42

the context of advising him shortly before his termination that the company was reviewing him for that or if I was misunderstanding and you were referring to a prior conversation that you had with Mr. Plump on that topic, but I think I understand your testimony now.
Ms. Beaver, at the time that you informed him of that, did you ask him to submit any kind of statement, if there was any information that he wanted the company to consider in reviewing him for termination?
A. I did.
Q. Do you recall if he did submit a statement in response to that request?
A. Yes.
Q. What do you recall Mr. Plump stating in that statement that he submitted?
A. I don't recall the specifics of what was included in his statement.
Q. Ultimately, the company did terminate Mr. Plump's employment, correct?
A. That's correct.
MS. PAULUS: Let's take a couple-minute break. I think I'm almost finished, I am just going through my notes. We'll take about

Page 43

five minutes and come back.
MS. STEELMAN: Sounds good, thanks.
(A short recess was taken.)
BY MS. PAULUS:
Q. Ms. Beaver, I am sharing my screen with what I'm going to mark as plaintiff's Exhibit 24. And before I ask you to review any of the contents, I am just going to ask if you recognize this document?
A. Yes.
Q. What is it?
A. This is a screenshot of a Webex message between Allison Selg and myself.
Q. I am going to move on to the second page here. Is this also a screenshot of Webex chat message between yourself and Ms. Selg?
A. Yes.
Q. And the message reads: Okay, go ahead, finish your audits on him and see if anymore of these type of things come up. I would recommend auditing ten calls on him instead of five.
Did I read that correctly?
A. Yes.
Q. Why were you recommending to Ms. Selg that she audit ten of Mr. Plump calls rather than

Page 44

five?
A. I don't recall specifically.
Q. Moving on to the next page of plaintiff's Exhibit 24 and I will have to rotate this. Do you recognize this page?
A. Yes.
Q. What is this?
A. This is the agenda and meeting notes from a one-on-one meeting with my boss.
Q. And from these notes, looks like that meeting occurred on December 7th. I assume that was in 2021, is that correct?
A. Yes.
Q. So one of the agenda items during that meeting of one-on-one between you and your boss was Dion Plump, is that correct?
A. Yes.
Q. And the first sub-bullet point under that is QTC audit shows 50 percent transfer due to license, 20 percent due to call avoidance, parentheses, 18 transfers to -- is that California gate?
A. Yes.
Q. In November where he holds an active license. Did I read that correctly?

Page 45

A. Yes.
Q. The sub-bullet point after that states: See if you can find a call with the California transfer recorded.
Did I read that correctly?
A. Yes.
Q. Is that your note that you made after meeting with your boss or do you recall why you included that in this agenda?
A. Yes. So it's a different color which is how I take my meeting notes. So this would have been my takeaway from the conversation with my boss.
Q. And so that third bullet point under there which states term for California call avoidance first, term for license second, was that also kind of your takeaway notes after speaking with your boss about that particular agenda item?
A. Correct.
Q. So at that time, the intention was to terminate Mr. Plump's employment for California call avoidance?
MS. STEELMAN: Objection, form. You can answer.
A. I wouldn't say that my takeaway was to term because the order that it follows is see if

Page 46

California call avoidance is occurring through the California transferred calls. So if that was the case, then -- or if I was -- if I saw California calls recorded that were transferred out where he was able to handle, then that is the path that I would then take.
BY MS. PAULUS:
Q. And if there wasn't recording of that, then was the intention to terminate Mr. Plump for the license issue?
A. Correct.
Q. I am going to move on to this page of plaintiff's Exhibit 24 and I am going to have to rotate it again, so please bear with me just a second. And this page document is also Webex, your Webex chat screenshot.
A. Yes.
Q. This one is between you and Meaghan Urban, is that correct?
A. Yes.
Q. Same question for this page, is it still a screenshot from your Webex chats with Megan Urban?
A. Yes.
Q. That's in February of 2022, is that

