*DION PLUMP vs.*

*GOVERNMENT EMPLOYEE INSURANCE CO.*

*DEPOSITION OF MEAGHAN N. URBAN*

*August 03, 2023*

MCR METROPOLITAN COURT REPORTERS
COURT REPORTING + LEGAL VIDEO

mcr@metropolitanreporters.com
www.metropolitanreporters.com
913.317.8800 800.748.7511

OUT-OF-TOWN DEPOSITIONS?
WE'VE GOT YOU COVERED!

DEPOSPAN™
NETWORK OF LOCALLY-OWNED REPORTING AGENCIES

WWW.DEPOSPAN.COM

EXHIBIT C

Page 5

(Deposition commenced at 9:43 a.m.)
MEAGHAN N. URBAN,
being first duly sworn, testified under oath as follows:
EXAMINATION
BY MS. PAULUS:
Q. Could you state your full name?
A. Meaghan Nicole Urban.
Q. Ms. Urban, have you ever been known by any other names?
A. Yes, Meaghan Nicole Kohr.
Q. Ms. Urban, where are you currently employed?
A. GEICO.
Q. What is your current job title with GEICO?
A. Senior associate relations specialist.
Q. How long have you worked for GEICO?
A. Since February of 2007.
Q. How long have you held your current senior associate relations specialist position with GEICO?
A. Since October of 2019.
Q. Prior to October of 2019, what was your job title with GEICO?

Page 6

A. Hiring specialist.
Q. How long did you hold the hiring specialist position with GEICO?
A. It's September of 2018.
Q. What position did you hold prior to the hiring specialist position with GEICO?
A. I think it was called a senior underwriter.
Q. How long were you a senior underwriter for GEICO?
A. I believe four years.
Q. So if I am getting my timeline correct, you moved into that senior underwriter position in 2014, is that correct?
A. Approximately. I would have to look at my job history to know for sure.
Q. Prior to the senior underwriter position, what position did you hold at GEICO?
A. Reissue specialist.
Q. How long did you hold that reissue specialist position?
A. Probably about four years. I can't tell you for sure.
Q. What position were you hired into when you first began at GEICO?

Page 7

A. Telephone claims representative.
Q. I don't believe I asked, Ms. Urban, where are you physically located in your current position for GEICO? Where do you office out of?
A. Lenexa, Kansas.
Q. Have you worked for GEICO out of that same location during the entirety of your employment with that company?
A. No.
Q. Where else have you been located during your employment with GEICO?
A. San Diego.
Q. When did you move to the Lenexa, Kansas location?
A. September 2018.
Q. Why did you move to the Lenexa, Kansas location in November of 2018?
A. I moved in September, but I did for the position of the hiring specialist position.
Q. What were just kind of a high level summary of your job responsibilities in the hiring specialist position?
A. Interact with and interview candidates and I -- my position I mainly focused on background reviewing for pre-hire. Reviewing their background

Page 8

history, reviewing their education history, reviewing all of the things that they needed to get into their position. And making offers, I would extend the offers to them.
Q. I believe you said that you started your senior associate relations specialist position in October of 2019, is that correct?
A. Yes.
Q. Could you give me a high level summary of your job responsibilities in that position?
A. So that position, when I started that position, my duties were to review corrective actions for management and provide them guidance as well as to review separations that management wanted to pursue and provide them guidance. I also provided the guidance whenever there were any associate relations issues or concerns between management and associates on their working relationships as well as providing data information to management on the percentages of our associates that had corrective actions and what the trending was so that we could try to find ways to help our associates.
(The court reporter asked if there was an issue with the connection.)
MS. PAULUS: I was just going to say

Did I read that correctly?
A. Yes.
Q. You also asked him if he knew his year-to-date rating, correct?
A. Yes.
Q. And he responded that it was 3.6, is that correct?
A. Yes.
Q. What is the rating? Is that a one-to-four scale?
A. One to five.
Q. To your knowledge, what kind of rating would a 3.6 be considered? Would that be considered a positive rating?
A. It would be .6 above proficiency.
Q. Thank you for that clarification. So three is considered proficient?
A. For the metrics, yes.
Q. Mr. Plump also spoke with you about the interview that he had had for a service position, is that correct?
A. Yes.
Q. And he raised some concerns about that interview process?
A. He was confused about the process and



