**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

**DION PLUMP,**

Plaintiff,

v.

**GOVERNMENT EMPLOYEES INSURANCE COMPANY d/b/a GEICO,**

Defendant.

Case No. 22-cv-02498

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Respectfully Submitted,

CORNERSTONE LAW FIRM

By: */s/ M. Katherine Paulus*
M. Katherine Paulus D. Kan 23866
Drew M. Russell D.Kan #79133
d.russell@cornerstonefirm.com
5821 NW 72nd Street
Kansas City, Missouri 64151
Telephone (816) 581-4040
Facsimile (816) 741-8889

**ATTORNEYS FOR PLAINTIFF**

# I. STATEMENTS OF FACT

## A. Plaintiff's Response to Defendant's Statement of Facts[1]

1. Defendant GEICO is an insurance provider that provides insurance to a wide range of customers-both government and private sector employees. (https://www.geico.com/about/corporate/at-a-glance/.)

**RESPONSE: Uncontroverted.**

2. Defendant maintains equal employment opportunity, anti-discrimination, anti-harassment and anti-retaliation policies within its Fair and Safe Workplace Policy. (Exhibit Stipulation xii, *see* Exhibit L, Fair and Safe Workplace Policy.)

**RESPONSE: Uncontroverted**

3. GEICO is committed to celebrating the diversity of all their associates. (https://www.geico.com/about/diversity-and-inclusion/.)

**RESPONSE: Controverted in Part. Uncontroverted that Defendant's website states the company is "committed to celebrating the diversity of all their associates."**

4. GEICO has comprehensive Diversity and Inclusion goals that include associate development, management development, management tools and resources, community building, and improving job seeker experience. (https://www.geico.com/about/diversity-and-inclusion/.)

**REPONSE: Uncontroverted**

5. Plump is a Black male. (Fact Stipulation i.)

**RESPONSE: Uncontroverted.**

6. Beginning June 8, 2020, Geico employed Plump at its facility in Lenexa, Kansas as a MOAT Sales Representative II. (Fact Stipulation ii.)

---

[1] Plaintiff refers to Defendant's Statements of Fact by the abbreviation "DSOF," and to Plaintiff's Additional Statements of Material Fact by the abbreviation "PSOF."

**<u>RESPONSE:</u> Uncontroverted.**

7. On February 10, 2022, GEICO sent Plump a letter informing him that his employment was terminated effective February 9, 2022. (Fact Stipulation xxxii.)

**<u>RESPONSE:</u> Uncontroverted.**

8. At the time of the termination of his employment, Plump's title was MOAT Sales Representative II. (Fact Stipulation xxxii.)

**<u>RESPONSE:</u> Uncontroverted.**

9. Plump was an at-will employee at GEICO. (*See* Exhibit A, Plump Dep. 97:16-98:1.)

**<u>RESPONSE:</u> Uncontroverted.**

10. Ms. Beaver, along with her boss, discussed the termination of Plump's employment with GEICO. (*See* Exhibit B, Beaver Dep. 13:10-15.)

**<u>RESPONSE:</u> Uncontroverted.**

11. Ms. Beaver chose to separate Plump's employment because he did not have the required licenses to maintain employment as a MOAT Sales agent. (*See* Exhibit B, Beaver Dep. 13:16-20.)

**<u>RESPONSE:</u> Controverted in part. While this was ultimately the reason for termination given in February 2022, Defendant had been in the works to terminate Plaintiff for his purported call avoidance issues in December 2021, and his supervisor, Allison Selg, attempted to follow the "job abandonment" procedure for him on December 29, 2021 due to his absence from work since the date he had requested FMLA paperwork. (Plf. Exhibit 1, GEICO 07.)**

12. In his role as MOAT Sales Representative II, Plump sold insurance to customers by telephone and, as such, was required to obtain and maintain required licenses issued by the insurance departments in various states. (Fact Stipulation ii and Exhibit Stipulation i, *see* Exhibit E, MOAT Sales Representative II Job Description.)

**<u>RESPONSE:</u> Uncontroverted.**

13. New York is the second most frequent state from which MOAT Sales receives calls. (Fact Stipulation iii.)

**RESPONSE: Uncontroverted.**

14. GEICO considers New York a required state license for the MOAT Sales Department. (Fact Stipulation iii.)

**RESPONSE: Uncontroverted, but incomplete without further context. *See* PSOF 1-2.**

15. Plump was told that having a New York license was important to his role. (Fact Stipulation iv.)

**RESPONSE: Uncontroverted.**

16. On Plump's resume, he self-identified his position with GEICO as a "licensed agent." (*See* Exhibit A, Plump Dep. 69:17–70:4.)

**RESPONSE: Uncontroverted.**

17. The goal of Plump's role at GEICO was to sell property insurance. (*See* Exhibit A, Plump Dep. 75:4-6.)

**RESPONSE: Uncontroverted.**

18. Plump did not obtain a New York insurance license while he was employed by GEICO. (Fact Stipulation iv.)

**RESPONSE: Uncontroverted.**

19. In June of 2020, Plump first attempted to complete his New York insurance license application. (*See* Exhibit C, Urban Dep. 51:15-24.)

**RESPONSE: Controverted in part. Uncontroverted that Plaintiff's application for a New York state license was initially completed in June of 2020. Controverted that it was the Plaintiff himself who completed that application. After a MOAT Sales Agent passes the licensing exam, Defendant's licensing team "takes over" to apply for state licenses on the agent's behalf. (Plf. Exhibit 2, Selg Dep. At 12:15-13:24.) Moreover, Plaintiff's supervisors**

**instructed him to let the licensing team handle any license issues that occurred so plaintiff could focus on answering customer calls. Plf. Exhibit 3, Plump Dep. At 22:25-23:24; 77:3-16; 138:5-11.)**

20. On February 5, 2021, the New York Department of Financial Services ("NYDFS") sent Plump a letter stating that his application was referred to their office, and that the NYDFS determined that Plump had been involved in a fine, denial, refusal, suspension, or revocation of license. (Fact Stipulation v, Exhibit Stipulation iii, *see* Exhibit F, NYDFS Letter Dated February 5, 2021.)

**RESPONSE: Uncontroverted, but incomplete without further context. *See* PSOF 7-10.**

21. In the February 5, 2021, NYDFS letter, the NYDFS requested that Plump submit specific information and documentation regarding the issue cited in the letter. (Fact Stipulation v., Exhibit Stipulation iii, *see* Exhibit F, NYDFS Letter Dated February 5, 2021.)

**RESPONSE: Uncontroverted.**

22. NYDFS gave Plump 15 days to respond. (Fact Stipulation v, Exhibit Stipulation iii, *see* Exhibit F, NYDFS Letter Dated February 5, 2021.)

**RESPONSE: Uncontroverted.**

23. Plump was involved in a fine, denial, refusal, suspension, or revocation of his license in the State of North Dakota that he did not report to the State of New York. (Fact Stipulation vi.)

**RESPONSE: Uncontroverted.**

24. On July 21, 2021, NYDFS sent Plump a letter stating it did not receive a response to its February 5, 2021, letter. (Fact Stipulation vii, Exhibit Stipulation iv, *see* Exhibit G, NYDFS Letter dated July 21, 2021.)

**RESPONSE: Uncontroverted.**

25. In that July 21, 2021 letter, NYDFS told Plump that they would deny his application unless they received the requested information by August 6, 2021. (Fact Stipulation vii.)

**RESPONSE: Uncontroverted.**

26. On August 9, 2021, NYDFS sent Plump a letter stating that Plump's application was denied based on the examiner's recommendation. (Fact Stipulation ix, Exhibit Stipulation v, *see* Exhibit H, NYDFS Letter Dated August 9, 2021.)

**RESPONSE: Uncontroverted.**

27. The August 9, 2021 letter stated that Plump demonstrated untrustworthiness within the meaning and intent of the New York State insurance law. (Fact Stipulation ix, Exhibit Stipulation v, *see* Exhibit H, NYDFS Letter Dated August 9, 2021.)

**RESPONSE: Uncontroverted.**

28. The August 9, 2021 letter further stated that Plump could appeal the decision by requesting a hearing via email. (Fact Stipulation ix, Exhibit Stipulation v, *see* Exhibit H, NYDFS Letter Dated August 9, 2021.)

**RESPONSE: Uncontroverted.**

29. Plump did not respond to the NYDSF's February 5, 2021, or July 21, 2021, letters. (Fact Stipulation viii.)

**RESPONSE: Uncontroverted**

30. Plump does not recall how he replied to the August 9, 2021, letter. (*See* Exhibit A, Plump Dep. 136:19–138:14.)

**RESPONSE: Controverted in part. Uncontroverted that Plaintiff testified he did not recall who, specifically, he corresponded with within the NYDFS when he responded to the August 9, 2021 letter. Controverted that Plaintiff did not recall "how" he replied to this letter, as he testified he believed he responded to it by email. (*See* Exhibit A to Doc. 50 at 136:9-11, 137:6-14.) Plaintiff also testified he ran the letter by his supervisor after he received it to see what next steps he should take, and that he was told by whomever he contacted in the NYDFS that he could not reapply for his New York state license until August 9, 2022. *Id.* at 136:9-21; 137:6-13.**

31. After the time for Plump to appeal the denial had passed, Plump was prohibited from reapplying for a New York license for one year from the date of the denial. (Fact Stipulation x.)

**<u>RESPONSE:</u> Uncontroverted.**

32. State insurance license appeals and denials were sent to GEICO associates. (*See* Exhibit B, Beaver Dep. 49:3-6.)

**<u>RESPONSE:</u> Uncontroverted, but incomplete. *See* PSOF 8-10.**

33. Ms. Beaver became aware of issues with Plump's New York license in November of 2021. (*See* Exhibit B, Beaver Dep. 14: 5-10.)

