# Plf.'s Exhibit 2

Deposition of Allison Selg

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DION PLUMP,
Plaintiff,
vs. No. 2:22-cv-02498
GOVERNMENT EMPLOYEE INSURANCE COMPANY,
Defendant.

CERTIFIED ORIGINAL TRANSCRIPT

REMOTE VIDEOTAPED DEPOSITION OF ALLISON SELG, a Witness, taken on behalf of the Plaintiff before Nissa M. Sharp, CSR No. 1365, CCR No. 528, pursuant to Notice on the 25th of July, 2023, with all parties, including the witness, appearing via mobile videoconference.

how long was it for you in particular?
A. That's another one that does vary. For myself, I'm just trying to think of how many months, I'd say in total from my hire date until I was a certified agent was about 3 to 4 months.
Q. And during that 3 to 4 months, what specifically were you doing to become a certified agent?
A. Having extensive training. So, at first, being in a class virtually held by a certified trainer, walking us through. We would do role plays with other peers, other classmates in that training class, and then we would go on the phones to speak with actual GEICO customers.
Q. What about licensing? What's involved in the licensing process when you're onboarding as a MOAT sales agent?
A. We are required to take a licensing exam, which we have extensive training for as well in that regard. But once you pass, from there it is not -- you are made, like -- I completed my test, so then the licensing team takes over to apply on our behalf for all the states.
Q. So the licensing exam that you have to take, is that a, I guess for lack of a better term,

is that a universal exam for all states that is a prerequisite that you take before the licensing team is actually making your applications?

A. That is correct.

Q. And did you have to provide any information to the GEICO licensing team to assist them in that process of getting your state licensure?

A. Yes. For myself, there -- I had no outstanding, nothing outstanding that needed to be notated. But for others, it was case by case.

Q. And when you say something outstanding that needed to be notated, what do you mean by that?

A. Others in the team had previous incidents relating to the court that needed to be addressed. That was not my experience. I had no experience prior. So, myself, I had nothing that I needed to provide documentation of.

Q. Okay, so if I understand correctly, it was your understanding that there were other agents on the team who may have had previous legal issues or something to that effect, some sort of court records, documentation that they needed to provide in order to clear licensing in certain states; is that correct?

A. To my knowledge, yes.

Q. Prior to being in the Management

through Teams, Microsoft Teams, we would Outlook email if necessary, text message as well.

Q. And did you have a smart phone or mobile device that was provided to you by GEICO?

A. I did not.

Q. Did GEICO provide you any reimbursement for your smart phone or cell phone that you were using at that time?

A. No.

Q. Was there any kind of chat software or anything like that that you used to communicate with your team?

A. That would be Microsoft Teams. No, I'm sorry, it was Webex, I apologize. It was Webex. We did not have Microsoft Teams, it was Webex.

Q. And I'm familiar with Webex as a video conferencing service. Does it also have a chat functionality?

A. It does.

Q. The MOAT sales agents that you supervised, they were an hourly position; is that correct?

A. That is correct.

Q. Were there standardized shifts that those agents were typically assigned to work? Or how

MS. BROFSKY: Thank you.

VIDEOGRAPHER: Very good. We are off the record at 10:28 AM.

(Recess.)

VIDEOGRAPHER: We're back on the record at 10:41 AM. Please proceed.

BY MS. PAULUS:

Q. Ms. Selg, I'm going to share my screen here. I'm going to show you what I am introducing as Plaintiffs Exhibit 1.

Can you see my screen here?

A. Yes.

Q. Okay. And I want to ask you if you recognize this document.

MS. BROFSKY: Katherine, can we just see the Bates number on that, please, for my records?

MS. PAULUS: 273.

MS. BROFSKY: Thank you.

A. Give me just a moment please.

Yes, I do recognize it.

BY MS. PAULUS:

Q. And this appears to be an email from Brian Blowe to you, CC'ing some other individuals, sent on Wednesday, November 17, 2021, at 1:19 PM; is that correct?

