# Plf.'s Exhibit 3

Deposition of Dion Plump

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

| | | |
|---|---|---|
| DION PLUMP, Plaintiff, vs. GOVERNMENT EMPLOYEES INSURANCE COMPANY d/b/a GEICO, Defendant. | ) | Case No.: 22-cv-02498 |

DEPOSITION OF DION S. PLUMP,

produced, sworn, and examined on Thursday, the 1st day of June, 2023, between the hours of 8:00 o'clock in the forenoon and 6:00 o'clock in the afternoon of that day at the law offices of Husch Blackwell LLP, 4801 Main Street, Suite 1000, in the City of Kansas City, County of Jackson, State of Missouri, before:

JANIECE Y. YOUNG, RPR, CSR-No. 1217, CCR-No. 798
Registered Professional Reporter
Certified Livenote Reporter
of
YOUNG COURT REPORTING
office@youngcourtreporting.net
Suite 310, 8700 Monrovia
Lenexa, Kansas 66215-3500

a Certified Court Reporter within and for the State of Missouri and a Certified Shorthand Reporter within and for the State of Kansas.

Taken on behalf of Defendant pursuant to Notice to Take Depositions.

document. And do you see there's different paragraph numbers listed?
A. Uh-huh.
Q. Oh, and I forgot to add this to the rules, but if you could avoid saying uh-huh or --
A. Yes.
Q. Thank you. It's for the court reporter so we can have a clear transcript. Okay?
A. Okay.
Q. Okay. Paragraph 16 you state, during your employment you reported to human resources that you felt you were discriminated against because of your race. Do you see that?
A. Yes.
Q. Was that an accurate statement?
MS. PAULUS: Yeah, we can't consult during the --
THE WITNESS: Okay.
A. So, on this one, I'll say -- I'll say no, just because in the communication I had with the HR rep I never directly alluded to it. But I was just -- I brought up certain circumstances that was kind of -- it was -- I was just, basically, like: Hey, I just find it funny that this happened, and this -- like, basically, what

happened to another person didn't happen to me. So I never directly brought up race, but I just brought up a circumstance that was kind of peculiar.

Q. Who -- when you said communication with HR, who are you talking about?

A. I believe it was -- so it was three Meaghans involved, so I always -- I get them confused, but I believe it was Meaghan Urban.

Q. Okay.

A. She was the -- there was a Meaghan Urban, there was Megen Snyder, and there was a Meghan Beaver. I just -- I always get them confused. But I think it was Meaghan Urban that was the HR person that I was talking to.

Q. All right. And when do you recall having this conversation with Meaghan Urban?

A. So we never actually had a conversation. It was all done through text -- I mean, email.

Q. Okay. So when you're talking about alluding to something funny that happened, that was via email or text message?

A. It was strictly email.

Q. Do you still have a copy of that email?

A. Somewhere.

Q. And are you claiming that he discriminated against you, or just claiming that he didn't appreciate the way that he acted in that situation?
A. I'm claiming that I didn't appreciate the way he acted in that time.
Q. Okay. So just to confirm, other than the situation with Kyle and the situation with licensing, which I'll ask you about in a second, that's what you were referring to when you said things that happened in the first couple months?
A. Yeah.
Q. Okay. Before we get into licensing, because it's critical that I get full and complete answers, are you taking any medications that might impair your ability to understand and answer my questions today?
A. No.
Q. Is there any reason why you can't give full, complete, and accurate testimony?
A. No.
Q. Is there any reason you can't recall events from several years ago?
A. No.
Q. Okay. So tell me about the, quote,

situation with licensing. What do you mean by that?

A. So during your first -- during your first, like, couple weeks on the floor, you're waiting to see which -- which states you get licensed for. And you have to -- the way it was explained to me, you have to have at least 12 states that you can service. And so there would be times where I would need to -- once I got onto the floor, there were times I would need to handle something for another state.

And, like, Kyle would -- Kyle would come to me and be like: Why are you off the phones?

And I would tell him: Like, hey, I'm trying to handle this thing for licensing.

And he would just, like, shut it down and say: Hey, you need to -- you need to let licensing handle that and just get back on the phones.

Q. Okay. What was the issue with the way that --

A. Well, when I tried to explain to him my -- my situation was kind of unique, he would just shut it down and just be like: No, you've got to get back on the phones.

