# Plf.'s Exhibit 5

Deposition of Meghan S. Beaver

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DION PLUMP,
Plaintiff,
vs.
GOVERNMENT EMPLOYEE INSURANCE COMPANY,
Defendant.

Case No. 2:22-cv-02498

CERTIFIED ORIGINAL TRANSCRIPT

REMOTE DEPOSITION OF MEGHAN S. BEAVER, a Witness, taken on behalf of the Plaintiff before Linda M. Wilson, CSR No. 1391, CCR No. 988, pursuant to Notice on the 3rd day of August, 2023, with all parties, including the witness, appearing via mobile videoconference.

A. She met expectations.

Q. When you say she met expectations, are you referring to the company's expectations or yours as her direct manager?

A. The company's.

Q. Why did Ms. Selg leave her employment with GEICO?

A. She left voluntarily.

Q. About how many MOAT sales agents report to each supervisor?

A. Currently the lowest I have reporting to a supervisor is five and the most I have is nine or ten.

Q. Do the MOAT sales supervisors need to have your approval as a MOAT sales manager for any corrective action that is issued to the representatives or agents on their team?

A. Yes.

Q. What does that approval process specifically look like?

A. Any time there is corrective action, it is submitted to our HR team and I am included on the submission, whether it be via e-mail or any other means. Our HR team reviews it and approves it and then we issue it and generally I am involved in the

issuance of it.

Q. When you say generally you are involved in the issuance of it, do you typically deliver it directly to the sales agents or are you present when it's issued by the supervisor? What do you mean by that?

A. Depending on the supervisor's experience with issuing using corrective action, I will be present while they administer it or I will administer it and have them present.

Q. What are some of the criteria that MOAT sales supervisors are measured on?

A. Currently for performance, they are measured on points for their associates. Survey percent excellent and I am blanking on the third thing that they're measured on right now.

Q. Okay. So when you say they are measured on points for their associates, what points are you referring to? What does that mean?

A. There is a point value associated with every policy form, so when an associate sells a policy, they receive a certain number of points based on that sale and the average number of points per associate falls on the supervisor's performance criteria.

go off the record for a couple of minutes.
(Off-the-record discussion.)
MS. PAULUS: Let's go back on.
BY MS. PAULUS:
Q. Ms. Beaver, do you recall when approximately you first became aware of a licensing issue with Mr. Plump?
A. Yes.
Q. When was that?
A. In November of 2021.
Q. How did you become aware of that issue?
A. I don't recall.
Q. Once you became aware of it, however that may have been, what steps did you take kind of in response to that issue with Mr. Plump?
A. So there were already steps being taken at the time I became aware of it. The licensing supervisor and manager were already reviewing to see if we were able to obtain the license or appeal the denial, and upon learning that we could not appeal the denial, they were reviewing options for a move outside of MOAT sales.
Q. When you say options, are you referring to potentially transfer to a different

of associates who were denied licenses at that point in time for other states.

Q. Since the time that you held the MOAT sales manager position in Kansas City or at that Lenexa, Kansas location, have you terminated any other sales agents within that department for not having required licenses for any states?

A. Yes.

Q. How many?

MS. STEELMAN: Objection, form. Katherine, if I could just ask, are you asking for her personal knowledge since she held that role in November 2021?

MS. PAULUS: I am going to ask you not to make speaking objections. It's inappropriate under the District of Kansas guidelines, but I am happy to rephrase my question.

BY MS. PAULUS:

Q. I'm asking how many do you recall terminating for not having a required state license within that department since the time you held that role which would have been November 2021 through the present?

A. At the moment, I can recall two.

Q. Is that two other than the plaintiff

in this lawsuit, Mr. Dion Plump, or does that include him?

A. Outside of Dion.

Q. So do you recall the names of either of those individuals?

A. Yes.

Q. What were their names?

A. Eric Roberts and I don't recall the second name.

Q. Do you recall which state license Mr. Roberts did not have?

A. Kansas.

Q. The other individual, do you recall which state license that individual did not have?

A. They did not pass the licensing exam.

Q. Do you recall with Mr. Roberts, whether his Kansas license was denied, do you recall?

A. Yes.

Q. How soon after his license was denied, approximately, was he terminated?

A. Three months.

Q. For the other individual that did not have their licensing exam, when in the process after a sales agent is hired by GEICO, where in the training process do they take their licensing exam,

how soon does that occur after they are hired?
A. They start on a Monday and they take their licensing exam the following Thursday.
Q. What kind of training do they receive for that exam?
MS. STEELMAN: Objection, form. You can answer if you know.
A. They receive group training by a licensing instructor starting Tuesday, the day after they begin through the day before their exam.
BY MS. PAULUS:
Q. And that licensing exam they take, is that a universal exam that is required for every state license?
A. There is a different exam depending on which state they live in.
Q. So it's dependent on where they live or what state they work in for that licensing exam?
A. Where they live.
Q. So even if they work at the Kansas location, if they live across the state line in Missouri, they have to take the Missouri state licensing exam initially?
A. Yes.
Q. Ms. Beaver, I am going to show you --

their time.
Q. The final e-mail on this thread response from the Kansas City HR compliance box: Hi, Meghan, I am going to be reaching out to him. I will let you know as soon as I have been able to make contact.
And I have an understanding that that is Meaghan Urban. Does that match your understanding?
A. Yes.
Q. So going back to the e-mail that you sent on January 24, 2022, you reference that you previously were unable to move forward with a call avoidance warning/termination due to licenses. Do you see that?
A. Yes.
Q. Had you made prior attempts to issue a call avoidance warning corrective action to Mr. Plump at some point?
A. Sorry, can you re-ask the question?
Q. Yes. Here on January 24, 2022 you made a reference to saying we were previously unable to move forward with the call avoidance warning plus termination due to licenses since we couldn't get his statement, and then my follow-up question was had you

made an effort prior to this date, January 24th, 2022, to issue a call avoidance warning or to terminate his employment due to not having a required license?

