# Plf.'s Exhibit 8

Deposition of Meaghan Urban

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DION PLUMP,
Plaintiff,
vs. Case No.
GOVERNMENT EMPLOYEE INSURANCE 2:22-cv-02498
COMPANY,
Defendant.

CERTIFIED ORIGINAL TRANSCRIPT

REMOTE DEPOSITION OF MEAGHAN N. URBAN, a Witness, taken on behalf of the Plaintiff before Linda M. Wilson, CSR No. 1391, CCR No. 988, pursuant to Notice on the 3rd day of August, 2023, with all parties, including the witness, appearing via mobile videoconference.

him specifically at that time?

A. I was reviewing my knowledge of his position as a sales agent and that in order to sell insurance in the State of Kansas, he needs to have a license to sell insurance and that is the requirement for his position because without it, he could not be able or do his position.

Q. How did you come to have the knowledge that the licensing requirements sometimes change based on business needs?

A. Because I have -- I've been at work for GEICO many years. I have had a license myself, I have been in a customer position where I needed to have the license, I have been in an underwriting position where I needed to have the license. I also have worked in the human resources department in both hiring where we tell candidates they need to have a license and I have worked in the associate relations position where this is something that is discussed regularly where you need to have licenses based on what calls are coming in. And in order to service or sell policies from outside of your state, you have to have a non-resident license.

Q. I am going to stop sharing my screen here. On the topics of discussion when you spoke

with Mr. Plump, what did you do to -- let's start with his concerns about the service position interview process. What did you do to investigate that particular concern that he raised?

A. I asked him for details on what his interview was, on who he interviewed with and when he raised concerns that this was not a process that was done consistently according to him. I asked him for any people with information or anybody that could give me the details of what they experienced. He mentioned somebody that he knew, a colleague of his that didn't have the same experience. I asked for that person's information, he did not tell me that information. And then after that I spoke with Nick Reed, the licensing supervisor about his licensing and I asked him if he was part of the process for changing positions. I believe he said he wasn't in that decision-making process. Then I talked to his manager, Meghan Beaver, and asked her for what happened as far as the transfer between the two different departments, and she provided me information based on her own knowledge as well as verifying with the parties who did speak with Dion.

Q. Ms. Urban, I am going to share my screen again. I am going to show you what is marked

as plaintiff's Exhibit 12.

A. Can you make that bigger, please?

Q. This is GEICO 535 through 537. I am actually going to start at the bottom here since this is an e-mail thread and I think it's reversed chronological order here. Let me know when you need me to scroll up, Ms. Urban. I am going to ask you to review this document.

A. You can scroll up. You can scroll up. You can scroll up. I don't know if there is anything else.

Q. That's it. Ms. Urban, have you had a chance to review this document?

A. Yes.

Q. And with the exception of the first e-mail on this thread, this appears to be an e-mail exchange between you and Nick Reed on December 20th through December 22nd of 2021, is that correct?

A. Yes.

Q. Is this the information that you sought from Mr. Reed about Mr. Plump's New York licensing and that process that you referenced earlier?

A. Part of it. I also spoke with him directly.

Q. Understood. Do you believe that you spoke with him prior to this e-mail exchange?
A. I can't recall.
Q. Here in the e-mail from Mr. Reed to you, the one that was sent on Wednesday, December 22nd, 2021, he lays out a timeline of the application and denial dates for Mr. Plump's New York license, is that correct?
A. Yes.
Q. And the second bullet point under his timeline states: KC MOAT licensing unit created 8/23.
Did I read that correctly?
A. Yes.
Q. And do you know what the KC MOAT licensing refers to? Is that an internal department or group that was created, to your knowledge?
A. Yes.
Q. And prior to the KC MOAT licensing unit created, to your knowledge what team or personnel within GEICO were responsible for assisting the licensing process for MOAT sales agents?
A. There was a team out of our Dallas office who handles multiple different offices including the Kansas City office and handled all of

communications from New York. Please let me know if there is anything else you need.

Did I read that correctly?

A. Yes.

Q. I'll stop sharing my screen. So I want to make sure I understand. In this e-mail exchange with Mr. Reed you also recall speaking with him and you also spoke with Ms. Beaver, is that correct?