Page 47

correct?
A. Yes.
Q. I want to ask you to review this page here and let me know if you need me to scroll. I am just asking you to review the contents of this particular page of Exhibit 24.
A. Okay.
Q. In one of the messages here from Ms. Urban to you, and this is February 9th, 2022, I will indicate here with my cursor so you can see what I am referring to. Ms. Urban asks you: As far as the service position, I want to make sure I am outlining correctly to them. Service spoke with Dion about moving to service, even though he didn't want to, but ultimately you decided not to allow the move because of the concern over call avoidance and you confirmed with them that it would be an issue in service as well.
Did I read that correctly?
A. Yes, you did.
Q. Does that match your recollection of what had occurred when the transfer for Mr. Plump to the service department was contemplated?
A. Close. So in terms of who was making the decision to not allow him to move to service, I

Page 48

was not the service hiring manager so ultimately that would have been the service managers deciding that due to the call avoidance concerns, they did not want to have him move into the service department.
Q. So when you responded back to Ms. Urban, That is correct, you didn't note that you were not the decision-maker on deciding not to allow him to transfer into service, is that correct?
MS. STEELMAN: Objection, form.
BY MS. PAULUS:
Q. I'm sorry, did you answer?
A. Sorry. I didn't -- I did not correct her at the time, that's correct.
Q. Finally just on this last page of plaintiff's Exhibit 24, these are also Webex chats between you and Ms. Urban from December 9th of 2022, is that correct?
A. That's correct.
Q. I will stop sharing my screen here.
MS. PAULUS: I don't have any further questions for you, Ms. Beaver. I will pass the witness.

EXAMINATION

BY MS. STEELMAN:
Q. Ms. Beaver, did Mr. Plump ever make

any complaints of race discrimination to you?
A. Not to my knowledge.
Q. To your understanding, are state insurance license appeals and denials sent to associates or to GEICO?
A. Associates.
Q. Are you aware of any other MOAT sales representatives that have been unable to appeal a license denial from a state licensure department?
A. No.
Q. Did you perform any of Mr. Plump's performance appraisals?
A. No.
Q. To your recollection, were any of Mr. Plump's transfer calls related to jewelers, mutual or identity theft?
A. No.
MS. STEELMAN: No other questions at this time.
MS. PAULUS: Nothing for me.
(Deposition adjourned at 3:47 p.m.)



_______________________
MEGHAN S. BEAVER

Subscribed and Sworn to before me this _________ day of __________, 2023.

_______________________
Notary Public

County of _______________

State of ________________

DION PLUMP vs. GOVERNMENT EMPLOYEE INSURANCE COMPANY



ERRATA SHEET

RE: DION PLUMP vs. GOVERNMENT EMPLOYEE INSURANCE

DEPOSITION OF: MEGHAN S. BEAVER

| PG/LN NO. | CORRECTION | REASON FOR CHANGE |
|---|---|---|
| :________ | :________________ | :_______________________ |
| :________ | :________________ | :_______________________ |
| :________ | :________________ | :_______________________ |
| :________ | :________________ | :_______________________ |
| :________ | :________________ | :_______________________ |
| :________ | :________________ | :_______________________ |
| :________ | :________________ | :_______________________ |
| :________ | :________________ | :_______________________ |
| :________ | :________________ | :_______________________ |
| :________ | :________________ | :_______________________ |
| :________ | :________________ | :_______________________ |
| :________ | :________________ | :_______________________ |
| :________ | :________________ | :_______________________ |
| :________ | :________________ | :_______________________ |

_______ I certify that I have read my deposition in the above case and I request that no changes be made.

_______ I certify that I have read my deposition in the above case and I request that the above changes be made.

SIGNATURE OF DEPONENT:

__________________________

DATED: ___________________



C E R T I F I C A T E

I, Linda M. Wilson, a Certified Court Reporter, do hereby certify:

That prior to being examined the witness was by me duly sworn;

That said deposition was taken down by me in shorthand at the time and place hereinbefore stated and was thereafter reduced to writing under my direction;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested in the action.

The original transcript is in the custody of:
Ms. M. Katherine Paulus
CORNERSTONE LAW FIRM
5821 NW 72nd Street
Kansas City, Missouri 64151

WITNESS my hand and seal this 3rd day of August, 2023.

_________________________________
Linda M. Wilson
CSR No. 1391, CCR No. 988

DION PLUMP vs. GOVERNMENT EMPLOYEE INSURANCE COMPANY