he wasn't sure how it was supposed to work.
Q. On this last page of your notes here, right here it's referenced: Reviewed licensing requirements and that sometimes they do change based on business needs.
Did I read that correctly?
A. Yes.
Q. And where you wrote that, are you referring that you reviewed licensing requirements and that sometimes they change based on business needs with Mr. Plump?
A. Yes.
Q. Where were those licensing requirements? What did you reference when reviewing that with him? Was there some sort of internal document that you were looking at?
A. No, I reviewed with him what the expectations are for the position that he is in with regards to licensing and reviewed that in addition to having a resident license, you are required to have certain non-resident licenses and the requirements for which do change based on what the business needs.
Q. And in reviewing that with Mr. Plump, were you looking at any kind of internal requirements that set that forth or what were you reviewing with



him specifically at that time?
A. I was reviewing my knowledge of his position as a sales agent and that in order to sell insurance in the State of Kansas, he needs to have a license to sell insurance and that is the requirement for his position because without it, he could not be able or do his position.
Q. How did you come to have the knowledge that the licensing requirements sometimes change based on business needs?
A. Because I have -- I've been at work for GEICO many years. I have had a license myself, I have been in a customer position where I needed to have the license, I have been in an underwriting position where I needed to have the license. I also have worked in the human resources department in both hiring where we tell candidates they need to have a license and I have worked in the associate relations position where this is something that is discussed regularly where you need to have licenses based on what calls are coming in. And in order to service or sell policies from outside of your state, you have to have a non-resident license.
Q. I am going to stop sharing my screen here. On the topics of discussion when you spoke



with Mr. Plump, what did you do to -- let's start with his concerns about the service position interview process. What did you do to investigate that particular concern that he raised?
A. I asked him for details on what his interview was, on who he interviewed with and when he raised concerns that this was not a process that was done consistently according to him. I asked him for any people with information or anybody that could give me the details of what they experienced. He mentioned somebody that he knew, a colleague of his that didn't have the same experience. I asked for that person's information, he did not tell me that information. And then after that I spoke with Nick Reed, the licensing supervisor about his licensing and I asked him if he was part of the process for changing positions. I believe he said he wasn't in that decision-making process. Then I talked to his manager, Meghan Beaver, and asked her for what happened as far as the transfer between the two different departments, and she provided me information based on her own knowledge as well as verifying with the parties who did speak with Dion.
Q. Ms. Urban, I am going to share my screen again. I am going to show you what is marked

you interviewed?
A. No.
Q. Would you be able to estimate was it less than 30 minutes?
A. I don't know.
Q. What was your typical practice when it came to interviewing peers like this when conducting an investigation?
A. Generally for interviews I schedule half an hour, but sometimes it takes longer, sometimes it takes shorter.
Q. At any time while you were investigating Mr. Plump's concerns, did you inform Ms. Selg that you were conducting an investigation?
A. No.
Q. Did you inform Meaghan Beaver, the MOAT sales manager, about the investigation that you were conducting?
A. I don't recall.
Q. I am going to share my screen again. Ms. Urban, I am going to show you what I am marking at plaintiff's Exhibit 15 and this is GEICO 257 through 259. I will zoom in so you can see the content of this first page. It appears to be just limited to the sentence here.



A. Um-hum.
Q. Let me know when you're ready for me to scroll.
A. You can scroll. You can scroll. You can scroll. You can scroll. Okay.
Q. Ms. Urban, do you recognize this document?
A. Yes.
Q. What is it?
A. This is an overview of the investigation I completed based on Mr. Plump's concerns.
Q. So the first page of this exhibit is an e-mail from you to HR Manager Chelsea Hicks sent on December 22nd, 2021, is that correct?
A. Correct.
Q. Then there is an attachment of the overview that you are providing, is that correct?
A. Correct.
Q. Just to confirm, this next page, is that the overview that you had prepared that you were providing to Ms. Hicks?
A. Yes.
Q. So I am going to go to under the headline of the first concern, Concern No. 1, the