**<u>RESPONSE:</u> Uncontroverted.**

34. At that time, the licensing supervisor and manager were already reviewing to see if GEICO could obtain a license or appeal the NYDFS's denial. Once they determined an appeal was not possible, they explored another role for Plump outside of MOAT sales. (*See* Exhibit B, Beaver Dep. 14: 14-23.)

**<u>RESPONSE:</u> Controverted in Part. While the licensing supervisor and service managers purportedly explored a role for Dion in service by giving him an interview for the position, Plaintiff did not feel he was in serious consideration for the position given the brevity of the interview and the type of questions asked. (Plf. Exhibit 4, GEICO 476-477; Plf. Exhibit 3, Plump Dep. 152:5-22). *See also* PSOF**

35. In November 2021, members of GEICO management met with Plump to tell him that he was not eligible to remain in his sales position because he did not have a New York license and to explore the possibility of transferring Plump to a role in the Service Department, which would not require the New York license. (Fact Stipulation xii.)

**<u>RESPONSE:</u> Uncontroverted.**

36. Plump interviewed for a Service role, but ultimately was not approved to transfer to a position in that department. (Fact Stipulation xv.)

**RESPONSE: Uncontroverted.**

37. Plump previously failed to respond to another state's insurance department after failing to respond to two different letters from that department. (*See* Exhibit A, Plump Dep. 25: 14-23.)

**RESPONSE: Controverted in part. Uncontroverted that Plaintiff testified his North Dakota state license was suspended after the state did not receive responses to letters they sent requesting additional documentation or information. Controverted that Plaintiff failed to respond the letters in question; Plaintiff testified it was his former employer, Spring Venture Group, that submitted the application for his license in that state; correspondence from that state about his license was sent only to his employer's address (and not Plaintiff's address); his employer failed to see to the letters; he was eventually made aware of the issue and while he cannot recall exactly what documentation or information had been requested, he recalls it was "something he would have responded to." (Exhibit 3, Plump Dep. at 23:25-25:23.)**

38. Plump's failure to respond to North Dakota's letters resulted in that state—North Dakota—suspending Plump's license. (*See* Exhibit A, Plump Dep. 25:7–26:10.)

**REPONSE: Controverted in part. Plaintiff never became licensed to sell insurance in North Dakota to begin with. (Plf. Exhibit 3, Plump Dep. 26:8-10.)**

39. Plump's North Dakota license was suspended when Plump was with a previous employer. (*See* Exhibit A, Plump Dep. 24:7-9.)

**RESPONSE: Controverted in part. Plaintiff never became licensed to sell insurance in North Dakota to begin with. (Plf. Exhibit 3, Plump Dep. 26:8-10.)**

40. "Call avoidance" can refer to the process of passing a customer call to someone else when the answering employee has a license in the state where the caller is calling from. (*See* Exhibit A, Plump Dep. 34:13-23.)

**RESPONSE: Uncontroverted.**

41. Plump had, at least on one occasion, transferred a call where he was licensed in the state of the caller. Additionally, Plump believes there could be several more occasions. (*See* Exhibit A, Plump Dep. 35: 5-19).

**<u>RESPONSE:</u> Controverted in part. Uncontroverted that Plaintiff testified he could remember one occasion "for certain" where he had a license to sell insurance to a caller but chose to transfer the call. Controverted as to the characterization of Plump's testimony regarding his purported belief that there could be several more such occasions. In the portion of Plaintiff's testimony cited at 35:11-19, in answer to counsel's question, "So, again, just to confirm, do you believe there's only one time that you were licensed to sell insurance to a caller, and then transferred the call anyway" Plaintiff testified, "There's only one that I remember." Then in answer to counsel's next question, "It's possible there could be more?" Plaintiff answered, "Could be." Additionally, Plaintiff testified some of his transfers were due to the fact that he was not able to service certain policies, and when a customer calling from a state where he was licensed (such as California) was inquiring about more than one policy where one of the policies was one Plaintiff could not service. (Plf. Exhibit 3, Plump Dep. 175:25 – 177:9.)**

42. QTC means quote to call and is the percentage of quotes that an associate generates in relation to the number of calls they receive. (*See* Exhibit B, Beaver Dep. 22:24-25:5.)

**<u>RESPONSE:</u> Uncontroverted.**

43. On November 18, 2021, Mr. Foskey, Ms. Beaver's boss, sent an email with the subject line "QTC" to Kansas City MOAT Managers and MOAT Sales Supervisors. The email stated "I need to understand why these associates are below 60 percent QTC. No associates should be below 60 percent." Plump's name was included in the list. (*See* Exhibit B, Beaver Dep. 22:1- 25:11.)

**<u>RESPONSE:</u> Uncontroverted.**

44. In response to the November 18, 2021, email, Ms. Selg indicated that Plump was the only agent that had licensing problems as he was denied his New York license, and his transfer percentage was currently above 50 percent month to date. (*See* Exhibit B, Beaver Dep. 26:4-7.)

**<u>RESPONSE:</u> Uncontroverted, but incomplete. Mr. Foskey's email specifically asked the MOAT Managers and Supervisors to indicate** if anyone they supervised on that list had a licensing issue, and if so, what license they were missing. **Plf. Exhibit 1, GEICO 1320). In her response to this email, in addition to the information in DSOF 44, Ms. Selg indicated she had three agents on her team (including Plaintiff) who were on the list/had below a 60% QTC. (Plf. Exhibit 1, GEICO 1320). Ms. Selg then goes on to explain:**

> **When I asked my team why their QTC is so low, they admitted that they are not logging every quote that they are quoting (such as JM/ID and other ancillary products)….My team said that they are going to start immediately working on logging every quote and that I will do my part as their supervisor by holding them accountable and making sure they are doing so.**

***Id.***

45. On December 7, 2021, Ms. Beaver and her boss had a meeting. The meeting agenda reflected that Plump's QTC audit showed a 50 percent transfer due to license, 20 percent due to call avoidance, and 18 transfers to California in November where he held an active license. This transfer rate could have led to employment termination. (*See* Exhibit B, Beaver Dep. 44:3-46:11.)

**<u>RESPONSE:</u> Controverted in part. Uncontroverted that Ms. Beaver and her boss had a meeting on December 7, 2021, and that the agenda for that meeting includes the information included in the second sentence of DSOF 45. Controverted as to the third sentence of DSOF 45—*i.e.* "[t]his transfer rate could have led to employment termination"--because it is not supported by the cited portion of the record. In the cited portion of her deposition testimony, Ms. Beaver makes no reference whatsoever to whether a transfer rate (or Plaintiff's specific transfer rate) could have led to employment termination. *See* Exhibit B to Doc. 50 at 44:3-46:11. Plaintiff testified he did transfer some calls from customers calling from California, a**

**state where he was licensed; however, he also testified that those transfers were due to the fact that he was not licensed in certain policies at the time. (Plf. Exhibit 3, Plump Dep. 175:25 – 177:9.) *See also* PSOF 31-34.**

46. On December 10, 2021, Plump emailed GEICO's Human Resources to raise concerns about the handling of his New York license, his interview with the Service Department, his phone line receiving calls for flood insurance, and his working relationship with his supervisor. (Fact Stipulation xvi.)

**RESPONSE: Uncontroverted.**

47. Later that day, HR invited Plump to a meeting to discuss his concerns. When Plump raised these concerns with HR, he did not refer to his race or make any reference to racial discrimination. (Fact Stipulation xvi, Exhibit Stipulation viii, *see* Exhibit J, HR interview notes and related emails.)

**RESPONSE: Uncontroverted.**

48. Plump never alluded to race during his conversation with the GEICO "HR rep." (*See* Exhibit A, Plump Dep. 11: 10-21.)

**RESPONSE: Uncontroverted.**

49. Plump never brought up race. (*See* Exhibit A, Plump Dep. 11:18–12:4.)

**RESPONSE: Uncontroverted.**

50. Paragraph 16 of Plump's Complaint ("during your employment you reported to human resources that you felt you were discriminated against because of your race") is not accurate. (*See* Exhibit A, Plump Dep. 11:10-14 and 13:4-11.)

**RESPONSE: Controverted in Part. Plaintiff testified he did not directly allude to race but referred to wanting his complaint open for interpretation so that he could get questions answered from HR reps. Plaintiff also testified that he did not communicate to HR that he felt**

**he was being discriminated against because of his race, but he "definitely felt like race" had a play in "what was going on." (Plf. Exhibit 3, Plump Dep. at 11:10-12:4; 275:8-276:9.)**

51. Plump believed that "a lot of stuff that could be misconstrued as some type of discrimination" took place since his first day of employment with GEICO. (*See* Exhibit A, Plump Dep. 19:13-21.)

**RESPONSE:** **Uncontroverted.**

52. No one in management ever made any negative comments about Plump's race. (*See* Exhibit A, Plump Dep. 238:25 – 239:2.)

**RESPONSE:** **Uncontroverted.**

53. Human Resources investigated Plump's concerns, and summarized the conclusions reached as a result of that investigation. (Fact Stipulation xvii, Exhibit Stipulation vii, *see* Exhibit I, Overview of Dion Plump's Concern's.)

**RESPONSE:** **Uncontroverted.**

54. Human Resources followed up with Plump regarding the findings of its investigation. (Fact Stipulation xvii, Exhibit Stipulation viii, *see* Exhibit J, HR Interview Notes and related emails.)

**RESPONSE:** **Uncontroverted.**

55. Part of that follow up included reviewing that licensing requirements sometimes change based on business needs and that Plump is required to have certain non-resident licenses. (*See* Exhibit C, Urban Dep 38:2-22.)