A. It is correct.

Q. And do you recall what this Brian Blowe held within GEICO?

A. He was a MOAT sales manager.

Q. And here in this email Mr. Blowe states he's reaching out to you "in regards to Dion. You may know (or you may not), however he has been denied his New York license and we don't have the ability to keep him in sales going forward."

Did I read that sentence correctly?

A. That is correct.

Q. And at the time that Mr. Blowe sent you this email, were you aware that Mr. Plump's New York license had been denied? Were you aware of that particular issue?

A. Yes.

Q. And Mr. Blowe goes on to state, "We are currently working with the Service managers to see if he would be a good fit with their department.

In doing, they are asking for a synopsis of his current performance (3-month rolling and YTD)," which I understand to be year to date, "overall attendance standing and any behavioral concerns."

Did I read that correctly?

A. Correct.

Q. And so from this email, it appears that the service managers are asking you, as Mr. Plump's supervisor, to provide some information about his performance as a MOAT sales agent; is that correct? Am I characterizing that correctly?

A. Correct.

Q. And do you recall at the time that you received this email that was November 17th of 2021, do you recall about how long you had been supervising Mr. Plump at that time?

A. For approximately, officially, approximately a few weeks as his direct supervisor.

Q. And you qualified that as "officially," did you have any prior supervisory responsibility for Mr. Plump?

A. No.

Q. And do you recall, did you provide that requested synopsis of Mr. Plump's performance in response to this email from Mr. Blowe?

A. I'm sorry, can you repeat that please?

Q. Sure. I was asking if whether you did respond to Mr. Blowe's email and provide that requested synopsis of Mr. Plump's performance?

A. I did, yes.

Q. I'm going to stop sharing my screen.
Ms. Selg, I'm going to show you what I've marked as Plaintiffs Exhibit 2.
MS. PAULUS: This is GEICO 433, Jenna.
BY MS. PAULUS:
Q. Can you see my screen?
A. I can.
Q. And this appears to be in a email from you to Brian Blowe, with some other individuals copied, also dated Wednesday, November 17, 2021, sent at 8:40 PM; is that correct?
A. If I could just see the full document first, please.
Q. I was just asking about this top here, but I'll certainly allow you to review the entire document.
A. Yes.
Q. I was just asking about that information there.
A. Yes.
Q. Is that correct? Okay.
Now, can you see the document? I'll represent to you there's nothing beyond that for this particular exhibit.
A. Okay. But, yes, thank you.

Q. Let me know when you've had a chance to review it.
A. Okay, thank you.
Q. And, Ms. Selg, this email that I've marked as Plaintiffs Exhibit 2, to your recollection, is this the response that you had provided to Mr. Blowe's request of a synopsis of Mr. Plump's performance?
A. That is correct.
Q. The first sentence of your email after, "Hey Brian," is, "I have attached 2 PDF's of Dion's 3MR and YTD, as well as his ROA."
Did I read that correctly?
A. Correct.
Q. What is a 3MR?
A. Three-month rolling.
Q. And a 3-month rolling, what kind of information would be included within that document?
A. His metrics from the past 3 months, basically how he's been scoring based on his performance as a sales associate.
Q. And then would the YTD be those same metrics, just from a year-to-date perspective rather than a 3-month rolling?
A. Correct.

Q. And the ROA, that I believe you stated earlier, that's a record of attendance Excel spreadsheet, correct?

A. Correct.

Q. In the second bullet point under the heading "Some strengths about Dion," states that, "If Dion receives an error from PMT, he will learn what it is, how he made the error, and vow that it will never happen again."

Did I read that correctly?

A. That is correct.

Q. So you mentioned earlier, PMT I think you stated was performance management team; is that correct?

A. To my knowledge, I believe so.

Q. What kind of errors would PMTs inform an agent about?

A. A whole variety. It could be miniscule in regards to more so coaching opportunity, like, hey, you did good, but this, like, try this, maybe you can close on this sale next time if you try this approach. That would be still passing a call.