Q. Why was your situation unique?

Spring never -- they never saw to it. So, because of that whenever -- whenever you have to answer the question: Have you ever had your license suspended in a certain state, on that one, up until that point, to my knowledge, I hadn't had it, my license, suspended.

But then I found out that because North Dakota suspended my license, I should start answering that question yes. So once I have to do that, license bureaus, they want to know what happened in that situation, why was it suspended, and -- and then also, like, what steps I'm taking to -- to alleviate the situation.

Q. And why -- why did North Dakota suspend your license?

A. They -- I don't remember exactly. I know the lady sent me a letter. And she was just, like, hey, we sent you -- we sent you a letter and we sent you a follow-up letter. And you responded to neither one of them; so --

But I don't remember exactly what it was they were -- they were looking for, but it was something I would have responded to.

Q. Did -- did you fail to report any child support payments to North Dakota?

A. I don't remember. That might have been the -- that might have been the situation because that definitely came up with a bunch of states, but I don't remember exactly what it was.
Q. Are you currently licensed to sell insurance in North Dakota?
A. No.
Q. Did you ever become licensed to sell insurance in North Dakota?
A. No.
Q. So I think you mentioned that at GEICO you needed to be licensed at least 12 states --
A. Uh-huh.
Q. -- is that accurate?
A. Yes -- well --
Q. Okay.
A. -- at least that's -- at least that's how it was communicated to me.
Q. And who was -- who communicated that to you?
A. Kyle Fuller.
Q. And at any point in time, were you licensed in 12 states?
A. Yes.
Q. Okay. Did that ever include New York?

not produced in this case?
A. Not that I'm aware of.
Q. Did you review the answers that you provided, or that were provided on your behalf, to defendant's interrogatories?
A. I'm not sure which -- which --
Q. Okay. I'm going to hand you a document that might help clarify. This is what's been marked as Exhibit 2.
(Plump Deposition Exhibit No. 2 was marked for identification.)
Q. (By Ms. Brofsky) All right. This document is titled "Plaintiff's Answers and Objections to Defendant's First Interrogatories to Plaintiff." Do you see that?
A. Yes.
Q. Okay. And if you could turn -- start on the last page of this document. Is this your sworn signature on the last page?
A. Yes.
Q. And by sending this, you stated that you've read the foregoing interrogatories and the answers are true to your best knowledge and belief, correct?
A. Yes.

Q. And when did you sign those? What's the date?
A. April 3rd of 2023.
Q. You say April --
A. I'm sorry, April 1st of 2023.
Q. Thank you.
And did you have the opportunity to review these in advance of their being submitted to us?
A. I had the opportunity to review a version of this. I just want to make sure it's the right one.
Q. Absolutely.
A. Yeah, that's mine.
Q. I'm sorry, I didn't hear you.
A. Yeah.
Q. Okay. You can put that to the side for now.
In addition to providing these answers, you and your counsel also produced documents in this case. Do you understand that?
A. Yes.
Q. Part of those documents include text messages between yourself and Allison Selg. Do you remember that?

A. I remember sending over the text messages, yes.
Q. All right. And who was Allison?
A. Allison was my last supervisor at GEICO.
Q. And did you refer to her by her last name?
A. I didn't really refer to her by any name.
Q. When you were speaking with her or about her, did you use her first name or last name?
A. Allison.
Q. Okay. Are those messages with Allison the only text messages you have regarding your claims in this matter?
A. Yes.
Q. Do you have any text messages with friends or families regarding the claims in your complaint?
A. Maybe some stuff with Liz, Liz Rose (ph), but that's about it.
Q. And tell me who Liz Rose is, please.
A. Elizabeth Rose was a colleague of mine at GEICO. We were -- we were in the same training class. And we became real close.
Q. And did you have a romantic relationship?
A. No.

Q. Would you spell it, please.
A. M-E-D-I-N-A.
Q. Medina, okay.
And when -- when was the move to Medina?
A. I want to say it was around -- February 22nd is the date that keeps jumping out to me. Yeah, February 22nd is when I moved to Medina.
Q. What day of the week was that?
A. I don't recall.
Q. How did you get to Medina?
A. I drove.
Q. Did you bring all your stuff with you in your car?
A. I brought what I could fit.
Q. Did you have a moving truck?
A. No.
Q. And what type of car do you -- or did you drive at that time?
A. RAV4 2007.
Q. Do you still have that?
A. Yes.
Q. I think that's R-A-V, correct?
A. Yes.
Q. Do you also have some traffic tickets in your record?

what would happen was we would set them -- we would -- we would, basically, sell property insurance for them to qualify for the discount.