A. Are you asking if I had made the effort to issue it directly to Dion or are you asking if I had made the effort to engage with HR on the related matter?

Q. For clarification, the latter.

A. To my understanding I had. Given that this chain began on December 23rd of 2021, and I was then following up on it almost a month later or over a month later.

Q. Do you know why you reference that Dion now has access to his e-mail/phone in your e-mail on January 24th, 2022?

A. Yes.

Q. Why was that that you were referencing that?

A. Dion -- I don't recall if Dion advised us that he was seeking help in a mental health facility or if his emergency contact stated that to us, but I was aware at that time that he did not have access to his phone previously due to seeking help in a mental or behavioral health facility.

Q. So it was your understanding that he now had access to e-mail and phone and you were attempting to move forward with prior efforts to issue corrective action or terminate his employment?

MS. STEELMAN: Objection, form. You can answer.

A. Can you restate your question?

BY MS. PAULUS:

A. So you had an understanding, then, that as of January 24, 2022, that because he now had access to his e-mail and phone, you were asking HR for assistance in moving forward with the prior efforts made to issue him a call avoidance warning, corrective action or to terminate his employment due to not having required licensure, correct?

MS. STEELMAN: Objection, form. You can answer.

A. That is my understanding, yes. In this e-mail I say we were unable to move forward due to not being able to get his statement, so with him now having access to his phone, we would be able to get his statement.

BY MS. PAULUS:

Q. I will stop sharing the screen. During the time period that you were managing

California call avoidance is occurring through the California transferred calls. So if that was the case, then -- or if I was -- if I saw California calls recorded that were transferred out where he was able to handle, then that is the path that I would then take.

BY MS. PAULUS:

Q. And if there wasn't recording of that, then was the intention to terminate Mr. Plump for the license issue?

A. Correct.

Q. I am going to move on to this page of plaintiff's Exhibit 24 and I am going to have to rotate it again, so please bear with me just a second. And this page document is also Webex, your Webex chat screenshot.

A. Yes.

Q. This one is between you and Meaghan Urban, is that correct?

A. Yes.

Q. Same question for this page, is it still a screenshot from your Webex chats with Megan Urban?

A. Yes.

Q. That's in February of 2022, is that

correct?
A. Yes.
Q. I want to ask you to review this page here and let me know if you need me to scroll. I am just asking you to review the contents of this particular page of Exhibit 24.
A. Okay.
Q. In one of the messages here from Ms. Urban to you, and this is February 9th, 2022, I will indicate here with my cursor so you can see what I am referring to. Ms. Urban asks you: As far as the service position, I want to make sure I am outlining correctly to them. Service spoke with Dion about moving to service, even though he didn't want to, but ultimately you decided not to allow the move because of the concern over call avoidance and you confirmed with them that it would be an issue in service as well.
Did I read that correctly?
A. Yes, you did.
Q. Does that match your recollection of what had occurred when the transfer for Mr. Plump to the service department was contemplated?
A. Close. So in terms of who was making the decision to not allow him to move to service, I

was not the service hiring manager so ultimately that would have been the service managers deciding that due to the call avoidance concerns, they did not want to have him move into the service department.

Q. So when you responded back to Ms. Urban, That is correct, you didn't note that you were not the decision-maker on deciding not to allow him to transfer into service, is that correct?

MS. STEELMAN: Objection, form.

BY MS. PAULUS:

Q. I'm sorry, did you answer?

A. Sorry. I didn't -- I did not correct her at the time, that's correct.

Q. Finally just on this last page of plaintiff's Exhibit 24, these are also Webex chats between you and Ms. Urban from December 9th of 2022, is that correct?

A. That's correct.

Q. I will stop sharing my screen here.

MS. PAULUS: I don't have any further questions for you, Ms. Beaver. I will pass the witness.

EXAMINATION

BY MS. STEELMAN:

Q. Ms. Beaver, did Mr. Plump ever make

any complaints of race discrimination to you?
A. Not to my knowledge.
Q. To your understanding, are state insurance license appeals and denials sent to associates or to GEICO?
A. Associates.
Q. Are you aware of any other MOAT sales representatives that have been unable to appeal a license denial from a state licensure department?
A. No.
Q. Did you perform any of Mr. Plump's performance appraisals?
A. No.
Q. To your recollection, were any of Mr. Plump's transfer calls related to jewelers, mutual or identity theft?
A. No.
MS. STEELMAN: No other questions at this time.
MS. PAULUS: Nothing for me.
(Deposition adjourned at 3:47 p.m.)