A. Yes.

Q. And with Ms. Beaver, you were getting information about why Dion was interviewed for the service position? Is that the reason why you spoke with Ms. Beaver?

A. I can't recall all of the topics we spoke about. I'm not sure if it was just specifically about that, but I know that that topic was one of the things I spoke with her about.

Q. Ms. Urban, I am going to share my screen again. I will zoom in. This is plaintiff's Exhibit 13 and it is GEICO 361 to 362. As you can see underneath your e-mail signature, there is no other content on that second page. I'll zoom in and please let me know when you've had chance to review and when you need me to scroll.

A. Can you zoom in a little bit for me, please. And can you scroll up. I am just not sure who this was to. Okay, thank you. You can scroll down. Okay, you can scroll down. Okay.

Q. Have you had a chance to review this document, Ms. Urban?

A. Yes.

Q. Do you recognize this document?

A. Yes.

Q. And this appears to be an e-mail to Mr. Plump from you through the Kansas City HR compliance box sent on Wednesday, December 15, 2021 providing leave information, is that correct?

A. Yes.

Q. Does this refresh your recollection as to whether you had provided this information directly to Mr. Plump?

A. Yes.

Q. I'll stop sharing my screen here. Ms. Urban, I am going to share my screen again and show you what I marked as plaintiff's Exhibit 14. Mr. Urban, I am going to ask you to review this document. Do you need me to zoom in at all?

A. Yes, please.

Q. Let me know when you need me to

scroll.

A. You can scroll. Okay. Okay. Okay.

Q. Ms. Urban, I will represent that this document was produced to us with the name of the individual, the associate redacted. I will ask you if you recognize plaintiff's Exhibit 14?

A. Yes.

Q. And what is it?

A. This would have been my notes from an interview with one of Dion's peers.

Q. I believe you testified earlier you don't recall who that individual was?

A. No, I do not.

Q. And here where I'm indicating with my mouse icon you asked a question: When are you coached, how often, for how long? And this individual responds: Alison has been pretty aggressive with that. She's a brand new supe, so I think she wants to make her mark. I would say we have meetings with the whole team when we go over things. I think we've been talking and coaching twice a week. We communicate every day on Webex.

Did I read that correctly?

A. Yes.

Q. And you asked the follow-up question,

communication.

Q. So would another way to say that is there were issues regarding communication with the management team and the Dallas licensing team was the conclusion that you reached?

A. I wouldn't say that I said that there were opportunities regarding communication.

Q. Right, but opportunities is kind of one of those that says maybe something that is used internally as a corporate terminology. I just want to make suer I am understanding what you're stating there. When you say opportunities for improvement or opportunities regarding communication, what led you to that conclusion?

A. My investigation.

Q. What specifically from your investigation led you to that conclusion?

A. In speaking with the parties involved and getting the timeline from Nick Reed, my overall investigation into the concerns.

Q. Right. And, Ms. Urban, what specifically from Mr. Reed or from other aspects of your investigation led you to believe there were opportunities regarding communication with the management team and the Dallas licensing team?

A. In the timeline below you can see Dion's denied license, denied New York 8/9, not uploaded to file by R5. R5 references the Dallas licensing team. That's one of the things that would have keyed that in to me and the timeline of events. License was denied in August of 2021, but it was applied for in June of 2020 and we were -- we did not have the upload that was necessary. So there was some communication that needed to happen that did not happen to our management team.

Q. So in that bullet point timeline event after KC licensing took over, the second kind of sub-bullet point there says: KC MOAT licensing unit created 8/23, and then there's three initial sub-bullet points under that. Are those sub-bullet points there where you kind of -- the timeline of KC MOAT licensing unit's involvement?

A. The bullet point there is to help identify why there is a difference in the timeframe. So the licensing unit was created in August and was advised of missing licenses in October and we wanted to provide some explanation as to why there was seeming delay in that. And that they were focusing on the folks who were new to the company and needed to get their licenses immediately to even be able to

A. Yes.

Q. Did you provide feedback to the supervisor that gating should be checked and that associate should be given a contact when the supervisor is out of the office to provide support and help with tech issues like gating?