first bullet point states: New York is and always has been, quotation marks, A required state for MOAT sales; therefore, even if he feels he is not getting a lot of New York calls, he is required to be licensed in that state.
Did I read that correctly?
A. Yes.
Q. Where did you get the information for that bullet point result, where did that come from?
A. I believe that Nick Reed provided that information to me based on information he was given by I believe Brian Bowle or Meaghan Beaver. I am not sure which of the two. I believe Meaghan confirmed it as well, if I remember right.
Q. The second bullet point references the New York application was completed first in June of 2020. Starting in February of 2021, New York Department of Finance reached out to Dion asking for additional information, and without that information having been provided, the license was denied in August 2021. The denial was sent to our Dallas team and Dion.
Did I read that correctly?
A. Yes.
Q. Do you recall were you got that



information from that bullet point?
A. That came from a number of different sources. I had been included on several e-mails before even speaking with Dion about his licensing concerns and what was being required or requested from the state. I also got information from Dion himself stating that he needed to provide information when his license was denied and Nick Reed confirmed much of the information as well when I spoke with him and via e-mail.
Q. The third bullet states: Dallas licensing team had opportunities regarding communication with our management team and confirming applications were completed.
Did I read that correctly?
A. Yes.
Q. What does that mean?
A. It means that our Dallas licensing team had opportunities regarding communication with our management team and confirming applications were completed.
Q. Right, but I am asking. I don't understand what opportunities regarding communication? What did you mean by that?
A. They had opportunities to improve

communication.
Q. So would another way to say that is there were issues regarding communication with the management team and the Dallas licensing team was the conclusion that you reached?
A. I wouldn't say that I said that there were opportunities regarding communication.
Q. Right, but opportunities is kind of one of those that says maybe something that is used internally as a corporate terminology. I just want to make suer I am understanding what you're stating there. When you say opportunities for improvement or opportunities regarding communication, what led you to that conclusion?
A. My investigation.
Q. What specifically from your investigation led you to that conclusion?
A. In speaking with the parties involved and getting the timeline from Nick Reed, my overall investigation into the concerns.
Q. Right. And, Ms. Urban, what specifically from Mr. Reed or from other aspects of your investigation led you to believe there were opportunities regarding communication with the management team and the Dallas licensing team?



A. In the timeline below you can see Dion's denied license, denied New York 8/9, not uploaded to file by R5. R5 references the Dallas licensing team. That's one of the things that would have keyed that in to me and the timeline of events. License was denied in August of 2021, but it was applied for in June of 2020 and we were -- we did not have the upload that was necessary. So there was some communication that needed to happen that did not happen to our management team.
Q. So in that bullet point timeline event after KC licensing took over, the second kind of sub-bullet point there says: KC MOAT licensing unit created 8/23, and then there's three initial sub-bullet points under that. Are those sub-bullet points there where you kind of -- the timeline of KC MOAT licensing unit's involvement?
A. The bullet point there is to help identify why there is a difference in the timeframe. So the licensing unit was created in August and was advised of missing licenses in October and we wanted to provide some explanation as to why there was seeming delay in that. And that they were focusing on the folks who were new to the company and needed to get their licenses immediately to even be able to



do anything on the floor before they would look at the associates who were currently taking phone calls and could at least work some of the calls.
Q. And under the heading of Concern No. 2, we have results of the investigation for Concern No. 2, first bullet point: Confirm the process in MOAT where there is an associate who is unable to continue their position due to licensing concerns and MOAT management team does confirm with the other departments, sales or service if any positions are open.
Did I read that correctly?
A. Yes.
Q. Where did you come down with the information that you included in that bullet point?
A. That was confirmed with I believe Nick Reed and Meghan Beaver.
Q. And that sub-bullet points state: If so, they will set up an interview meeting with that department in the hopes that the associate can transition to the other departments and the associate is asked a few basic qualifying questions to establish that they are fit for the position and the management team will make the decision if they can proceed with the transfer to the new department.



Did I read that correctly?
A. Yes.
Q. The information in that sub-bullet point there, did you gain that from either Meaghan Beaver or Nick Reed?
A. Yes, in addition to my own experience.
Q. The second main bullet point under that result of investigation Concern No. 2 states: We were unable to confirm any situations where an associate was transferred without an interview and without knowing who this associate is, I cannot proceed any further with investigating that scenario. However, I can tell you that in this case, the management team determined after speaking with you that they would not be selecting you to move into the service position.
Did I read that correctly?
A. Yes.
Q. When you -- how did you come to have the information that you stated in the second bullet point under results of investigation, Concern No. 2?
A. I'm sorry, would you repeat that?
Q. Sure. How did you come to have the information that you included in that second bullet point under results of investigation for Concern No.