**RESPONSE:** **Uncontroverted.**

56. Additionally, Human Resources was unable to confirm any situations where an associate was transferred to another department without an interview. And in Plump's case, the management team determined after speaking with him, that they would not be selecting him to move into a service position. (*See* Exhibit C, Urban Dep. 56:7-18.)

**<u>RESPONSE:</u> Controverted in Part. Uncontroverted that management did speak with Plaintiff, and that he was not selected to move to a service position. Controverted that the management team determined after speaking with Plaintiff that they would not select him to move into a service position. Plaintiff testified that he did not feel that the interview process was part of a serious consideration for a service role. (Plf. Exhibit 4, GEICO 476-477.) Additionally, conflicting evidence in the record suggests: (1) that after receiving feedback from Ms. Selg, service management was not seriously considering Plaintiff for a transfer even before they interviewed him; (2) that it was the MOAT Sales Manager (Ms. Beaver), and not service management who made the decision not to permit Plaintiff to transfer, or (3) that service management decided not to accept Plaintiff as a transfer after reviewing his information and without interviewing him. *See* PSOF ¶¶ 21-27, 46.**

57. Plump began seeing a new therapist in New York in December 2021. (*See* Exhibit A, Plump Dep. 106:10-12.)

**<u>RESPONSE:</u> Uncontroverted.**

58. On December 15, 2021, Plump contacted Human Resources to inquire about Family and Medical Leave Act ("FMLA") leave. (Fact Stipulation xviii.)

**<u>RESPONSE:</u> Uncontroverted.**

59. GEICO gave Plump the paperwork he needed to complete for FMLA leave. (Fact Stipulation xix, Exhibit Stipulation viii, *see* Exhibit K, Internal emails regarding Plump's FMLA.)

**<u>RESPONSE:</u> Uncontroverted.**

60. GEICO directed Plump on how to return the completed FMLA forms. (Fact Stipulation xix, Exhibit Stipulation viii, *see* Exhibit K, Internal emails regarding Plump's FMLA.)

**<u>RESPONSE:</u> Uncontroverted.**

61. It was Plump's (or Plump's doctor's) responsibility to maintain and return the required leave documentation. (Fact Stipulation xx.)

**<u>RESPONSE:</u> Uncontroverted.**

62. When Plump originally applied for FMLA leave, it was handled by Hartford, a third-party company. (Fact Stipulation xx.)

**<u>RESPONSE:</u> Uncontroverted.**

63. At that time, Hartford handled GEICO's FMLA and Short-Term Disability ("STD") requests. (Fact Stipulation xxii.)

**<u>RESPONSE:</u> Uncontroverted.**

64. At the end of 2021, GEICO began to transition away from using Hartford as their their-party provider. (Fact Stipulation xxiii, Exhibit Stipulation ix, *see* Exhibit M, Internal emails regarding Plump's FMLA)

**<u>RESPONSE:</u> Uncontroverted.**

65. As of January 1, 2022, Hartford was still handling GEICO's pending STD requests. (Fact Stipulation xxv, Exhibit Stipulation ix, *see* Exhibit M, Internal Emails regarding Plump's FMLA.)

**<u>RESPONSE:</u> Uncontroverted.**

66. As of January 1, 2022, GEICO handled the intermittent FMLA requests. (Fact Stipulation xxv, Exhibit Stipulation ix, *see* Exhibit M, Internal Emails regarding Plump's FMLA.)

**<u>RESPONSE:</u> Uncontroverted.**

67. On December 29, 2021, GEICO sent an email to Plump that stated "Associates with a pending intermittent claim must provide their completed medical paperwork to the GEICO leave team for review. (Contact information provided below.)" (Fact Stipulation xxiv, Exhibit Stipulation ix, *see* Exhibit M, Internal emails regarding Plump's FMLA and Exhibit D, Snyder Dep. 11:12-14:1.)

**<u>RESPONSE:</u> Uncontroverted.**

68. On January 7, 2022, Plump was told the due date for paperwork was "1/22/22." (Fact Stipulation xxxvi, Exhibit Stipulation ix, *see* Exhibit N, Internal emails regarding Plump's FMLA and Exhibit D, Snyder Dep. 23:1-10.)

**RESPONSE: Uncontroverted.**

69. On January 21, 2022, Plump emailed Ms. Snyder stating, "I've been receiving ongoing treatment, but today was the earliest appointment I could get with my PC doctor. We went over the paperwork, and she mentioned she is sending it today." (Exhibit Stipulation ix, *see* Exhibit N, Internal emails regarding Plump's FMLA and Exhibit D, Snyder Dep. 23:24-25:7.)

**RESPONSE: Uncontroverted.**

70. Ms. Snyder responded that she checked for the documents, and they had not yet been received. Ms. Snyder then followed up and gave Plump suggestions on calling his provider's office to fax it again and possibly email the documents." (Exhibit Stipulation ix, *see* Exhibit N, Internal emails regarding Plump's FMLA and Exhibit D, Snyder Dep. 24:18–25:4.)

**RESPONSE: Uncontroverted.**

71. On January 21, 2022, GEICO approved Plump for FMLA intermittent leave retroactively from December 17, 2021, to September 21, 2022. (Fact Stipulation xxvii, Exhibit Stipulation ix, *see* Exhibit O.)

**RESPONSE: Uncontroverted.**

72. Plump's approved FMLA was limited to one-day episode up to two times a month with two doctor appointments a year. (Fact Stipulation xxvii, Exhibit Stipulation ix, *see* Exhibit O, Internal Emails regarding Plump's FMLA.)

**RESPONSE: Uncontroverted.**

73. Plump understood he was approved for leave for anxiety and depression in early 2022. (*See* Exhibit A, Plump Dep. 44:4-24.)

**RESPONSE: Uncontroverted.**

74. On December 16, 2021, Plump sent an internal message to his supervisor stating that he was going to check into a hospital. (Fact Stipulation xxi, Exhibit Stipulation ix, *see* Exhibit P, Internal Emails regarding Plump's FMLA)

**<u>RESPONSE:</u> Uncontroverted.**

75. Plump did not check into a hospital on that date. (Fact Stipulation xxi.)

**<u>RESPONSE:</u> Uncontroverted.**

76. On December 16, 2021, and for the following 42 days, Plump did not report to work. (*See* Exhibit 1 attached to Exhibit R, Fusco Declaration.)

**<u>RESPONSE:</u> Uncontroverted.**

77. On February 4, 2022, Plump told his supervisor he was "getting checked back into the hospital." (Fact Stipulation xxix.)

**<u>RESPONSE:</u> Uncontroverted.**

78. Plump did not check back into a hospital on February 4, 2022. (Fact Stipulation xxix.)

**<u>RESPONSE:</u> Uncontroverted.**

79. On February 9, 2022, Plump asked his friend and emergency contact, Maureen Griffin, to let GEICO know that he was "in the hospital for an extended period of time." (Fact Stipulation xxx, Exhibit Stipulation ix, *see* Exhibit Q, Internal emails regarding Plump's FMLA.)

**<u>RESPONSE:</u> Uncontroverted.**

80. Maureen Griffin was Plump's listed emergency contact at GEICO. (Fact Stipulation xxx.)

**<u>RESPONSE:</u> Uncontroverted.**

81. Maureen Griffin is Plump's daughter's mom. (*See* Exhibit A, Plump Dep. 17:10-13.)

**<u>RESPONSE:</u> Uncontroverted.**

82. Plump was not in the hospital on February 9, 2022. (Fact Stipulation xxx.)

**<u>RESPONSE:</u> Uncontroverted.**

83. Despite his statements to the contrary, Plump was never admitted into a hospital at any time between December 16, 2021, and February 9, 2022. (Fact Stipulation xxxi.)

**<u>RESPONSE:</u> Uncontroverted.**

84. Ms. Selg was a MOAT Sales Supervisor at GEICO. (Selg Dep. 6:16-18.)

**<u>RESPONSE:</u> Uncontroverted.**

85. Ms. Urban is a Senior Associate Relations Specialist with GEICO. (*See* Exhibit C, Urban Dep. 5: 12-17.)

**<u>RESPONSE:</u> Uncontroverted.**

86. Ms. Snyder is an HR Leave Specialist for GEICO. (*See* Exhibit D, Snyder Dep. 6:13-14.)

**<u>RESPONSE:</u> Uncontroverted.**

87. Ms. Beaver is a MOAT Sales Manager for GEICO. (*See* Exhibit B, Beaver Dep. 4:14-19.)

**<u>RESPONSE:</u> Uncontroverted.**

88. Ms. Beaver has direct reports of supervisors, trainers, and members within the development programs and associates in the MOAT Sales Department. (*See* Exhibit B, Beaver Dep. 7:15-24.)

**<u>RESPONSE:</u> Uncontroverted.**

89. Ms. Beaver supervised Ms. Selg. (*See* Exhibit B, Beaver Dep. 8:4-8.)

**<u>RESPONSE:</u> Uncontroverted.**

90. Ms. Selg supervised five individuals other than Plump. Two of those other individuals are Black. (*See* Exhibit S, Selg Dep. 83:23 – 84:20.)

**<u>RESPONSE:</u> Uncontroverted.**

91. The authority to make the decision to separate employment is Ms. Beaver's. (*See* Exhibit B, Beaver Dep. 12:24-13:5.)