However, for failing a call, could be any legal compliance. If we didn't state legal terms correctly, if we -- if the associate didn't even ask

for a sale and just went here's your quote, good-bye, etc.

There are many different scenarios and situations as outlined in the guidelines that they -- that PMT does. There's PMT department that grades, as well as the supervisors, and we all go off of the same guidelines.

Q. So, if an agent had an error, how would PMT inform the agent of that error?

MS. BROFSKY: Objection. Calls for speculation.

BY MS. PAULUS:

Q. You can answer.

A. If a PMT agent was the one grading the call, they, with me being the direct supervisor, it would typically go to their supervisor, to which they would contact me and go, hey, this associate failed this call, have a coaching discussion with them or discussion with them.

Q. Where -- well, strike that.

At the time that you sent this email to Mr. Blowe regarding Mr. Plump, I believe you had stated you had only been supervising him for a couple of weeks; is that correct?

A. Correct.

Q. And so these strengths and then the opportunities for Mr. Plump that you provided in this email, were these, kind of bullet points, were these based upon just our own observation of his performance? Or was there any other information that you used in putting together this email?

A. A mix of the two. A mix of the two. From myself and also from other information.

Q. What other information?

A. I was with this team shadowing during my MDP, so I did work with Dion previously to me being his official supervisor.

Q. Under the first bullet point under the heading, "Some opportunities for Dion," states, "He has a bit of pushback when receiving feedback. He often shuts down and will," in quotation marks, "'yes' you until you are done giving him constructive feedback."

Did I read that correctly?

A. Correct.

Q. And can you give me an example of a time you recall receiving feedback from Mr. Plump to -- or excuse me -- to receiving pushback when providing feedback to Mr. Plump?

A. For example, this was a situation when

you recall receiving regarding Mr. Plump's FMLA or short-term disability applications?

I believe you stated you were notified by email when that application was first made. What other kind of notifications do you recall receiving on those topics regarding Mr. Plump?

A. That the FMLA, for example, was denied due to not receiving paperwork or documentation.

Q. Do you have an understanding of whether Mr. Plump was ever approved for FMLA during the time that you supervised him at GEICO?

A. During that time, I had no knowledge that it was approved or that, like, anything communicated to me was denied.

Q. So I'm going to share my screen again.

Ask you if you can see that? This is GEICO 264 and 265.

A. Yes, I can, thank you.

Q. And I'm marking this as Plaintiffs Exhibit 4. Let me know when you've had a chance to review this document.

A. Just a moment.

Q. Let me know when I need to scroll as well.

A. If you would scroll down please.

Q. Certainly.
A. Okay, thank you.
Q. Ms. Selg, do you recognize this document?
A. Yes.
Q. And what is it?
A. A warning.
Q. A warning regarding Mr. Plump?
A. Correct.
Q. And so would this be considered a disciplinary warning?
A. Correct.
Q. And did you prepare this document?
A. Yes.
Q. And what was the reason that you prepared this document?
A. Due to it stating in the document that it showed that Dion was licensed and appointed in the state of Texas, but that instead of taking the customer, that he transferred the customer out to another associate.
Q. And so I understand that's the reason for it. Did that violate a company policy?
A. It did. It violated the company's Code of Conduct.

Q. And, to your recollection, which provision of the Code of Conduct did that violate?

A. Gosh. To my understanding, I would relate it to the first, it kind of relates to the first bullet point, manipulating the computer system in a sense where we were not truthful to the customer.

Q. And do you recall addressing this situation with Mr. Plump?

A. Yes.

Q. And what do you recall Mr. Plump saying to you when you addressed the situation to him?

A. I, if I recall correctly, for this situation I believe he stated that he would take the L, quote/unquote, and that he wanted to go on break and that he would take the L and that it would not happen again.

Q. And when you say take the L?

A. Yeah.

Q. Take the loss?

A. Correct. That would be my assumption.

Q. As a supervisor for GEICO, what was the procedure for issuing this type of warning to an agent that you supervised? I take it you had -- you