Q. Okay. So, again, the goal was to sell property insurance, broadly speaking?

A. Yeah.

Q. Okay. Paragraph 11 of the job description has certain requirements that most sales representatives are required to meet. Do you see that?

A. Yes.

Q. Okay. Can you read me the third bullet point from the top, please.

A. "Must be able to obtain and maintain required licenses issued by insurance departments of various states."

Q. Do you see that?

A. Yes.

Q. Did you meet that requirement?

A. I mean, the licenses that I obtained I maintained, yeah.

Q. But you didn't maintain all of the licenses required for your position, correct?

A. I don't remember losing any.

Q. You didn't, in fact, obtain licenses that

were needed for your position?
A. So it was never -- so it was never communicated to me that I needed to have New York or Florida. I had -- I had, at least, four supervisors prior to Allison. And -- which each four of those -- like, the -- the thing -- basically, the way it was communicated to me, as long as I had enough licenses to be serviceable, that's all that mattered.
Q. And who gets to decide if you're serviceable?
A. Well, so the way that was communicated to me was being able to maintain at least a 3 rating on your performance reviews.
Q. It was within GEICO's discretion to determine if you were serviceable or not, correct?
MS. PAULUS: Object to form.
You can answer.
A. Yes, I wouldn't know that. But I just know that like I said when I first started, I was told that I needed to have at least twelve with two of the five key states. And I, basically, was rocking and rolling with the states I had for the almost two years I worked there.
Q. (By Ms. Brofsky) At some point, though,

you were told that you needed to get New York?
A. No.
Q. You were never told that you needed New York to maintain your position?
A. So even when New York was communicating with me about needing certain things, around this time I was working under Cici Haverdash. And when I got off the phones to try to correct that issue, Cici called a one-to-one and we spoke. And I told her -- she was like: Hey, why are you off the phones?
And I was like: Hey, I'm trying to fix this thing with New York.
And she was like: Get back on the phones. Let New York -- let licensing handle that. And so that's pretty much what I did.
Q. Why were you trying to fix something with New York?
A. Because they were asking for certain things. I thought it would have been cool to have New York, but up until that point I was operating just fine without New York, New York and Florida.
Q. Okay. So I'm understanding, someone was asking you for information to get a New York license --

to something else.
Q. My impression is when you -- why did you put the word "working" in quotation marks if, in fact, you were working?
A. I don't know. It's social media. I just trying to have fun with it.
Q. Are you dishonest on social media?
MS. PAULUS: Object to form.
You can answer.
A. I wouldn't say dishonest. I'm just having fun with it.
Q. (By Ms. Brofsky) You said they didn't specify whose home. What do you mean by they? What did you mean by they?
A. I have no idea. Like I said, this is just -- yeah, I don't know. I can't speak to it intelligently.
Q. You did write this post, correct?
A. I did, yeah.
Q. And your location was Lime Lake, New York; is that right?
A. So this is me just posting video from Lime Lake -- I don't know for certain. I mean, like, for instance, this -- this other post with chips, I posted that, but that happened, like, two

months -- that happened, like, two months prior to when I actually posted it.

So, again, like, I don't -- I don't -- I take this with a grain of salt because I -- I don't always post immediately what's happening in the moment.

Q. On April 5th, 2021, you did post that you were "working" from home, correct?

A. Again, that post is there, yes, but -- yeah, I don't think -- I don't think this -- like, this photo has anything to do with like an actual shift. One of the things you can look at is, as far as my availability, I was always in the high 90s. And the reception is not great at that location, so I definitely wouldn't have tried to work from that location.

Q. On April 5th, 2021, who was your employer?

A. I'm assuming GEICO.

Q. Is Lime Lake close to Buffalo, New York?

A. No.

Q. Where is Lime Lake?

A. So it's, kind of, in the middle of nowhere, about 45 minutes southwest of Buffalo. Southwest? Southeast? I don't know.