A. I don't recall if I gave it to Alison or if I spoke with Meghan Beaver about that. I honestly don't remember.

MS. PAULUS: Let's take a ten-minute break.

(A short recess was taken.)

BY MS. PAULUS:

Q. Ms. Urban, we're going back on the record.

A. Um-hum.

Q. I want to back up just a little bit and ask you about what I am sharing on my screen and marking as plaintiff's Exhibit 16.

A. Okay.

Q. And I actually -- this is 411 through 412. If you need me to zoom in a little bit. I am going to ask you to review this and let me know when you need me to scroll down.

A. Okay, you can scroll down. Okay, you

can scroll down. Okay. Okay. Okay. Okay.

Q. Ms. Urban, do you recognize the document marked as plaintiff's Exhibit 16?

A. Yes.

Q. What is it?

A. These would be notes with another one of Dion's peers.

Q. Similar to what we looked at earlier, notes from one of the -- I believe you said two peer individuals you interviewed as part of investigating the complaints raised by Mr. Plump, is that correct?

A. Yes.

Q. So those are dated December 16, 2021, and, again, I will represent to you this was produced to us with the name of the associates who you interviewed redacted and I believe you testified earlier you do not recall the names or the genders of either of the individuals that you spoke with as part of the investigation, is that correct?

A. Correct.

Q. Do you recall the race of either of the individuals that you spoke to?

A. I do not.

Q. I'll stop sharing my screen. I am going to share my screen again, Ms. Urban, and this

is marked as Exhibit 17. It's GEICO 413. I am going to ask you to review this, Ms. Urban, and let me know when you need me to scroll down. It's just a single page.

A. Can you scroll down, please. Okay.

Q. Ms. Urban, do you recognize this document that I am marked as plaintiff's Exhibit 17?

A. Yes.

Q. What is it?

A. This would be a discussion or interview I had with Nick Reed.

Q. This was a discussion that you had with Mr. Reed as part of your investigation into Mr. Plump's concerns?

A. Yes.

Q. And you had asked Mr. Reed: Can you tell me about how you decide on what is a required state? And he responded: Any state that ten percent of their calls or more is now a required state in sales.

Did I read that correctly?

A. Yes.

Q. Then you asked: If someone doesn't have a required state license, how do you determine if it's impactful? Mr. Reed responded: If transfer

A. At that time I attempted to, but I wasn't able to meet with him. Part of the reason that the information was sent to Chelsea besides letting her know the information was because I was going to be out of office for a period of time, too, and she would have met with him. I believe she tried to, but wasn't able to. I think he went out of the office or was not available.

Q. Was there any point at which the information from the investigation, to your knowledge, was -- or the outcome of your investigation I should say -- to your knowledge was there any point at which that information was conveyed to Mr. Plump?

A. Yes.

Q. And when was that, to your knowledge?

A. I believe in February.

Q. I am going to share my screen again. Ms. Urban, I am going to show you what I am marking as plaintiff's Exhibit 18. I actually included one page in error here. This is GEICO 260 through 262. I am going to zoom in a little bit. Ms. Urban, before I ask you to review any of the contents of this document, plaintiff's 18, I just wanted to ask you, this appears to be an e-mail from you to Meghan

Beaver with the subject line Dion Plump term memo updates dated Tuesday, February 8, 2022 with an attachment of the Dion Plump term memo, is that correct?

A. Yes.

Q. Now, I will give you an opportunity to review the contents of it. Please let me know when you need me to scroll. I'm just going to get the header out of the way.

A. Okay, you can scroll down. Okay, scroll. Okay. Okay. Okay.

Q. So just going back to the purpose of this e-mail, you are responding or you were sending an e-mail to Meghan Beaver regarding the term memo that she had prepared, termination memo for Mr. Plump that she had prepared? Is that what the purpose of this e-mail was?

A. Yes.

Q. And so you indicate that: For the term memo, corporate would like a more in-depth explanation of the events that led to this review and the results of the investigation included in the term memo. Since I am familiar with both, I reviewed what they were looking for with him. I have drafted up the following to more clearly outline to corporate