**<u>RESPONSE:</u> Uncontroverted.**

92. Plump only assumes his race had a factor in GEICO's decisions. (*See* Exhibit A, Plump Dep. 239:3–340:6.)

**<u>RESPONSE</u>: Uncontroverted that Plaintiff testified he assumed his race was a factor in Defendant's decisions. Controverted to the extent this statement implies Plaintiff testified he "*only*" assumes his race was a factor without providing any additional explanation. Plaintiff testified the circumstances surrounding the interview he had for a service role supported his claim of race discrimination, and that he believed his race was a factor in Defendant's decisions because he believes he was treated differently than some of his coworkers, his interactions with supervisor Allison Seg (and the manner in which she graded his calls), and the fact that he was not allowed to transfer to a service position despite his good performance appraisal rating and the number of "comp" (*i.e.* compliment) calls the company received from customers about him. (Plf. Exhibit 3, Plump Dep. 238:8-24; 239:3-9; 275:13-277:20; 279:3-16; 280:1-19.)**

93. Ms. Beaver is unaware of any other GEICO associates who have been denied their New York license. (*See* Exhibit B, Beaver Dep. 18:10-21.)

**<u>RESPONSE:</u> Uncontroverted.**

94. Ms. Beaver recalls terminating the employment of two other individuals who did not have required licenses in the MOAT Department at the Lenexa, Kansas location besides Plump. (*See* Exhibit B, Beaver Dep. 19:3-20:21.)

**<u>RESPONSE:</u> Controverted in part. While Ms. Beaver identified two other associates who were terminated for licensing issues, they were distinguishable from Plaintiff's situation. One was denied for not having a Kansas license and was terminated shortly (3 months) thereafter, while the other was terminated for failing the licensing exam. (Plf. Exhibit 5, Beaver Dep. at 19:19-21:24.) Plaintiff's New York state license was denied in August 2021, and he was not terminated until February 2022, a whole six months later. (Fact Stipulation ix; Fact Stipulation xxxii.) Additionally, evidence in the record suggests an employee's failure to**

**obtain a "required" state license does not always result in his or her termination. *See* PSOF ¶¶ 44, 45, 47, 57.**

95. According to Plump, he might have worked a shift or two for GEICO from New York. (*See* Exhibit A, Plump Dep.87:4-8.)

**RESPONSE: Uncontroverted.**

96. On April 5, 2021, Plump posted to a social media account, "I'm 'working' from home . . . " in Lime Lake, New York (which is approximately 45 minutes from Buffalo, New York). Plump's social media post also said, "They didn't specify whose home." Plump testified that the "they" might have referred to an employee of GEICO. (*See* Exhibit A, Plump Dep. 87:20– 93:20.)

**RESPONSE: Controverted in Part. While Plaintiff did testify that "they' might have referred to a GEICO employee, he also testified that he was not talking about anyone in particular, and that it was more banter than anything. (Plf. Exhibit 3, Plump Dep. 92:2-93:20.) He also testified the date of his social media posts about events is not always indicative of when the event he is posting about actually occurred, explaining, "I don't always post immediately what is happening in the moment." (Plf. Exhibit 3, Plump Dep. 89:20-90:6.)**

97. While employed by GEICO, Plump inquired about transferring to a role in Buffalo, New York. (Fact Stipulation xiii.)

**RESPONSE: Uncontroverted.**

98. Plump was evicted from his property twice while working for GEICO by Celtic Property Management. In the first eviction, he was able to maintain the residence. For the second eviction, he surrendered the property and went to Buffalo, New York. (*See* Exhibit A, Plump Dep. 42:5-43:14.)

**RESPONSE: Uncontroverted that Plump testified he faced eviction proceedings two times while he was employed by Defendant, that he was able to maintain his residence the first time, and that Plaintiff testified he surrendered his property and moved to New York after**

**the second eviction. Controverted to the extent this statement implies Plaintiff was physically evicted from his apartment in Kansas City while he was still employed with Defendant. In response to Defendant's Second Set of Requests for Production of Documents, Plaintiff produced a copy of the Petition from his second eviction proceeding, which was filed with the Jackson County Circuit Court in Missouri on February 7, 2022—*i.e.* three days prior to the date he was notified of his termination from employment with Defendant. (Plf. Exhibit 6, PLUMP 293-296.) Plaintiff also testified he did not officially relinquish his apartment in Kansas City until February 2022, when eviction proceedings were already underway, and that he recalls moving to Medina, New York on February 22, 2022. (Plf. Exhibit 3, Plump Dep. at 50:3-7, 204:10-20.)**

99. Celtic Property Management is a company in Kansas City, MO. (https://www.celticproperties.net/contact.)

**RESPONSE: Uncontroverted.**

100. Plump resided in Buffalo, New York after he was evicted in 2022. (*See* Exhibit A, Plump Dep. 43:17-19.)

**RESPONSE: Uncontroverted.**

101. At the time of his eviction in 2022, Plump was still employed at GEICO. (*See* Exhibit A, Plump Dep. 43:22-44:3.)

**RESPONSE: Controverted in part. Uncontroverted Plaintiff testified he was still employed by Defendant at the time his 2022 eviction proceedings began. Controverted to the extent this statement of fact implies Plaintiff was actually evicted from his apartment in Kansas City while he was still employed with Defendant. (*See* Plaintiff's Response to DSOF 98.) In response to Defendant's Second Set of Requests for Production of Documents, Plaintiff produced a copy of the Petition from his second eviction proceeding, which was filed with the Jackson County Circuit Court in Missouri on February 7, 2022—*i.e.* three days prior to the date**

**he was notified of his termination from employment with Defendant. (Plf. Exhibit 6, PLUMP 293-296). Plaintiff also testified he did not officially relinquish his apartment in Kansas City until February 2022, when eviction proceedings were already underway, and that he recalls moving to Medina, New York on February 22, 2022. (Plf. Exhibit 3, Plump Dep. at 50:3-7, 204:10-20.)**

102. From approximately mid-December 2021 through the beginning of January 2022 and late January or early February 2022, Plump was in New York. (*See* Exhibit A, Plump Dep. 104:8-17.)

**RESPONSE: Uncontroverted, but confusing as written. Plaintiff testified he was in New York from mid-December of 2021 through early January 2022, when he returned to Kansas City. Then, in late January or early February 2022, Plaintiff went back to New York. (*See* Exhibit A to Doc. 50, Plump Dep. at 104:4-20.)**

103. On the date GEICO terminated Plump's employment, Plump was in Buffalo, New York. (*See* Exhibit A, Plump Dep. 104:1-3.)

**RESPONSE: Uncontroverted.**

104. Plump later testified he did not move to New York until after he was terminated from GEICO. (*See* Exhibit A, Plump Dep. 204:10-15.)

**RESPONSE: Uncontroverted that Plaintiff testified that he did not officially relinquish his Kansas City address, load up his belongings into his vehicle, and physically move to a new residence in New York until February 22, 2022. (Plf. Exhibit 3, Plump Dep. at 50:3-23; 204:10-15.)**

105. By February 22, 2022, Plump was living in Buffalo, New York. (*See* Exhibit A, Plump Dep. 16:16-18.)

**RESPONSE: Controverted in part. Uncontroverted that Plaintiff testified he officially moved to New York on February 22, 2022; controverted to the extent it implies Plaintiff had already been living there as of that date. (Plf. Exhibit 3, Plump Dep. at 50:3-7; 204:10-15.)**

106. At least for part of the time, Plump lived in Medina, New York outside of Buffalo. (*See* Exhibit A, Plump Dep. 49:21-25.)

**<u>RESPONSE:</u> Uncontroverted that Plaintiff testified he lived in Medina, New York outside of Buffalo after he relinquished his apartment in Kansas City. (Plf. Exhibit 3, Plump Dep. at 50:3-7.)**

### B. Plaintiff's Additional Statements of Fact

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Plaintiff provides the following statement of additional uncontroverted material facts in opposition to Defendant's Motion for Summary Judgment:

1. The MOAT Sales Representative II position description does not mention any specific state being required for licensure. (Plf. Exhibit 7, GEICO 399.)

2. The MOAT Sales Representative II position description's only statement regarding licensure is that an associate "must be able to attain and maintain the required licenses issued by the insurance departments of various states. (Plf. Exhibit 7, GEICO 399.)

3. Plaintiff testified that during his employment with Defendant, when he would take time away from the phone to address or respond to issues with his licensing, including his New York state license, that his supervisor would instruct him to let the licensing team or department handle the issue so that Plaintiff could focus on answering customer calls. (Plf. Exhibit 3, Plump Dep. at 22:25-23:24; 77:3-16.)

4. On October 13, 2021, Plaintiff made his supervisor at the time—Ceci Haberdash—aware of an issue with his Louisiana state license by forwarding her an email thread between himself and Nece Cosby in Defendant's licensing group. (Plf. Exhibit 7, GEICO 1195-1197.)

5. On October 27, 2021, Ms. Haberdash followed up with Ms. Cosby by email to inquire whether the issue had been taken care of, stating "[p]lease let me know if there is additional information you need as Dion should not be handling this." (Plf. Exhibit 7, GEICO 1195-1197.)

6. Until the Kansas City MOAT Licensing Team was created on August 23, 2021, requests and requirements for Defendant's MOAT Sales Representatives in in the company's Lenexa, Kansas location were handled by a licensing team located in Dallas, Texas. (Plf. Exhibit 8, Urban Dep. at 42:10-43:1.)

7. Copies of correspondence from the New York State Department of Financial Services regarding Plaintiff's state license were sent both to Plaintiff and to Defendant's licensing group. (Plf. Exhibit 8, Urban Dep. at 53:21-54:10; Plf. Exhibit 7, GEICO 565-571.)

8. In her summary of conclusions reached from the investigation she conducted into Plaintiff's complaint, Ms. Urban notes that the Dallas licensing group (a/k/a "R5") failed to upload a copy of the August 9, 2021 denial letter regarding Plaintiff's New York license to the company's file. (Plf. Exhibit 4, GEICO 257-259; Plf. Exhibit 8, Urban Dep. at 53:21-54:10.)