No, I don't --
Q. Who -- who else could you be referring to as "they," on April 5th, 2021, when you stated you that were working from home?
MS. PAULUS: Object to form.
You can answer.
A. So, I mean, it's just -- yeah, it's -- like I said, it's just -- it's more so banter more than anything. If I showed you, like, you know, what me and Brandon talk about it, it's just a lot of silliness from all over the place.
So --
Q. (By Ms. Brofsky) Like --
A. -- there's a reason why I didn't use any -- any particular name because I wasn't talking about anybody, in particular.
I, honestly, don't know how to -- how to answer the question you're asking because, again, it's more so banter than anything. And Lime Lake is not an area that I would even try to -- try to work a shift from.
Like I said, I worked -- when I did work a shift in Buffalo, a couple shifts in Buffalo, I did it at Maureen's house.
Q. And setting -- and I appreciate the

context. Setting aside all that, my specific question is, when you say they didn't specify who is home, am I correct that the "they" refers to the employer you were working for at that time, which was GEICO?

MS. PAULUS: I object to form.

A. No.

Q. (By Ms. Brofsky) Who were you referring to when you said they didn't specify whose home on April 5th, 2021?

A. They could be a -- I don't know. It's -- it's definitely not -- like, if I would say something about GEICO, I would say GEICO. Again, this is more so banter than anything else. I don't know how to directly answer your question.

Q. Is it possible you were referring to GEICO?

A. I mean, it might have been -- if anything, it might have been, like, an employee of GEICO but not GEICO particularly.

Q. You can put that to the side for now.

All right. Mr. Plump, I think we've established that you began your employment at GEICO on June 8th, 2020. Do I have that right?

A. Yeah.

A. Kyle Fuller.
Q. Okay. And that was the first, he was the first?
A. That was the first.
Q. Okay. Any other supervisors I missed?
A. Not that I can remember.
Q. Did you get along, generally, with your supervisors?
A. Yeah.
Q. Were you able to freely communicate with Ms. Selg?
A. No.
Q. And when you say no, why -- why do you say no?
A. We just didn't have good interactions. Part of the reason why -- like, part of the reason why I was feeling the way I was, every time me and Allison would have a communication, it was never a positive interaction. Like, even if it started positive, something would come up that would be extremely negative.

And so it just got to the point, like, whenever I would see her name darken my phone, or -- I just -- I was just bracing myself for, like, what's -- okay, what did I do this time?

Q. Can you give me an example of a conversation that became negative?

A. So -- so we were trying -- like, I was trying hard to get my -- my next promotion. And in that next promotion you have to -- you have to hit certain -- first, your performance has to be on par, but then you have what's called a customer experience score. And so I was -- I was basically -- like, she would tell me I was missing something. And it would be something, like, really ticky-tacky of how I missed it.

Like, for instance, there was a phone call where -- so when you're -- when you're assessing a customer, you're supposed to ask if anybody else should be listed.

Q. Okay.

A. And the way that I phrased that, it wasn't -- she said, I missed that -- I missed that phone call by that. So, basically, I didn't qualify for the promotion because I missed that one phone call, so it was stuff like.

Q. So she was providing feedback to you in a way that you didn't think was the best way to do it?

A. I guess that's one way to put it, yeah.

message?
A. "Ok thanks for letting me know."
Q. Okay. And then on February 4th, what did you tell Allison?
A. "I'm getting checked back in" --
Q. You're getting checked --
A. -- to the -- "to the hospital."
Q. So you told Allison, on February 4th, that you were getting checked back in to the hospital, correct?
A. Yeah.
Q. Was that a truthful statement?
A. So to provide context, no, it's not a truthful statement. But I did book a appointment -- an appointment to see my therapist. And I just wanted to get my full -- at that point I was looking for -- a lot of times I would use in the hospital just to -- to just basically, like, shut down communication.
Q. But you never were, in fact, inpatient care --
A. I was never inpatient care, no.
Q. Can we agree that you lied to your supervisor?
MS. PAULUS: I object to the

form.
You can answer.
A. So I didn't -- I didn't -- I don't think I lied to him because I was trying to seek treatment. And my whole standpoint on that was -- I was trying to seek treatment unperturbed. And I was constantly getting phone calls from Allison and the text messages from Allison. And I just didn't want to deal with it.
Like, I -- like I felt good that -- just that period of December through, like, mid-January, where I didn't have to worry about anything I was enjoying that. I was enjoy -- I was in a good space and just feeling good about everything. I finally got to some good places with my therapist. And so, ultimately, I just wanted to highlight just the importance of, like, I'm just -- I'm trying to seek treatment. I just don't want any contact.
Q. On February 3rd and 4th --
A. Uh-huh.
Q. -- did you tell Allison, I'm seeking treatment with my therapist?
A. So I just wanted the communication to be out there that I was seeking treatment.
Q. But where in this -- these text

recall. I just remember the context of what happened in my communication that I knew I -- I had -- I couldn't reapply for New York for 365 days.