9. Ms. Urban's investigation conclusions also note the Dallas licensing team had "opportunities regarding communication with our management team and confirming applications were completed." (Plf. Exhibit 4, GEICO 257-259.)

10. In a February 8, 2022 email providing Ms. Beaver with language that Ms. Urban had drafted to add to a memorandum regarding Plaintiff's termination, Ms. Urban further explained:

> It was determined prior to this investigation that there was opportunity within the Dallas licensing team who previously handled Kansas City licensing. It was found that they were not properly following up with leadership and all necessary parties to advise of deficiencies in licensing and were incorrectly notifying leadership of extended delays when there were none. Additionally, typically associates are to obtain licenses within 60 days of passing the state exam but this timeframe was frequently exceeded due to the explanation of extensive state delays and lack of clear communication given by the licensing team in Dallas.
>
> It was later determined that the delays were caused by a lack of follow-up and application for licenses by the team. As a result of these opportunities, the Dallas licensing supervisor was removed from her position and Kansas City established a licensing team who immediately began trying to resolve all deficiencies and outstanding applications.

(Plf. Exhibit 1, GEICO 260-261; Plf. Exhibit 8, Urban Dep. at 67:18-68:18.)

11. Allison Selg, (white/Caucasian) was Plaintiff's last supervisor at GEICO; Plaintiff began reporting to Ms. Selg around the end of October 2021. (Exhibit 3, Plump Dep. 31:3-4; Fact Stipulation xi.)

12. Mr. Plump testified that he did not have any positive interactions with Ms. Selg, and rather than feeling like the feedback she provided him was intended to help him improve, he felt she was nitpicking him or out to get him. (Plf. Exhibit 3, Plump Dep. at 109:10-110:21; 198:22-199:9; 201:1-202:6.)

13. On November 17, 2021, MOAT Sales Manager Brian Blowe sent an email to Ms. Selg stating Plaintiff had been denied his New York license and "we don't have the ability to keep him in sales going forward." (Plf. Exhibit 9, GEICO 1190-1193; Plf. Exhibit 2, Selg Dep. at 33:8-34:11.)

14. In this email, Mr. Blowe goes on to state, "we are currently working with the Service managers to see if he would be a good fit with their department" and that in "[i]n doing so, they are asking for a synopsis of his current performance (3-month rolling and YTD), overall attendance standing and any behavioral concerns" and then asks Ms. Selg to provide the requested information. (Plf. Exhibit 9, GEICO 1190-1193; Plf. Exhibit 2, Selg. Dep. at 34:17-35:7.)

15. Ms. Selg responded to Mr. Blowe's email on the same day (November 17, 2021), attaching a copy of Plaintiff's Three-Month Report Card, Year to Date Report Card, and Record of Attendance, and providing a summary of Plaintiff's performance strengths and opportunities. (Plf. Exhibit 9, GEICO 1190-1193; Plf. Exhibit 2, Selg Dep. at 36:1-38:11; 39:20-40:12.)

16. In this email, Ms. Selg notes Plaintiff "does not seem to be doing call avoidance anymore since the conversation" she had with him. (Plf. Exhibit 9, GEICO 1190-1193.)

17. After reviewing the feedback Ms. Selg provided regarding Plaintiff, Manager Alicia Sullivan stated in a November 18, 2021 email that she had "serious concerns" about accepting Plaintiff in a transfer to a service position. Mr. Blowe then asked her to consider interviewing Plaintiff to give

him an opportunity to give his perspective on these concerns, and Ms. Sullivan agreed to do so. (Plf. Exhibit 9, GEICO 1190-1193.)

18. On November 29, 2021, Ms. Beaver asked Ms. Selg to submit a warning for Plaintiff for call avoidance. (Plf. Exhibit 1, GEICO 428.)

19. Three days later, Ms. Selg submitted a call avoidance corrective action warning for Plaintiff, dated December 2, 2021, for review by Ms. Beaver and local Human Resources. (Plf. Exhibit 1, GEICO 414; Plf. Exhibit 1, GEICO 264-265; Plf. Exhibit 2, Selg Dep. at 51:15-53:7; Plf. Exhibit 5, Beaver Dep. at 9:14-10:1.)

20. This corrective action was ultimately never issued to Plaintiff; he was never subject to any formal discipline during his employment (Plf. Exhibit 3, Plump Dep. at 166:3-11; Plf. Exhibit 5, Beaver Dep. at 29:17-31:22.)

21. On February 9, 2022, Ms. Urban asked Ms. Beaver *via* a WebEx chat to confirm some information about Plaintiff and the service position so Ms. Urban could ensure she was "outlining this correctly to" corporate. (Plf. Exhibit 9, GEICO 1341; Plf. Exhibit 5, Beaver Dep. at 46:12-47:20.)

22. The specific information Ms. Urban asked Ms. Beaver to confirm that she was outlining correctly, was "Service spoke with Dion about moving to service (even though he didn't want to) but ultimately you decided not to allow the move because of the concern over call avoidance and you confirmed with them that it would be an issue in service as well"; and Ms. Beaver responded, "That is correct." (Plf. Exhibit 9, GEICO 1341; Plf. Exhibit 5, Beaver Dep. at 46:12-47:20.)

23. When Ms. Beaver was asked at her deposition whether Ms. Urban's description in that WebEx chat matched Ms. Beaver's own recollection of what had occurred when a transfer for Plaintiff to the service department had been contemplated, Ms. Beaver responded:

> Close. So in terms of who was making the decision to not allow him to move to service, I was not the service hiring manager so ultimately that would have been the service managers deciding that due to the call avoidance concerns, they did not want to have him move into the service department.

(Plf. Exhibit 5, Beaver Dep. at 47:21-48:4.)

24. However, when Ms. Urban had previously interviewed Ms. Beaver as a part of her investigation into Plaintiff's complaint, Ms. Beaver also identified herself as the decisionmaker for not letting Plaintiff move into a service role; more specifically, Ms. Urban asked Ms. Beaver to talk her "through the options [she] gave [Plaintiff] regarding service, and Ms. Beaver responded:

> So because we were looking at call avoidance warning and that's a behavior that would effect them as well, *it was my decision not to make that move (letting him go to service)*. We discussed the potential of the move to service with him – but he was upset about having to leave sales. But we never did an interview with him or an offer to him.

(Plf. Exhibit 4, GEICO 371-372 (emphasis added); Plf. Exhibit 8, Urban Dep. at 39:24-40:23; 44:11-18.)

25. Ms. Urban then attempted to clarify whether Plaintiff had received an interview for a service position (noting Plaintiff indicated he had); after checking with others, Ms. Beaver confirmed that Plaintiff did receive an interview for a service position. (Plf. Exhibit 4, GEICO 371-372.)

26. Ms. Urban then asked, "So was that interview and discussion with him before you decided against service" and Ms. Beaver responded:

> Yes. So basically Nick/Alison/Brian met with him and discussed licensing. They offered to have him interview with service. Then after that convo the call avoidance came up. I didn't want him to move to service bc that issue can transfer from departments and when I told Alicia/Erin about it they confirmed they wouldn't want him if he's on an active warning.

(Exhibit 4, GEICO 371-372.)

27. Plaintiff interviewed for a service position on December 1, 2021. (Plf. Exhibit 4, GEICO 235-237.)

28. Call gating refers to the way customer calls were "funneled" to customer-facing employees like Plaintiff. (Plf. Exhibit 3, Plump Dep. at 145:9-15.)

29. In Plaintiff's December 10, 2021 email complaint to Human Resources, he noted his call gating had been shifted to Flood service calls while his supervisor was on vacation and he was not

in a position to get it fixed in her absence, and that he had experienced gating issues with service calls the prior month as well. (Plf. Exhibit 4, GEICO 476-477.)

30. During his December 15, 2021 interview with Ms. Urban, Plaintiff told her that since November he had been experiencing issues with his call gating, including two days where he received only customer service calls, and more recently when he had predominately received flood insurance calls. (Plf. Exhibit 4, GEICO 235-237.)

31. Plaintiff also told Ms. Urban that he had spoken with Ms. Selg about his call gating, but she initially told him to "ride out the day and would go from there," and the only other thing Ms. Selg told him was that she had looked at his gating and "alluded that [Plaintiff] and a few others were having issues with gating." (Plf. Exhibit 4, GEICO 235-237.)

32. Ms. Urban interviewed two of Plaintiff's peers who similarly reported to Ms. Selg during her investigation of Plaintiff's complaints. (Plf. Exhibit 8, Urban Dep. at 45:19-46:10; 59:17-60:20.) One of these peers noted they were supposed to receive only sales calls, but that "doesn't always happen" given misdirects and customers being transferred from the auto department without warning; this peer also noted a recent increase in the amount of flood insurance calls received (which the team was still in the process of being trained to handle). (Plf. Exhibit 4, GEICO 411-412.)

33. Plaintiff was not trained to take Flood insurance calls, and thus, could not handle them. (Plf. Exhibit 4, GEICO 258-259; Plf. Exhibit 3, Plump Dep. at 150:7-15.)

34. On December 15, 2021, Ms. Selg received an email notification from the Hartford, indicating that a Short-Term Disability claim and a leave of absence claim had been created for Plaintiff, and that his first date of absence would be December 17, 2021. (Plf. Exhibit 9, GEICO 283.)

35. This email notification Ms. Selg received also indicated "the necessary information from [Plaintiff's] health care provider to support the leave request" was due by January 11, 2022, at which time they would "make a determination to approve or deny the request." (Plf. Exhibit 9, GEICO 283.)