Q. Now, did you reach out to New York within the 15-day deadline required here, or did you reach out to New York after the 15-day deadline?

A. So that's around the time I was told that I just needed to focus on being on the phones as opposed to -- let licensing handle that type of stuff.

Q. So you didn't respond within the 15-day deadline, correct?

A. No.

Q. So when you say that you reached out to the State, it was not in accordance with the instructions in the August 9th, 2021, letter, correct?

MS. PAULUS: Object to form.

You can answer.

A. I -- are there instructions on here?

Q. (By Ms. Brofsky) This letter states, "This request must be received by the licensing bureau within fifteen days from the date of this letter."

floor.
Q. Okay. And when you were on the floor, do you ever receive calls from New York?
A. Yes.
Q. Could you service those calls?
A. No.
Q. Why not?
A. Because I wasn't licensed in New York.
Q. What is gating?
A. So gating is the way -- the way that the calls are funneled to you. The way it was explained to me was, even though I was receiving New York calls, it was because New York was in a certain gate that I had access to. And so that's why New York calls would come in.
But the crazy part about it is, like, when I first started, I would get, during my shift, on average, I would get, maybe, three phone calls from New York. And, towards the end, I was getting, like -- I was -- for every -- every call I would sell, I'd probably get, like, a call from New York right afterwards. So probably anywhere from the neighborhood of six to eight New York calls.
Q. A shift?

were trying to roll out a new thing where they wanted us to be active in selling flood, but -- I mean, I went through the training, but we never actually -- I never actually -- I don't think I was ever on the rollout of actually selling some flood insurance.

Q. Are you saying you never received a call requesting flood insurance?

A. No, I'm not saying that. I'm saying I never received training to actually sell flood insurance. Not the -- the flood insurance that was -- like I -- I sold -- I sold what was called a rider that allowed for flood insurance, but selling an actual flood policy, I never sold a flood policy.

Q. Okay. What -- and what was the training for that you attended?

A. Just learning about flood coverage, if I remember correctly.

Q. And that was a prerequisite to selling flood insurance, I imagine?

A. That's the way it was described. Like I said, we never got -- I never, personally, got around to selling flood insurance.

Q. What is -- what does service do?

in my -- at that time, I was assuming that they would just talk about the policy as a whole, but I didn't realize that they had to be licensed as well.
Q. Okay. You mentioned a -- a meeting or an interview for service on December 1, 2021. Do you remember that?
A. I mean, if you want to call it an interview. But I remember a meeting about a role.
Q. Okay. What do you remember about the meeting?
A. I just remember I had a calendar invite to meet with two people in service. I remember that their affect was kind of -- didn't really -- most of the time when you -- when you get in an interview, like the person you're interviewing with will have some type of liveness in them. They were just kind of stone-faced. And they asked me a few questions. It was really quick. I just remember that final -- that final question of: What's your attendance like? So I'd call it a meeting. I wouldn't call it an interview.
Q. Did they ask you why you were interested in the position?
A. Yeah, they did ask me why I was

A. Yeah, she lived in Buffalo.
Q. Okay. You can put that to the side.
I think I asked you earlier whether you had ever received any kind of coaching or discipline. Do you recall that?
A. So coaching and discipline are two different things.
Q. Okay.
A. We always had coaching sessions. We always had one-to-ones. As far as discipline, no, I never received any disciplinary action.
Q. What's the difference, in your mind?
A. So coaching is to get you better. Like, for instance, if you're not -- if you're not offering enough jewelry policies on a call, it's -- it's, basically, just taking advantage of opportunities that you could be missing.
Q. Okay. And everybody received coachings?
A. Yeah.
Q. Did everybody receive the same number of coachings?
A. I'm assuming so based on the communication I had with my supervisors.
Q. Okay. I'm going to hand you Exhibit 16.
(Plump Deposition Exhibit No. 16