36. In her December 29, 2021, email stating that she had begun the job abandonment procedure for Plaintiff because he had been a "no call no show" since December 16, 2021, Ms. Selg also notes that the company had been "getting ready to terminate Dion due to call avoidance" around December 16, 2021. (Plf. Exhibit 1, GEICO 07.)

37. Plaintiff was diagnosed as having mild major depression and anxiety. (Plf. Exhibit 3, Plump Dep. 205:15-20; 221:4-7.)

38. Ms. Snyder originally sent Plaintiff an email indicating the due date for his FMLA paperwork was February 22, 2022. (Plf. Exhibit 10, Snyder Dep. 23:1-10.)

39. Ms. Selg mentioned in text messages that the Hartford could not extend the deadline for Plaintiff's FMLA, and on January 12, 2022, that Plaintiff's FMLA request had been denied. (Plf. Exhibit 9, GEICO 1521-1522.) Ms. Selg told Plaintiff on January 15, 2022, that she had been informed his FMLA and short-term disability leave requests had been denied because documentation was not received by the deadline of January 12, 2022; Plaintiff informed her that his deadline was the 22nd and he was still working with his medical providers on obtaining documentation. (Plf. Exhibit 6, PLUMP 22-25.)

40. Plaintiff sent a chat message to Ms. Selg on January 28, 2022, stating, "Part of the reason I had to take leave is because of the stress and anxiety I have experienced under your leadership." (Plf. Exhibit 3, Plump. Dep. 198:5-20.)

41. When Ms. Urban interviewed him about his complaint on December 15, 2021, Plaintiff said that when he first got on the floor, he was told he needed to have at least eleven (11) licenses and he "for sure" needed to have "CA, TX, and I think NC or VA." (Plf. Exhibit 4, GEICO 235-236.)

42. Plaintiff testified that he was not originally told that that needed to have a New York license, but instead that he needed enough licenses to be serviceable, which meant maintaining at least a "3" rating on his performance appraisals. (Plf. Exhibit 3, Plump Dep. 75:25 – 76:1-14.)

43. On December 20, 2021, Ms. Urban interviewed Licensing Supervisor Nick Reed as a part of her investigation into Plaintiff's complaint. (Plf. Exhibit 8, Urban Dep. at 60:24-61:15; Plf. Exhibit 4, GEICO 413.) (emphasis added)

44. During this interview, Ms. Urban asked Mr. Reed how they decide what is considered a "required" state for agents to be licensed in, and Mr. Reed responded, "[a]ny state that is 10% of their calls or more *is now a 'required'* state in sales." (Plf. Exhibit 4, Interview Notes GEICO 413.) (emphasis added).

45. Ms. Urban also asked Mr. Reed, "If someone doesn't have a 'required state' license, how do you determine if it is impactful" to which Mr. Reed responded, "[i]f transfer percentage is below a certain point *they will keep the associate* but his transfer rate is in the 30's so he's high up there. Nobody else is missing NY, it's just him." (Plf. Exhibit 4, Interview Notes GEICO 413.) (emphasis added)

46. Mr. Reed told Ms. Urban he was not involved in the decision-making process for Plaintiff's possible transfer to service, but he understood Plaintiff's information had been sent over to service, and that department did not want to take him. Ms. Urban asked Mr. Reed, "did you find out after he was interviewed that they didn't want him or was it that you sent over his information and they looked it over and said no so that you guys would know not to mention that as a possibility?" Mr. Reed responded, "[t]he second one. We didn't even discuss service as an option since we knew. But I wasn't in the conversation with him." (Plf. Exhibit 4, Interview Notes GEICO 413.)

47. On December 20, 2021, Mr. Reed forwarded a list of the top states by call volume for sales to Ms. Urban; this list indicated calls from New York customers comprised 9.98% of the call volume for sales. (Plf. Exhibit 4, GEICO 535-537; Plf. Exhibit 8, Urban Dep. at 40:24-42:9.)

48. MOAT Sales Representatives were measured on several different performance metrics including productivity (the amount of calls they receive versus how much they have sold), their "points

per active hour" ("PPAH"), customer experience ("CE"), and cross selling. (Plf. Exhibit 2, Selg Dep. at 21:12-22:18; 57:20-58:18; Plf. Exhibit 5, Beaver Dep. at 36:1-38:5.)

49. Defendant's employees are assessed Performance Appraisal ("PA") ratings on a five point numerical scale, under which a PA rating of 1.0 – 1.9 is considered "Unsatisfactory"; a PA rating of 2.0 – 2.9 is "Fair"; a PA rating of 3.0-3.9 is "Good"; a PA rating of 4.0-4.9 is "Very Good"; and a 5.0 PA rating is considered "Outstanding." Plf. Exhibit 11, GEICO 34-35.)

50. A PA rating over 3.0 is considered "Good," or "Consistently meets and occasionally exceeds goals for the position. Makes full use of abilities and experience to produce desired results." Plf. Exhibit 11, GEICO 34-35.)

51. Plaintiff's PA Rating was a 3.8 for the period of January 1, 2021-June 30, 2021, and a 3.5 for the period of July 1, 2021-December 31, 2021. (Plf. Exhibit 11, GEICO 1180-118). As of November 30, 2021. Plaintiff's year to date PA Rating was a 3.5, and his rolling three-month PA Rating for the period of September 1, 2021 through November 30, 2021 was a 3.6. (Plf. Exhibit 11, GEICO 421; Plf. Exhibit 11, GEICO 423.)

52. Plaintiff testified he would use the phrase "in the hospital" as way to shut down communication with his supervisor, explaining Ms. Selg "constantly" texted and called him while he was on leave and he was just "trying to seek treatment unperturbed." (Plf. Exhibit 3, Plump Dep. 115:8-116:18.)

53. As of December 23, 2021, Plaintiff's year to date transfer rate was 41%; from month to month in 2021, Plaintiff's transfer rate ranged from 32% to 50%. (Plf. Exhibit 1, GEICO 435-436.)

54. Plaintiff does not know what Defendant considered an acceptable transfer rate for a MOAT sales agent (he testified "it was never a conversation, so [he] wouldn't know"), he did not know what other sales agents' transfer rates were, and did not know what his own transfer rate was. (Plf. Exhibit 3, Plump Dep. 187:2-10.)

55. In advance of his termination, Plaintiff submitted a written statement to Ms. Beaver, who had requested he provide a statement of any information he would like the company to consider during its "review of his employment" for his failure to obtain a New York license. (Plf. Exhibit 1, GEICO 353-354. In his statement, Plaintiff reiterates his history of good PA ratings and explains that he followed his supervisor's direction to let the licensing team handle any issues that arose with his state licensing (including New York). *Id.*

56. After a MOAT Sales Agent passes the licensing exam, Defendant's licensing team "takes over" to apply for state licenses on the agent's behalf. (Plf. Exhibit 2, Selg Dep. At 12:15-13:24.)

57. Emails between Defendant' licensing team and members of KC MOAT Management demonstrate there was frequent, ongoing communication regarding licensing delays and denials, and that MOAT Sales Representatives other than Plaintiff were missing "required" state licenses for long periods of time during Plaintiff's employment. (Plf. Exhibit 7, GEICO 650; GEICO 364-367; GEICO 632; etc)

58. Plaintiff had 28 state licenses as of December 4, 2020. (Plf. Exhibit 7, GEICO 364-367.)

## II. SUMMARY JUDGMENT STANDARDS

Summary judgment is warranted when the moving party has provided evidence demonstrating there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A party who moves for summary judgment bears the burden of showing that there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986). "There is a genuine dispute of material fact 'if a rational jury could find in favor of the nonmoving party on the evidence presented.'" *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 882 (10th Cir. 2018) (quoting *EEOC v. Horizon/CMS Healthcare Corp.,* 220 F.3d 1184, 1190 (10th Cir. 2000)) (emphasis provided). When deciding whether to grant summary judgment, courts view the evidence in the light most favorable to, and all reasonable inferences are drawn in favor of, the nonmoving party. *Id.* (citing *Gutierrez v. Cobos,*

841 F.3d 895, 900 (10th Cir. 2016)). "It is axiomatic that a judge may not evaluate the credibility of witnesses in deciding a motion for summary judgment." *Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir. 2000) (citing *Liberty Lobby, Inc.*, 477 U.S. at 255; *Koopman v. Water Dist. No.* 1, 972 F.2d 1160, 1164 (10th Cir. 1992)).

## III. ARGUMENTS & AUTHORITIES

Plaintiff's claims of FMLA discrimination/retaliation,[2] ADA retaliation, Title VII race discrimination, and 42 U.S.C. §1981 ("Section 1981") race discrimination are all subject to the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[3] *See Gerovic v. City & Cnty. of Denver,* No. 22-1148, 2023 U.S. App. LEXIS 4935, at *16 (10th Cir. Mar. 1, 2023) (analyzing Title VII and Section 1981 claims together under burden-shifting framework); *Proctor v. UPS,* 502 F.3d 1200, 1207-08 (10th Cir. 2007) (analyzing ADA retaliation claims under the burden-shifting framework). By contrast, "the *McDonnell Douglas* burden-shifting analysis does not apply" to Plaintiff's claims of interference under the FMLA because interference "is a violation regardless of the employer's intent." *Ford v. Brennan,* No. 21-4086, 2023 U.S. App. LEXIS 22917, at *8-9 n. (10th Cir. Aug. 30, 2023)(quoting *Metzler,* 464 F.3d at1180.