recordings that were produced in this case?
A. No.
MS. BROFSKY: Do you have -- can you --
Q. (By Ms. Brofsky) Okay. Mr. Plump, I'm going to play a recording of a call that was taken while you were employed at GEICO. Before I do, I'll ask, do you understand that calls were regularly recorded for purposes of training?
A. Yes.
Q. We're going to play one now. Let us know if you can't hear it. And we're going to mark it -- I guess we're going to mark it as Exhibit 19.
(Plump Deposition Exhibit No. 19 was marked for identification.)
(Whereupon, the audio recording was played.)
MS. BROFSKY: Was that the end of the recording?
Q. (By Ms. Brofsky) Okay. Sir, we just listened to a video. Did you hear your voice -- or an audio clip, rather, did you hear your voice in that audio clip?
A. Yes.
Q. And in -- in that audio clip, did you

transfer somebody who was calling from California about California insurance stating that you needed to find somebody who was licensed in California?

A. So I would need to see the date on that call because depending on -- depending on -- from the sounds of it, I wasn't licensed to do certain insurances, so that's probably the only reason why I would have transferred that call.

Q. The person in the call stated that they are calling about homeowner's insurance. That falls squarely within the role of a MOAT salesperson, correct?

A. So I wasn't -- I wasn't -- so for a healthy portion of my time at GEICO, I could only service renter's insurance.

Q. When was that?

A. I don't recall, but I do know that like -- because it was a big thing -- it was a sense of pride for me because, at one point, I was on pace to make chairman's only selling renter's insurance, and my manager, Michelle Brunelli, at the time, told me she was proud of me because it showed that I was working hard.

So depending on -- depending on when that -- when that happened, I might not have be

able to. I might have been able to do one of them and not the other one, but I didn't -- it just depends on when that was.

Q. You told the caller, though, that you needed to find somebody licensed in California, correct?

A. It's easier to say that than to say, hey, I'm licensed to service you one policy but not the other one.

Q. You didn't mention anything about rentals or not --

A. At the beginning of the call he said what two policies he was looking for --

Q. Yes.

A. -- so nine times out of ten, I was probably licensed to do one of them but not the other one. And instead of wasting his time, I said: Hey, I need to transfer you over to this guy. I -- I -- I mean, I'm assuming I just went to look for somebody else to -- that could do both policies at the same time.

Q. Now, we can listen to it again, but I don't believe he mentioned that he was looking for -- whether he was looking for a rental or a home.

A. No.
Q. What is -- or what was the acceptable transfer rate for a GEICO MOAT salesperson when you were employed there?
A. It was never a conversation, so I wouldn't know.
Q. Do you know other folks' transfer rates?
A. No.
Q. Do you know what your transfer rate was?
A. No.
Q. Any reason to dispute that your transfer rate was 50 percent in November 2021?
A. I wouldn't know.
Q. You would not?
A. I wouldn't know.
Q. All right. Before the break, we started to talk about your request for FMLA. Do you remember that?
A. To an extent, yeah.
Q. I'm going to hand you Exhibit 22. Maybe this refreshes your recollection as to your request.
(Plump Deposition Exhibit No. 22 was marked for identification.)
Q. (By Ms. Brofsky) Exhibit 20 -- 22 is

A. It was stressful on me.
Q. So when you say family stresses, you're referring to that, the death and leading up to the death of Maureen's mother?
A. Yes.
Q. Was that the first time you've dealt with death of a close family member?
A. No.
Q. How many times have you come to similar stresses?
A. Twice.
Q. When were those?
A. 2009, and whenever Maureen's mom died.
Q. So this was the second time?
A. Yes.
Q. Okay. Did this time trigger memories of the 2009 experience that you had?
A. Yes.
Q. You say also, "I honestly think you are a good person." Do you see that?
A. Yes.
Q. And you were telling Allison that you honestly thought that she was a good person, correct?
A. Yes.

Q. Do you still think she's a good person?
A. I think sometimes we can -- we can act in ways that we think are -- are just but they aren't. So I can't -- I don't know what her -- her motivations were, but I just know that me and her interactions just weren't positive. We never had any positive interactions whatsoever. I just didn't want to deliver my message with it sounding completely negative the whole way through.
Q. And did she respond to your message and say: I'm sorry?
Did she respond to your message and say: I'm sorry?
A. She said, I'm sorry you feel this way.
Q. Did she also explain that she wants her coachings to be nothing but positive and constructive?
A. Yes. I mean, that's what's on here.
Q. And no reason to doubt that that's what she typed to you on January 29th, correct?
A. Yeah. I mean, this is -- these are the words that came from her, but her actions definitely didn't follow up with the -- the message in this.
Q. Did she say, "I apologize for how it came

Q. So Allison's style is very different than Michelle's?

A. Yeah, that's putting it mildly.

I actually felt like Michelle was trying to get me better; whereas, I just -- I just felt like Allison was just trying to get me.