### A. Plaintiff Can Demonstrate a Prima Facie Case of Race Discrimination

To establish a *prima facie* case of race discrimination under either Title VII or Section 1981,[4] Plaintiff must show he (1) belongs to a protected class, (2) suffered an adverse employment action, and

---

[2] Although Plaintiff has referred to the claims asserted in Count II of his Complaint as FMLA "discrimination" claims, the Tenth Circuit "has recognized two theories of recovery under § 2615(a): an entitlement or interference theory arising from § 2615(a)(1), and a retaliation or discrimination theory arising from § 2615(a)(2)."). Put differently, in the Tenth Circuit, claims based on the theory of recovery arising from § 2615(a)(2) appear to be referred to as FMLA "discrimination" or "retaliation" claims, and for the sake of clarity, Plaintiff will refer to the FMLA claims he asserts in Count II as FMLA retaliation claims.

[3] Under the McDonnell Douglas burden-shifting framework, a plaintiff must first "raise a genuine issue of material fact on each element of the prima facie case. . ." *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019) (internal citations omitted). The burden then "shifts to the employer to offer a legitimate non-discriminatory reason for its employment decision." *Id.* If the employer does so, "the burden then reverts to the plaintiff to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual - i.e., unworthy of belief." *Id.*

[4] Plaintiff's Title VII and Section 1981 race discrimination claims arise out of the same facts, and thus, have the same elements. *Timmons v. AGC Flat Glass N. Am., Inc.*, Case No. 14-2272-EFM, 2015 U.S. Dist. LEXIS 146240, at *6 (D. Kan.

(3) the adverse employment action "occurred under circumstances giving rise to an inference of discrimination." *Wilson v. Textron Aviation Inc.,* No. 17-1287-EFM, 2019 U.S. Dist. LEXIS 114997, at *13-14 (D. Kan. July 11, 2019) (citing *Luster v. Vilsack*, 667 F.3d 1089, 1095 (10th Cir. 2011)). Defendant concedes Plaintiff meets the first and second elements of a *prima facie* claim of race discrimination; he is Black/African-American (DSOF 5), and he was involuntarily terminated[5] from his employment with Defendant (DSOF 7). Defendant argues, however, that Plaintiff cannot demonstrate the third element of his *prima facie* case—*i.e.* showing his termination "occurred under circumstances giving rise to an inference of discrimination." Doc. 55 at 22.

The Tenth Circuit has emphasized the "requirements for a *prima facie* showing are flexible and non-burdensome." *Nguyen v. Gambro BCT, Inc.,* 242 F. App'x 483, 489 (10th Cir. 2007)(citing *Ortiz v. Norton,* 254 F.3d 889, 895 (10th Cir. 2001)) ("[I]t should now be obvious that the burden imposed on a plaintiff at the prima facie stage is not onerous.") (quotations omitted). As this Court has previously noted, an "inference of discriminatory discharge arises if 'an employee who belongs to a racial minority . . . eliminates the two most common, legitimate reasons for termination, *i.e.*, lack of qualification or the elimination of the job.'" *Washington v. U.S. Bank Nat'l Ass'n,* No. 2:18-CV-02646-EFM, 2020 U.S. Dist. LEXIS 185632, at *6-7 (D. Kan. Oct. 7, 2020)(quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1229 (10th Cir. 2000))(citations and quotations omitted). To do so, a plaintiff typically must "produce evidence that: (1) [he] belongs to a protected class; (2) [he] was qualified and satisfactorily performing [his] job duties; (3) despite [his] qualifications, [he] was fired; and (4) [his] position was not eliminated after [his] discharge." *Id.* This burden is far from onerous.

---

Oct. 28, 2015) (citations omitted). *See also Shannon v. Cherry Creek Sch. Dist.*, Civil Action No. 1:20-cv-03469-WJM-SKC, 2022 U.S. Dist. LEXIS 171484, at *23 (D. Colo. July 12, 2022)( "When a case under Title VII and Section 1981 arises out of the same set of facts, the elements for each cause of action are identical.")(citations omitted).

[5] Actions that significantly change employment status, including "firing, failing to promote, [and] reassignment with significantly different responsibilities" are adverse employment actions. *Hillig v. Rumsfeld*, 381 F.3d 1028, 1032-33 (10th Cir. 2004).

Indeed, Plaintiff may satisfy this prong of his prima facie case "'by credible evidence that [he] continued to possess the objective qualifications [he] held when [he] was hired, or by [his] own testimony that [his] work was satisfactory, even when disputed by [his] employer, or by evidence that [he] had held [his] position for a significant period of time.'" *Flitton v. Primary Residential Mortg., Inc.,* 238 F. App'x 410, 416 (10th Cir. 2007) (quoting *Kenworthy v. Conoco, Inc.,* 979 F.2d 1462, 1470 (10th Cir. 1992)). The factual record demonstrates that: Plaintiff (who is a member of a protected class *see* DSOF 5) held the MOAT Sales Representative position from June 8, 2020 until his termination approximately 20 months later (DSOF ¶¶ 6, 7 ); Plaintiff did not have a New York license when he was hired by Defendant and never had one during his employment with Defendant (DSOF ¶ 18 ); that Plaintiff's last two PA ratings were 3.8 and 3.5, which Defendant defines as "Good," or "Consistently meets and occasionally exceeds goals for the position. Makes full use of abilities and experience to produce desired results" (PSOF ¶¶ 49-51) and Plaintiff testified about his satisfactory work performance--specifically noting his PA ratings, sales results, customer compliment calls, and lack of performance discipline (Plaintiff's Response to DSOF ¶ 92; PSOF ¶20). This Court has previously found similar evidence sufficient for a plaintiff to "establish[ ] she was qualified and satisfactorily performing her job duties." *Washington,* 2020 U.S. Dist. LEXIS 185632, at *7(finding plaintiff "satisfied her prima facie burden" where it was undisputed she was "a member of a protected class, had been employed by [defendant] for over two years at the time of her termination, and met her collection goals consistently.").

Here, Defendant argues Plaintiff cannot meet his burden to show he was qualified for his MOAT Sales Representative position because he did not have a New York state license (which Defendant considered to be a required state for licensure in that role). Doc. 55 at 22-23. Notably, Defendant also claims Plaintiff's failure to obtain and maintain this "required" license was the company's legitimate, non-discriminatory reason for terminating his employment. *Id.* at 24. "Where an employee's failure to meet objective, employer-imposed criteria is one of the legitimate, non-discriminatory reasons advanced by an employer to dispel the inference of discrimination raised by an employee at the prima facie stage, it

cannot also be used to defeat the employee's prima facie case." *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193 (10th Cir. 2000). As the Tenth Circuit has explained, "[t]o hold otherwise would be tantamount to collapsing the first and second stages of the *McDonnell Douglas* analysis and would deny a plaintiff the opportunity to demonstrate that the defendant's explanation for the adverse employment action is pretextual." *Id.*

Nevertheless, Plaintiff anticipates Defendant will argue the New York license requirement was an objective qualification "necessary to perform the [MOAT Sales Representative] job." *Id.* ("The relevant inquiry at the prima facie stage is not whether an employee or potential employee is able to meet all the objective criteria adopted by the employer, but whether the employee has introduced some evidence that she possesses the objective qualifications *necessary to perform the job sought.*")(emphasis in original). While it is undisputed that Defendant considers New York a required state license for the MOAT Sales Department, there are disputed issues of fact regarding whether that license was actually necessary for Plaintiff to perform his job in that department—*i.e.* the length of time Plaintiff (and other MOAT Sales Agents) worked in their positions without required state licenses (DSOF¶¶ 6,7,18-31, PSOF ¶ 57); evidence suggesting MOAT Sales will "keep" Agents who do not have required licenses if their transfer rates are below a certain measure (PSOF ¶ 45), and the "Good" PA Ratings Plaintiff received without this required license (PSOF ¶¶ 49-51).

Finally, Defendant argues Plaintiff cannot demonstrate an inference of discrimination regarding his termination because he "lacks any evidence of race-based comments or comparators who were treated differently." Doc. 55 at 22, 24. Critically, the Tenth Circuit has held "a plaintiff alleging discriminatory discharge is not required to provide a 'comparison to a person outside of the protected class' to establish a prima facie case." *Laul v. Los Alamos Nat'l Labs.*, 714 F. App'x 832, 837 (10th Cir. 2017)(quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1228-29 (10th Cir. 2000)). Rather, "[a]n inference of discriminatory motive can be shown by 'a variety of circumstances,' ranging from 'actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus' to 'the

timing or sequence of events leading to [the] plaintiff's termination.'" *Laul ,* 714 F. App'x at 836 (quoting *Plotke v. White,* 405 F.3d 1092, 1101 (10th Cir. 2005)).[6]

Viewing the facts in the light most favorable to Plaintiff, the timing and sequence of events leading to his termination evinces an inference of discrimination. *See* PSOF ¶ 3-10, 36.

### B. Plaintiff Can Also Demonstrate a Prima Facie Case of Retaliation Under the ADA and FMLA

To establish a prima facie case for retaliation under the ADA or the FMLA, Plaintiff must show that (1) he engaged in a protected activity under the applicable statute; (2) a reasonable employee would have found Defendant's conduct materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action. *Smith v. Millennium Rail, Inc.,* 241 F. Supp. 3d 1183, 1204 (D. Kan. 2017)(citing *Proctor,* 502 F.3d at 1208)(noting the similar elements of, and applicability of burden-shifting framework to ADA and FMLA retaliation claims and considering them together where plaintiff's claims under both statutes "arise from the same or related events"). To proceed on a claim of retaliation under the ADA, Plaintiff "'need not show that [he] suffers from an actual disability[;] [i]nstead, a reasonable, good faith belief that the statute has been violated suffices." *Jones v. UPS, Inc.,* 502 F.3d 1176, 1194 (10th Cir. 2007)(quoting *Selenke v. Med. Imaging of Colo.,* 248 F.3d 1249, 1265 (10th Cir. 2001)).