Q. Why did you feel that way?

A. Just because every -- I mean, for instance, like, so the one call that always stands out to me when I asked about secondary insured, Michelle would have fought for me on that because it was a -- it was a call that was -- that was graded poorly. If Michelle had fielded that call, she would have -- she would have been like, hey, that's ticky-tacky because he did ask for this.

Whereas, Allison, like, it was just -- it was just a -- a ticky-tacky file. And even when I asked her, like, when did they put that into place?

She's like: It's been in place.

And then, when we did some research, it had only been in place for, like, three months.

And, see, another thing with Michelle, like, if they were making any kind of changes in the grading, Michelle would have had a meeting with us two weeks before to let us know it's coming.

The week -- the next week she would have said: Hey, make sure you -- you are working this into your calls because this is something they are going to be looking for. And then, the week of, she'd be like: Hey, it's -- it's the week of. Make sure you're doing this on every call.

Q. Was Michelle a more experienced manager than Allison?

A. I wouldn't say so because they both came from nonsales background, as far as to my recollection.

Q. Do you know how many years of experience Michelle had versus Allison?

A. No.

Q. And these messages are from January 29th, 2022. Where were you physically located on that date?

A. I don't recall. I might have been back in Kansas City around that time. I don't know. I was, basically, in Buffalo for much of the holidays. Then, after the holidays I came back.

Q. (By Ms. Brofsky) All right. I'm going to hand you what's being marked as Exhibit 25.

(Plump Deposition Exhibit No. 25 was marked for identification.)

A. I mean, I got the notice from Celtic Property Management.
Q. And when did you get that notice?
A. I got the notice in, like, December.
Q. So, then, you went to New York in December, at least before this appointment on the 15th, correct?
A. No, I think I -- I don't know. I don't remember when I got it, but I just know the process was getting starting around that time because I wasn't working.
Q. Did you receive the eviction notice before December 15th, 2021?
A. I don't recall.
Q. You went to an appointment in New York on December 15th, 2021?
A. Yes.
Q. And you were diagnosed with mild major depression, correct?
A. Yes.
Q. Is this the first time you've been diagnosed with MMD?
A. Yes.
Q. And you said that you spoke to the doctor's office about getting another copy of this

personal questions. And just rather than going to the particulars of everything, I just kept it very surface level.

Q. In December of 2021, you went to New York and you saw a doctor who diagnosed you with anxiety, correct?

A. Yes.

Q. At that point, your daughter and your daughter's mother were living in New York, correct?

A. Yes.

Q. You were going through eviction proceedings in Kansas City, correct?

A. Nothing official. The actual -- like, I got the initial letter that they were going to start the proceedings. I didn't get the actual notice until much later.

Q. So you received a letter indicating that you would be evicted if you didn't pay --

A. Correct --

Q. -- prior to going to New York?

A. -- correct.

Q. You mentioned gout. Have you seen the doctor for your gout?

A. Yes.

Q. Same doctor?

remember. But I know we had one phone conversation, and that's when I just -- the phone conversation was, like, the last time I communicated with her.

Q. I -- do you still have those text messages with Megen?

A. I have to look. I don't think so.

Q. Okay. We'll take a look. Add it to the list for our next break.

In this complaint you -- excuse me.

In the complaint, you have two counts of race discrimination. What facts support your claim that you have been discriminated against on the basis your race?

A. Well, so the communication between Kyle, Allison, and then the fact that I talked to people that were asked to report to a new role; whereas, I had to go through an interview process. And it wasn't even an official interview process. Like, I never physically filled out the online form saying that I was applying for a certain job. I just had a calendar invite to talk to someone. And, in that meeting, I found out what job I was supposedly applying for.