With respect to the first element of his *prima facie* claim of ADA or FMLA retaliation, Plaintiff engaged in protected activity under the ADA and the FMLA when he requested the reasonable accommodation of a medical leave of absence under the FMLA related to his depression and anxiety (DSOF ¶¶ 57-73 PSOF ¶¶ 35, 37,39). *Smith,* 241 F. Supp. 3d at 1204 ("So by requesting FMLA leave, [plaintiff ] was taking action that is protected by both the ADA and the FMLA. Accordingly, [he] has

---

[6] A discriminatory discharge inference may also be evinced where a plaintiff shows "he was terminated and replaced in a job he was qualified for because it is facially illogical to randomly fire an otherwise qualified employee and thereby incur the considerable expense and loss of productivity associated with hiring and training a replacement." *Barlow v. C.R. Eng., Inc.,* 703 F.3d 497, 505 (10th Cir. 2012)(quotations omitted). Plaintiff has pointed to evidence he was otherwise qualified for the MOAT Sales Representative position, but was terminated nonetheless. PSOF ¶¶ 48-51, 55, DSOF ¶ 7.

demonstrated the first element of his prima facie cases of retaliation.").[7] Plaintiff also meets the second prong of a prima facie retaliation case, as it is undisputed that Plaintiff's employment was terminated. (DSOF ¶ 7). *See e.g.Proctor* v. *UPS,* 502 F.3d 1200, 1208 (10th Cir. 2007) ("[A] reasonable employee would certainly find [defendant's] termination of [plaintiff] a materially adverse action.").

Finally, "[t]o establish the third element of a prima facie case of retaliation, [Plaintiff] must show a causal connection between [his] protected activity" and "[Defendant's] decision to terminate [him]." *Metzler,* 464 F.3d at 1171. "The 'critical inquiry' at this prima facie stage is 'whether the plaintiff has demonstrated that the [employer's] action occurred under circumstances which give rise to an inference of unlawful discrimination.'" *Id.* (quoting *Garrett v. Hewlett-Packard Co.,* 305 F.3d 1210, 1221 (10th Cir. 2002)). Close temporal proximity between a plaintiff's protected conduct and his termination may suffice to "justify an inference of retaliatory motive." *Id.* Here, Plaintiff first inquired about FMLA leave on December 15, 2021 (DSOF ¶ 58) and his supervisor, Ms. Selg, received an email notification about Plaintiff's FMLA and Short-Term Disability claims being created that same day PSOF ¶¶ 34-35. The decision to terminate Plaintiff's employment may have been made as early as December 16, 2021 (PSOF ¶ 36); it had certainly been made prior to February 3, 2022 when Ms. Beaver requested a written statement from Plaintiff (PSOF ¶ 55). Approximately one and a half months elapsed between the date Plaintiff requested FMLA paperwork and the date he was terminated, and approximately two to three weeks between the date his FMLA intermittent leave was approved and the date he was terminated. (DSOF ¶¶ 7, 71, 58). This is a close enough temporal proximity to establish a causal connection for purposes of Plaintiff's FMLA and ADA retaliation claims. *See* Ramirez v. Oklahoma Dep'tof Mental Health, 41 F.3d 584, 596 (10th Cir. 1994)(holding that a one and one-half month period between the protected activity

[7] *See also Jones v. UPS, Inc.,* 502 F.3d 1176, 1194 (10th Cir. 2007)(requests for reasonable accommodation are protected activity under the ADA, and for purposes of an ADA retaliation claim, "[t]o show he engaged in protected activity, [plaintiff] must therefore show that he reasonably believed he was entitled to an accommodation under the ADA."); *Valdez v. McGill*, 462 Fed. Appx. 814, 818 (10th Cir. 2012)("A leave of absence may be a reasonable accommodation as long as the employee's request states the expected duration of the impairment."); *Diffee Ford-Lincoln-Mercury*, 298 F.3d at 967 (10th Cir. 2002) ("Because [plaintiff] had requested and taken no more leave than the FMLA already required that she be given, we cannot conclude that the length of time was unreasonable.").

and the adverse action may, by itself, establish causation). Viewing the facts, and drawing all reasonable inferences in the light most favorable to him, Plaintiff has established material issues of fact as to each element of his prima facia claims of retaliation under the ADA and FMLA.

### C. Defendant's Proffered Reason for Terminating Plaintiff's Employment is Pretextual

Here, Defendant proffers the purportedly legitimate, non-discriminatory and/or non-retaliatory reason for terminating employment applicable to each of Plaintiff's claims of discrimination and retaliation: Plaintiff's failure to obtain a license from what Defendant considers to be a required state for MOAT Sales. Doc. 55 at 22-3. Accordingly, for purposes of brevity and efficiency, Plaintiff comprehensively addresses his evidence and arguments regarding pretext here. "To show pretext, the plaintiff must establish that the employer's proffered reasons were so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief." *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1216 (10th Cir. 2022)(citations and quotations omitted). "When examining whether an employer's explanation is pretextual, a court must consider the evidence as a whole." *Ledbetter v. Unified Gov't of Wyandotte Cnty.,* No. 21-cv-02502-TC, 2023 U.S. Dist. LEXIS 174323, at *9 (D. Kan. Sep. 27, 2023). "A plaintiff is not required to prove pretext by any particular method." *Id.* (citing *Bird v. W. Valley City,* 832 F.3d 1188, 1203 (10th Cir. 2016)).

A plaintiff may also show pretext with evidence that the defendant had "shifted rationales." *Crowe v. ADT Servs., Inc.*, 649 F.3d 1189, 1197 (10th Cir. 2011). Here, there is evidence Defendant intended to terminate Plaintiff's employment for his purported call avoidance issues or for job abandonment due to his absences after he requested FMLA paperwork in December of 2021 (PSOF ¶ 36) before deciding to terminate his employment for his failure to obtain a New York license. In essence, a plaintiff shows pretext by presenting evidence of "weakness, implausibility, inconsistency, incoherency, or contradiction in the employer's stated reasons, such that a reasonable jury could find them unconvincing." *Debord v. Mercy Health System of Kansas, Inc.*, 737 F.3d 642, 655 (10th Cir. 2013).

Evidence of pretext "may take a variety of forms," including evidence tending to show "that the defendant's stated reason for the adverse employment action was false" and evidence tending to show "that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances." *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011). Evidence of pretext may also include: "prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (*e.g.,* falsifying or manipulating . . . criteria); and the use of subjective criteria." *King v. Bd. of Cnty. Comm'rs,* Case No. 21-2049-KHV, 2022 U.S. Dist. LEXIS 86438, at *27 (D. Kan. May 12, 2022)(quoting *Simms v. Okla. ex rel. Dept. of Mental Health & Substance Abuse Servs.,* 165 F.3d 1321, 1328 (10th Cir. 1999)). Here, the entirety of the record regarding Plaintiff's attempt to transfer to a service position is indicative of pretext; there are contradictory explanations, Plaintiff's strong PA ratings, Ms. Selg's feedback "poisoning the well," and no clear decisionmaker for not permitting the transfer, which is clearly related to his termination since they were contemplating service roles due to his licensing issue. *See* PSOF ¶¶ 13-17, 21-27, 46, 48-51, 55. Finally, defendant's "failure to conduct what appears to be a fair investigation of the violation that purportedly prompted adverse action may support an inference of pretext." *Smothers v. Solvay Chemicals, Inc.,* 740 F.3d 530, 542 (10th Cir. 2014) (quotations omitted).

Plaintiff advised Ms. Beaver in his written statement for consideration prior to his termination that he had not taken prior action to address issues with his New York state license application because his supervisors had specifically instructed him to let the licensing team handle any such issues so he could focus on taking calls., but Ms. Beaver largely dismissed his explanation and proceeded with his termination. PSOF ¶ 55. At the time Ms. Beaver requested and Ms. Urban assisted with the HR approval of Plaintiff's termination, they were clearly aware of the issues with their prior licensing department, and the fact that employees like Plaintiff were instructed by their supervisors to rely on the licensing team to handle any issues—and thus, they were aware how that may have affected

Plaintiff's ability to obtain his New York license. *See* PSOF ¶¶3-10, He also advised Ms. Urban during the investigation into his complaint of the call gating issues he had been experiencing, and the lack of support he received from Ms. Selg to address the issues when he made his complaint to HR in December 2021 (PSOF ¶¶ 28-31); Plaintiff's peer (interviewed by Ms. Urban during her investigation into Plaintiff's complaint) corroborated that their team had been receiving misdirects, flood insurance calls (which Plaintiff was not trained to take), and service calls. PSOF ¶¶ 32, 33. Although these gating issues could clearly be causing a negative impact to Plaintiff's transfer rate or even creating the appearance of call avoidance—all of which impacted his ability to retain a MOAT Sales Representative role or to transfer to service, yet neither Ms. Urban nor Ms. Beaver acknowledged that Plaintiff was not solely culpable for his licensing issues. *See* DSOF ¶¶ 53-56; PSOF ¶¶47, 53, 54.

Viewed in its entirety, and in the light most favorable to Plaintiff, there is sufficient evidence of pretext to preclude summary judgment. For all of the foregoing reasons, Plaintiff requests the Court deny Defendant's Motion for Summary Judgment.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 15th day of December, 2023, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which sent notification to the following counsel of record:

Jenna P. Brofsky
Julianne P. Story
Courtney Steelman
Husch Blackwell LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Jenna.Brofsky@huschblackwell.com
Julianne.Story@huschblackwell.com
Courtney.Steelman@huschblackwell.com

**ATTORNEYS FOR DEFENDANT**

*/s/ M. Katherine Paulus*