Q. Anyone in management ever make negative

comments about your race?
A. Not that I can recall.
Q. Are you assuming that your race was involved in the decisions that you mentioned earlier?
A. I'm assuming it might have had a factor.
Q. And why are you assuming that?
A. Because I was treated differently than some of my coworkers.
Q. And the specific alleged difference is the three individuals, one of whom is Liz Rose, the other two whose names you can't recall, that you believe were moved over to service, correct?
MS. PAULUS: Objection. Misstates prior testimony. You can answer.
A. I just know that --
(Stenographer asks for clarification.)
MS. PAULUS: I said, objection, misstates prior testimony. And then I said you can answer.
A. I just know that they were asked to report to a different department.
Q. (By Ms. Brofsky) But you don't know if they were asked to report to a different

And you responded, no, that was not accurate. Do you recall that?
A. Yes.
Q. And you did make a complaint to human resources in December of 2021; is that correct?
A. I believe that's correct, yes.
Q. And when you complained to human resources, you didn't use the term "race discrimination" or "discrimination because of race," correct?
A. Not directly, no.
Q. And is there any -- well, strike that.
At the time that you complained to human resources, did you believe that your race may have something to do with the concerns that you were bringing to human resources' attention?
MS. BROFSKY: Objection. Leading and form.
A. So, yes, I believe that it had a -- it was a factor in the way I was being handled, but I was trying to -- I was trying to be diplomatic in my email to -- to the HR person.
Q. And did you have any kind of concern if you would have stated outright that you believed

your race was the reason for the concerns that you were bringing to HR?

MS. BROFSKY: Objection. Leading. Objection to form.

A. I was concerned about it. And that's part of the reason why I just wanted to -- I wanted HR to -- to, kind of, connect the dots on what I was trying to say, and let me know what their findings were.

Q. (By Ms. Paulus) And you've testified that you believed your interactions with your last supervisor, Allison, were almost all negative; is that correct?

A. I don't remember a positive one.

Q. So, yes, you --

A. Yes, pretty negative.

Q. And did you believe that Allison's communications with you may have been harsh or harsher as compared to any of your white coworkers or colleagues?

MS. BROFSKY: Objection, form. Objection, leading. Objection, facts not in evidence.

A. So one thing I can say is, I would notice in my conversations with Allison, they were usually

not favorable conversations. And, like, when I was getting coaching -- like, say, for instance, if I failed a call, it was a really ticky-tacky -- it would be a really ticky-tacky reason for me failing.

Like, for instance, when -- the one that I always lean on because this is the one that stood out -- this is the moment that I realized I was probably getting a different type of treatment. Again, you're supposed to ask -- when you're talking to a customer, you're supposed to ask if there's more -- if there's somebody else that needs to be insured besides the customer. And I asked that question. But because I didn't ask it in a specific manner it was -- it was graded a failed call.

So that was just, kind of, the moment I realized that I was -- I might be getting a different type of treatment from anybody else.

Q. And the individuals that you referenced in your earlier testimony who were placed in positions in service and that you believe didn't have to interview for the position, or just -- no, no, I'll leave that there, that didn't have to

EXAMINATION

BY MS. BROFSKY:

Q. Mr. Plump, you testified that you've never complained of race discrimination. You're not changing that testimony, are you?

A. So, the question was, did I report to the HR person that I was being -- that I felt like I was being discriminated against race.

Q. And the answer is no, correct?

A. I didn't communicate to the HR person that I felt like I was being discriminated against race, but I definitely felt like race had a play -- a play in what was going on.

Q. And when did you come to believe that?

A. Just from interactions with Allison Selg.

Q. Did you come to believe there was race discrimination after talking to attorneys?

A. No.

Q. Is your entire -- strike that.

Is the basis for your belief that -- that any decision was made based on your race due to the sole fact that you're not Caucasian?

MS. PAULUS: Object to form.

A. Repeat the question?

Q. (By Ms. Brofsky) Yeah, that was a poorly-worded question.
The only reason you think that any decision was made based on your race is because you happen to be black, correct?
MS. PAULUS: Object to form.
A. I think my blackness had a hand in it because, if you look at my numbers, I was a high-performing agent.
And I constantly got calls -- well, customers wanting to talk to my supervisors about how well I did. So I didn't see anything in my -- my productivity that would have led to needing to be positioned into another position.
And, if anything, just based on the amount of comp calls I was getting, if it was a legitimate interview for service, I should have been a shoo-in to -- to fill a service role.
Q. Did you want to work in service?
A. I wanted to stay with GEICO.
Q. My question is: Did you want to work in service?
A. If working at -- so my attitude was, if working in service kept me in the seat long enough